IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUDGE AMY ST. EVE

04C 7071

| | | |
|---|---|---|
| CHARLES SCHWAB & CO., INC.<br><br>Plaintiff,<br><br>v.<br><br>BRIAN D. CARTER, ACORN ADVISORY MANAGEMENT, L.L.C., and ACORN ADVISORY CAPITAL, L.P.,<br><br>Defendants. | ) | Judge:<br><br>Magistrate Judge: MAGISTRATE JUDGE KEYS<br><br>Case No.: |

FILED FOR DOCKETING
ED-7
04 NOV -2 PM 3:53
CLERK
U.S. DISTRICT COURT

DOCKETED
NOV - 3 2004

**VERIFIED COMPLAINT**
**FOR TEMPORARY RESTRAINING ORDER,**
**PRELIMINARY INJUNCTION, AND OTHER RELIEF**

Plaintiff Charles Schwab & Co., Inc. ("Schwab"), by its attorneys, brings this action for immediate injunctive and other relief. Schwab complains as follows:

**CASE OVERVIEW**

1. This action arises out of the actual and threatened misappropriation of confidential business information by Defendants. Prior to defendant Brian D. Carter's ("Carter") resignation from Schwab, he was the Director of Information Technology for Schwab Soundview Capital Markets' Investment Analytics division ("IA"). Carter resigned without notice on October 22, 2004, to join defendant Acorn Advisory Management, L.L.C. and/or defendant Acorn Advisory Capital, L.P. (collectively, "Acorn").

2. Prior to November 1, 2004, IA had been in the business of providing proprietary analytical research to approximately 100 institutional clients. The analytical research distributed by IA was derived from approximately eighteen, trade secret financial models (the "Models"), which are confidential, complex analytical formulations prepared over many years by and at great expense to Schwab.

H

3. Carter served IA in a supporting, technology capacity. He did not develop the IA Models or provide ongoing analytical research used to maintain the Models. IA employed numerous highly trained analysts (PhDs and MBAs) who, working with Carter, ran and maintained the IA Models for Schwab.

4. In or about September 2004, Schwab announced it was closing IA, effective November 1, 2004. In connection with the closing of IA, Schwab offered its IA employees generous severance packages or employment within other areas of Schwab.

5. On October 1, 2004, Acorn made a written offer to acquire IA. Acorn and its affiliates manage in excess of $750 million in hedge fund assets and had been one of IA's institutional clients. Acorn expressed interest to Schwab in acquiring IA's Models, because, on information and belief, Acorn appreciated the value of IA's Models, including to Acorn's hedge fund business. Acorn proposed to acquire all of IA's intellectual property, including specifically the proprietary Models IA had developed, as well as six IA employees, including Carter and several of IA's analysts.

6. Schwab rejected Acorn's offer. The Models IA used are closely related to the proprietary financial models Schwab continues to use in connection with Schwab Equity Ratings, the investment research offered to its retail client base. Schwab has made substantial investments in developing and advertising its Schwab Equity Ratings, and that service is a vital component of Schwab's retail client offering. Accordingly, to maintain the competitive value of the models used for its retail client base, Schwab decided to retain IA's confidential intellectual property, including the Models.

7. On information and belief, on or about October 15, 2004, *after* Schwab rejected Acorn's offer to acquire IA, Acorn made offers to employ Carter and several of IA's analysts. On information and belief, all IA analysts rejected Acorn's employment offers on or about October 18, 2004.

8. Although all of the IA analysts Acorn had hoped to hire declined Acorn's offer, Acorn did not withdraw its offer to Carter. On October 18, 2004, on information and belief in preparation for joining Acorn, Carter e-mailed confidential data to Acorn relating to certain of the outside data sources used in IA's Models.

9. On Thursday, October 21, 2004, also on information and belief, in continuing preparation to join Acorn, Carter came to work at IA's office with a powerful, new, laptop, containing a DVD burner, suitable for copying massive amounts of digital information, such as IA's Models. This laptop was either Carter's personal property or the property of Acorn; it was not one of the laptops Schwab provided Carter for use on Schwab's behalf. On information and belief, Carter copied IA's Models using this new laptop. On information and belief, Carter copied the Models on behalf of and/or for the benefit of his future employer, Acorn.

10. Carter had previously told colleagues at IA that he had or was going to copy and keep IA's Models. When told by a subordinate IA employee that such conduct was illegal, Carter argued that it was not because Schwab was closing IA.

11. On October 22, 2004, the day after appearing in IA's offices with the new laptop with DVD burner, Carter resigned from Schwab without warning. Had Carter remained at Schwab for another week, he would have received a severance package from Schwab.

12. On information and belief, Acorn paid Carter a substantial amount of money to induce him to join Acorn before his severance payment from Schwab was paid to him and to bring along to Acorn the IA proprietary information Carter had copied, including the IA Models.

13. On information and belief, Acorn does not have an office in Illinois. On information and belief, Carter's value to Acorn is primarily the proprietary IA Models Carter unlawfully misappropriated from IA.

14. Defendants' conduct is already causing irreparable harm and threatens further irreparable harm to Schwab through the misappropriation and misuse of trade secret and other confidential information, and harm to Schwab's business.

15. Defendants' conduct against Schwab, which is described in more detail below, constitutes unfair competition, breach of fiduciary duty, inducement to breach fiduciary duties, misappropriation of trade secrets and conversion. Carter's conduct also violates Schwab's confidentiality policies to which Carter agreed as a condition of and throughout his employment with Schwab.

16. By this action, Schwab does not seek to restrain Carter from working for Acorn. Rather, Schwab seeks immediate injunctive relief to prevent Defendants from using and profiting from the information Carter has no right to retain or share with Acorn.

## PARTIES

17. Schwab is a full service investment and securities firm. Schwab is a California corporation with its principal place of business in San Francisco, California.

18. Brian Carter currently resides in Tinley Park, Illinois.

19. Acorn Advisory Management, L.L.C., is a diversified portfolio of hedge-fund assets. Acorn Advisory Management, L.L.C. is a Delaware Limited Liability Company with its principal place of business in New York, New York.

20. Acorn Advisory Capital, L.P. is a Delaware limited partnership affiliated with Acorn Advisory Management, L.L.C. with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

21. This District Court has personal jurisdiction over Defendants because they reside and/or do business in this District.

22. The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity exists between the parties and the amount in controversy exceeds $75,000, including, without limitation, the value to Schwab of the injunctive relief requested herein.

23. Venue also is proper in this District because Carter resides in the District and the events giving rise to the claims at issue in this Verified Complaint occurred here. See 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

### A. Carter received access to Schwab's confidential information pursuant to his fiduciary and contractual relationship with Schwab.

24. Schwab acquired IA's predecessor for substantial consideration, in part to acquire IA's proprietary Models and other intellectual property IA owned. Through IA, Schwab generated and maintained substantial amounts of confidential information, including proprietary investment research strategies and analytical tools. The Models provided Schwab with a competitive edge in the marketplace, and have substantial worth. The complex Models were kept confidential and were not disclosed to customers of IA or other individuals outside of Schwab.

25. Schwab used the IA Models in developing similar models now used by Schwab Equity Ratings, which serves investment research needs of Schwab retail clients. Thus, despite Schwab's determination in 2004 to close IA, the continued confidentiality and protection of trade secrets generated and maintained by IA provides Schwab with a continuing competitive advantage in other areas of its business.

26. To protect the confidentiality of its trade secret information, Schwab has instituted numerous policies and precautions. Schwab has security at all of its offices and restricts access

to confidential information on a need-to-know basis. Schwab also has other security provisions, including computer pass codes and detailed security procedures.

27. To further protect the confidentiality of its information, Schwab also has confidentiality policies to which Carter agreed. For example, as recently as February 2004, Carter signed a Charles Schwab Confidentiality, Nonsolicitation and Assignment Agreement (the "Confidentiality Agreement"), expressly agreeing to protect the confidentiality of Confidential Information owned, maintained, or developed by Charles Schwab. A true and correct copy of the Confidentiality Agreement signed by Carter is attached hereto as Ex. A.

28. The Confidentiality Agreement defines Confidential Information to include Schwab's confidential and trade secret information. *See* Ex. A at § 1.

29. Pursuant to the Confidentiality Agreement, Carter agreed as follows (at § 4):

> I . . . will not, for any purpose, directly or indirectly, disclose, reproduce, use, or disseminate in any manner during or after my employment with Schwab, on my own behalf or on behalf of any other person, company or entity, any Confidential Information.

30. Carter further agreed (at § 8):

> I agree that during my employment with Schwab, I will not remove any property of Schwab in original or copied form, including, but not limited to, any Confidential Information existing in any form from Schwab's premises, except as required in the ordinary course of my duties at Schwab and as necessary for me to perform my duties. I agree that I will promptly return to Schwab immediately upon Schwab's request, my acceptance of other employment, or the termination of my employment for any reason, any and all documents and materials that contain, refer to, or relate in any way to any Confidential Information, as well as any other property of Schwab in my possession or control . . .. I further agree that I will permit Schwab to inspect any materials provided by Schwab to me or developed by me as a result of or in connection with my employment with Schwab when I accept other employment or otherwise separate from my employment, regardless of where said materials are located.

31. In the Confidentiality Agreement, Carter also agreed that in the event of a breach of the Agreement by Carter, Schwab was entitled to injunctive relief including specifically (at § 11(a)):

> I specifically CONSENT TO THE ISSUANCE OF INJUNCTIVE RELIEF ordering, among other things: . . . (a) that I return to Schwab all records of any kind or nature (including but not limited to original and duplicate, typed and handwritten, soft (electronic, diskette) and hard copy and any other form) containing, referring to, or otherwise based on Confidential Information, and that I be prohibited from using or disclosing such records or the information in such records.

32. In reliance on his promises to maintain the confidentiality of Schwab's confidential information, Carter was furnished with and granted access to substantial amounts of Schwab's proprietary and confidential information.

33. At the time of Carter's resignation, he had access to the entire information network of the IA division, including access to the Models, the production platforms on which the Models were processed, and customer information.

**B. Carter breached his duties to Charles Schwab, including by misappropriating its confidential information.**

34. While still serving as an employee of Schwab and in a position of trust and confidence at Schwab, Carter coordinated with Acorn to divest Charles Schwab of proprietary and confidential business information.

35. On information and belief, Defendants agreed that Carter would resign from Schwab without waiting one additional week for the severance package being offered by Schwab and would bring along copies of IA's models and other confidential information useful to Acorn in its business.

36. On information and belief, Defendants have converted Schwab's confidential business information, including misappropriated copies of IA's Models. This information is Schwab's property and contains Schwab's proprietary and trade secret information.

37. While Carter was entitled to have access to and to use this information to perform his duties for Schwab, he had no authorization or right to copy all or part of such records for

personal use and was specifically required by his Confidentiality Agreement and Schwab's policies to return all such records and copies thereof to Schwab upon terminating from Schwab.

38. Schwab has uncovered powerful evidence of Carter's misappropriation and conversion of Schwab's business information. For example, on October 18, 2004, Carter sent an email to Gary Sabot, a manager at Acorn, attaching documents that could facilitate Acorn's access to an information database licensed by Schwab and used in connection with the proprietary IA Models. On information and belief, Carter also provided Acorn with additional information facilitating Acorn's unauthorized access to this information database.

39. On October 21, 2004, the day before he resigned, Carter came to IA's offices with a new, high-powered personal laptop computer – *i.e.*, not one of the computers issued to him by Schwab for use in connection with his work for Schwab. This new laptop computer contained a high-speed disc burner that allowed Carter to download and burn to a digital medium large amounts of data. On information and belief, Carter used this personal laptop computer to download and store copies of Schwab's confidential, trade secret information, including but not limited to copies of the Models, which Carter then removed from the Schwab IA office without authorization. Carter had informed other IA employees that he had intended to download information from Schwab's computers.

40. Schwab's confidential trade secrets, including the Models, are not publicly available and cannot be reconstructed from other sources. The Models represent years of investment, calculations, research, and refinement of strategies and analytical tools.

41. On information and belief, Carter copied and removed from Schwab's offices confidential information, including copies of the Models. On information and belief, this information was or is about to be delivered to Acorn.

42. In connection with the filing of this lawsuit, Schwab is demanding the return of all confidential information taken by Carter and received by Acorn.

C. **Defendants threaten to inflict serious and irreparable injury on Schwab.**

43. On information and belief, Defendants continue to have possession or control of Schwab's proprietary and trade secret information, including the detailed, confidential Models and other proprietary business information belonging to Schwab.

44. On information and belief, Defendants have used or are about to use the Schwab proprietary and trade secret information in their possession or control to do one or more of the following: (a) undermine Schwab's competitive advantages arising from its proprietary and trade secret information; (b) use Schwab proprietary and trade secret information to improve Acorn's own research technologies and strategies without compensating Schwab for the unauthorized use of this proprietary information; and (c) otherwise engage in acts constituting conversion and misappropriation of Schwab trade secrets and confidential information, breach of fiduciary duties, and other tortious conduct.

## COUNT I

## MISAPPROPRIATION OF TRADE SECRETS
## (AGAINST ALL DEFENDANTS)

45. Schwab incorporates the above allegations.

46. Schwab has protectable trade secrets in the Models and other confidential information to which Carter had full access while an employee of Schwab.

47. Schwab derives economic value from these trade secrets due to them not being generally known to other persons who could obtain economic value from their disclosure or use.

48. Schwab has made reasonable efforts under the circumstances to maintain its trade secrets' secrecy and confidentiality.

49. Defendants have misappropriated or threaten to misappropriate Schwab's trade secrets.

50. Schwab has been injured and is continuing to be injured by Defendants' misappropriation of its trade secrets.

**COUNT II**

**CONVERSION**
**(AGAINST ALL DEFENDANTS)**

51. Schwab incorporates the above allegations.

52. Defendants have wrongfully, and without authorization, retained possession, custody or control over files and information belonging to Schwab.

53. Schwab is the rightful owner of all copies of the Models, the platforms on which the Models are processed, customer records and information, and Schwab's business information taken by Carter at Acorn's direction or with Acorn's active support.

54. Schwab's right to possession of this property is immediate, absolute, and unconditional.

55. Schwab has been injured and is continuing to be injured by Defendants' misappropriation.

**COUNT III**

**BREACH OF FIDUCIARY DUTY**
**(AGAINST CARTER)**

56. Schwab incorporates the above allegations.

57. As an employee of Schwab who was allowed access to Schwab's confidential and other information, Carter owed Schwab certain fiduciary duties.

58. Among these fiduciary duties are the duty of loyalty and fair dealing while working for Schwab, the duty to advance the interests of Schwab, the duty to preserve Schwab's information, the duty not to destroy this information, and the duty not to use this confidential information in ways adverse to Schwab's interests.

59. Carter breached these duties by, among other things, converting Schwab's confidential and trade secret information to his personal use and the use of Acorn while affiliated with Schwab, and afterwards; using this information against Schwab's interests.

60. Schwab has been injured and is continuing to be injured by Carter's breaches.

**COUNT IV**

**BREACH OF CONTRACT**
**(AGAINST CARTER)**

61. Schwab incorporates the above allegations.

62. Carter signed and agreed to comply with the requirements set forth in the Confidentiality Agreement (Ex. A).

63. In this Confidentiality Agreement, Carter expressly agreed that he would not divulge and disseminate Schwab's confidential and proprietary information.

64. These terms are reasonable in that they impose restraints on Carter that are no greater than required to protect Schwab's legitimate interests, do not impose undue burden on Carter, and are not injurious to the public.

65. These terms protect Schwab's legitimate interests in its trade secret and other confidential information and in its goodwill.

66. Carter has willfully breached the terms of his Confidentiality Agreement by, among other things, converting to his personal benefit and the benefit of Acorn confidential business information owned and maintained by Schwab.

67. Schwab has been injured and is continuing to be injured by Carter's breaches.

**COUNT V**

**AIDING AND ABETTING AND/OR INDUCING A BREACH OF FIDUCIARY DUTY**
**(AGAINST ACORN DEFENDANTS)**

68. Schwab incorporates the above allegations.

69. As an employee of Schwab who was allowed access to Schwab's confidential and other information, Carter owed Schwab certain fiduciary duties.

70. Among these fiduciary duties are the duty of loyalty and fair dealing while working for Schwab, the duty to advance the interests of Schwab, the duty to preserve Schwab's

information, the duty not to destroy this information, and the duty not to use this confidential information in ways adverse to Schwab's interests.

71. On information and belief, Carter breached these duties by, among other things, converting Schwab's confidential and trade secret information to his personal use and the use of Acorn while affiliated with Schwab, and afterwards; using this information against Schwab's interests.

72. On information and belief, Acorn assisted Carter in breaching his fiduciary duties and/or induced Carter to breach such duties to Schwab through one or more of the following acts: (a) compensating Carter if he left Schwab abruptly and without notice; (b) encouraging Carter to misappropriate copies of the Models and other confidential Schwab information prior to Carter's resignation; (c) requesting that Carter provide Acorn with information Acorn knew was proprietary Schwab information; (d) offering Carter a performance bonus based on Carter's ability to provide Acorn with the Models and other Schwab proprietary information.

73. On information and belief, Acorn took such actions with knowledge that its actions would assist Carter in breaching his fiduciary duties and/or induced Carter to breach such duties to Charles Schwab.

74. Schwab has been injured and is continuing to be injured as a result of the Acorn Defendants' aiding and abetting of Carter's breach of fiduciary duties and/or the Acorn Defendants' inducement to Carter to breach fiduciary duties.

**WHEREFORE,** Schwab respectfully requests the following relief:

A. Direct Defendants to return all originals and copies of information, documents and other things taken from Schwab, including all copies of the Models and other Schwab business information in Defendants' possession or control, in hard copy or electronically stored (all electronically stored records must also be deleted permanently from Defendants' computers or other electronic memory files);

B. Enjoin Defendants, their agents, servants, employees, officers, attorneys, successors and assigns, and all persons, firms and corporations acting in connection or participation with them or on their behalf, from revealing,

disclosing or using in any manner information contained in the records of Charles Schwab, including the Models and any other Schwab business information;

C. Impose a constructive trust for Schwab's benefit on all proceeds of Carter's fiduciary breaches;

D. Award damages and attorney's fees and costs; and

E. Grant such other relief as just and appropriate.

November 2, 2004

Respectfully submitted,

CHARLES SCHWAB & CO., INC.

By: ______________________

Eric D. Brandfonbrener
Darrell J. Graham
Jonathan Buck
PERKINS COIE LLP
131 S. Dearborn, Suite 1700
Chicago, IL 60603
Tel: (312) 324-8400
Fax: (312) 324-9400

# Charles Schwab

## CONFIDENTIALITY, NONSOLICITATION AND ASSIGNMENT AGREEMENT

Charles Schwab & Co., Inc., its parent compan(ies) and/or its/their subsidiaries, affiliates, joint venturers, and successors (collectively, "Schwab" or the "Company") desires to protect its Confidential Information (as more fully described and defined in Paragraph 1, below), to maintain and protect the confidential and/or proprietary nature of such Confidential Information, and to protect against the unauthorized use of such Confidential Information. In consideration for my at-will employment with Schwab and in consideration for the compensation paid and to be paid to me and the receipt of other benefits by Schwab, the receipt and adequacy of which I acknowledge and agree, I am willing to enter into this Confidentiality, Nonsolicitation and Assignment Agreement (this "Agreement") to provide and facilitate the protection of Schwab Confidential Information during and after my employment with the Company in accordance with the terms and conditions set forth below.

1. (a) I acknowledge and agree that during and related to my employment with Schwab, I will obtain, have access to, and/or be exposed to certain information that is confidential and/or proprietary to, and/or trade secrets of Schwab (collectively, "Confidential Information"). I understand that such Confidential Information may be in any form, and will include all copies, reproductions, summaries, analyses or extracts thereof, based thereon or derived therefrom, and which is the sole and exclusive property of Schwab. Confidential Information may include, but not be limited to:

   (i) Confidential information about previous, current and/or contemplated products and services, confidential know-how, techniques, computer passwords, computer software designs, and hardware configurations, and confidential training materials, policies and procedures, and research projects;

   (ii) Market, financial, trade, and sales information and data, pricing, financial models or formulae, business plans, financial and business forecasts and estimates, account valuation, and information about costs and profits;

   (iii) The identities of Schwab customers or Prospective Customers, as defined in Paragraph 6 (including but not limited to, names, addresses, telephone numbers and/or social security numbers), any account, personal, business, financial and other information pertaining to such customers or Prospective Customers, Schwab customer or Prospective Customer lists in any form, and any information related to the assets and obligations carried in an account by a Schwab customer, a customer's positions, and/or account valuation;

   (iv) Account, personnel or financial information pertaining to current and former employees of Schwab, business, financial, and other information pertaining to Schwab's vendors and independent contractors, and any lists of such employees, vendors and/or independent contractors;

   (v) All Developments, as defined in Paragraph 5 below, and all information that relates to said Developments; and/or

   (vi) All information which Schwab has a legal obligation to treat as confidential, or which Schwab treats as proprietary or designates as confidential or for internal use only, whether or not owned or developed by Schwab.

   (b) "Trade secret," as used in this Agreement, shall mean, without limitation, any technical or non-technical data or other business information, which (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its use; and (ii) is the subject of reasonable efforts on the part of Company to maintain its secrecy.

   (c) Notwithstanding the definition in Paragraph 1 hereof, Confidential Information shall not include any information that is in its protected form (i) in the public domain through no fault of an employee of Schwab or otherwise, (ii) readily and accurately discernable from publicly-available products, literature or other information, or (iii) approved for disclosure by prior written permission of an authorized senior or executive officer of Schwab specifically designated by Schwab to give such authorization as required hereunder ("Authorized Officer").

2. I acknowledge that such Confidential Information has been developed by or on behalf of Schwab or licensed by Schwab at great expenditure of both financial and human resources and that such Confidential Information may be unique and not capable of being duplicated, or may only be acquired by significant expense. I acknowledge and agree that Schwab owns or licenses all such Confidential Information and that such information is entrusted to me for the sole and exclusive purpose of enabling me to conduct the business of providing brokerage and financial advice to customers and Prospective Customers (the "Business") on behalf of Schwab. I further understand that Schwab desires (or is under a legal obligation, in the case of information owned by others) to protect such information's confidential and proprietary nature, and takes, and requires me to take, all reasonable measures to maintain the confidentiality and proprietary nature of such information.

3. I acknowledge that Schwab's Business is intensely competitive and as an employee of Schwab in my position I have or will be exposed to Confidential Information, the direct or indirect disclosure of which to existing and potential competitors of Schwab would place Schwab at a competitive disadvantage and would do damage, monetary or otherwise, to Schwab's Business. I acknowledge that the Confidential Information constitutes a protectable business interest of Schwab.

4. I agree that I will not, at any time, assert any claim, ownership or other property interest in any Confidential Information. I also will not, for any purpose, directly or indirectly, disclose, reproduce, use, or disseminate in any manner during or after my employment with Schwab, on my own behalf or on behalf of any other person, company or entity, any Confidential Information, unless: (a) such disclosure is required in the ordinary course of my duties at Schwab and is necessary for me to perform my duties; (b) I have received advance written consent from an Authorized Officer; or (c) I am legally compelled (by deposition, interrogatory, request for documents, subpoena, or similar process) to disclose any of the Confidential Information; provided, however, prior to disclosing such Confidential Information, I shall give Schwab prompt prior written notice of such requirement so that Schwab may seek a protective order or other appropriate remedy and/or waive my compliance with the terms of this Agreement. In the event that such protective order or other remedy is not sought or obtained, or that Schwab waives my compliance with the terms hereof, to the extent I shall be legally compelled to disclose the Confidential Information, I agree to provide only that limited portion of the Confidential Information that is legally required and to exercise reasonable efforts to obtain assurance that confidential treatment will be accorded such Confidential Information. I will promptly notify Schwab if I become aware of or suspect any unauthorized (whether intentional or accidental) use or disclosure of Confidential Information by me or by any other person, company or entity.

5. I will promptly disclose in confidence to Schwab all inventions, improvements, designs, original works of authorship, formulas, processes, computer software programs, databases and trade secrets (collectively, "Developments") that I make, conceive, first reduce to practice, or create, either alone or jointly with others while I am employed by Schwab, and that: (a) result from any work performed by me for Schwab, whether or not in the normal course of my employment or during normal business hours; (b) reasonably relate to the actual or anticipated business, services, products, research or development of Schwab; or (c) are developed with the use of Schwab time, equipment, supplies, Confidential Information or facilities. I must promptly disclose Developments whether or not such Developments are patentable, copyrightable or protectible as trade secrets. I understand and agree that all Developments shall be the sole and exclusive property of Schwab, and I hereby irrevocably assign, transfer and convey to Schwab, exclusively and perpetually, all right, title and interest that I may have or acquire in and to such Developments throughout the world, including without limitation any copyrights and patents, and the right to secure registrations, renewals, reissues, and extensions thereof. I agree to sign any documents and to do all things necessary, without additional compensation, whether during my employment or after, to assist Schwab to register, perfect, maintain and enforce Schwab's rights in any Development, including without limitation any patent, copyright, trade secret or other right or interest. I understand that if I am now a California resident, or if I become a California resident while employed by Schwab, then this paragraph will not apply to any Developments which fully qualify under Section 2870 of the California Labor Code, which section is set forth in the accompanying Exhibit A, attached hereto and made a part hereof.

6. I acknowledge that during my employment, Schwab will be providing me with resources that enable me to develop, enhance, maintain and/or support account relationships with Schwab's customers and prospective customers, which such prospective customers have been designated as such by virtue of being listed, classified or otherwise identified by me or others, to which I have knowledge of, during my employment with Schwab ("Prospective Customers"). I also acknowledge that such resources are provided at Schwab's expense and the development, enhancement, maintenance and/or support of the account relationships with Schwab's customers and Prospective Customers are solely for Schwab's benefit. I acknowledge and agree that any account relationships I develop, enhance, maintain or support during my employment with Schwab are account relationships that belong solely to Schwab and not to me, with the

exception of account relationships of my immediate family or other relatives, or individuals or entities that I provided financial services to prior to joining Schwab, and which I have identified in the accompanying Exhibit B, attached hereto and made a part hereof. I agree that I will undertake to update this Exhibit B, as and when necessary, by written notice to Schwab.

7. I agree that during my employment with Schwab, I will not, directly or indirectly, on my behalf or on behalf of any other person, company or entity, solicit or induce, or attempt to solicit or induce (which shall include, but is not limited to, contact or communication in any manner for the purpose of soliciting or inducing): (a) any customer or Prospective Customer of Schwab to divert, transfer or otherwise take away any business from Schwab; or (b) any employee, vendor or independent contractor of, or consultant to, Schwab to leave his or her employment or assignment with Schwab.

8. I agree that during my employment with Schwab, I will not remove any property of Schwab in original or copied form, including, but not limited to, any Confidential Information existing in any form from Schwab's premises, except as required in the ordinary course of my duties at Schwab and as necessary for me to perform my duties. I agree that I will promptly return to Schwab immediately upon Schwab's request, my acceptance of other employment, or the termination of my employment for any reason, any and all documents and materials that contain, refer to, or relate in any way to any Confidential Information, as well as any other property of Schwab in my possession or control, including, but not limited to, any information pertaining and/or relating to Schwab's customers and Prospective Customers, and all originals, copies and derivations of Schwab's documents, electronic and telephonic equipment, credit cards, security badges, and passwords. I further agree that I will permit Schwab to inspect any materials provided by Schwab to me or developed by me as a result of or in connection with my employment with Schwab when I accept other employment or otherwise separate from my employment, regardless of where said materials are located.

9. I further agree that for a period of eighteen (18) months after my employment with Schwab ceases beginning on the date of my termination (the "Proscribed Period"), I will not, directly or indirectly, or on behalf of any third party: (a) solicit or attempt to solicit any existing customers I serviced, directly or indirectly, and/or any Prospective Customers (with the exception of individuals or entities listed in the attached Exhibit B), or customers whose identities I learned as a result of my employment with Schwab, in an attempt to divert, transfer or otherwise take away business or prospective business from Schwab; (b) sell or offer to sell any security, retirement, insurance or annuity product or related service to any customer or Prospective Customer of Schwab that I solicited or attempted to solicit in breach of my obligations hereunder; or (c) solicit or attempt to solicit or induce (which shall include, but is not limited to, contact or communication in any manner for the purpose of soliciting or inducing) any employee, vendor or independent contractor of, or consultant to, Schwab to leave his or her employment or assignment with Schwab. I further agree that the purpose of this provision is to prevent the intentional or inadvertent unlawful use of Schwab's Confidential Information, including its trade secrets. Nothing in this Paragraph 9 is intended to prevent me from discussing possible employment or prospective business with any customer, Prospective Customer, employee, consultant or independent contractor who contacts me directly on his or her own volition without my solicitation or attempted solicitation of him or her. I understand that nothing in this Paragraph 9 limits my absolute obligation under Paragraph 4 to never use Confidential Information for any other purpose at any time after my employment with Schwab ceases. Sections (a) and (b) of this Paragraph 9 shall not apply to any institutional customer or institutional Prospective Customer of Schwab Capital Markets L.P. whose identity is publicly available (notwithstanding the provisions in paragraph 6).

10. I represent and warrant that I do not have any agreement(s) with any former employer or other third party that would be breached by my performance of my duties at Schwab or that would limit, impair or otherwise adversely affect my performance of such duties, and that I will not take any action to breach any such agreement while I am employed by Schwab. In any event, I will not use or disclose to Schwab any confidential information that belongs to others. I have listed on Exhibit C to this Agreement all the confidential, proprietary, trade secret, non-solicitation and/or non-competition agreements to which I am subject and affirm that those agreements, if any, would not be breached by performance of my duties at Schwab. I also agree that I will disclose my obligations under this Agreement to any prospective or future employer or contractor and that my obligations under this Agreement in their entirety shall survive the termination of my employment with Schwab regardless of the reason for the termination.

11. I understand and agree that any breach of this Agreement may subject me to disciplinary action, up to and including termination of my employment (if I am still employed at Schwab). I also understand and agree that any breach of this Agreement by me will cause immediate irreparable injury to Schwab that cannot be adequately compensated by money damages or whose damages may be difficult to ascertain. If a court of competent jurisdiction or an arbitration panel finds that injunctive relief is appropriate to enforce any provision of this Agreement, I agree that Schwab is entitled to such injunctive relief, in order to, among other things, prevent a continuing breach or to protect and preserve the status

quo pending full resolution of any dispute relating to this Agreement and under such circumstances, I specifically CONSENT TO THE ISSUANCE OF INJUNCTIVE RELIEF ordering, among other things:

(a) that I return to Schwab all records of any kind or nature (including but not limited to original and duplicate, typed and handwritten, soft (electronic, diskette) and hard copy and any other form) containing, referring to, or otherwise based on Confidential Information, and that I be prohibited from using or disclosing such records or the information in such records; and

(b) that, for the Proscribed Period, I shall be prohibited from soliciting or attempting to solicit (i) any Schwab customer whom I serviced (directly or indirectly) or any Schwab customer or Prospective Customer whose identity I learned as a result of my employment with Schwab to divert, transfer or otherwise take away business or prospective business from Schwab; and/or (ii) any employee, vendor or independent contractor of, or consultant to, Schwab to leave their employment or assignment with Schwab.

12. I understand and agree that in the event of a breach of this Agreement by Schwab or me, either party may seek interim injunctive relief against the other in an appropriate forum. The parties agree to expedited discovery, including depositions, in connection with any proceeding alleging breach of this Agreement, whether or not the laws of the jurisdiction or the applicable rules of arbitration procedure imposed by a regulatory body or by agreement provide for such expedited discovery. To the extent applicable, this provision is intended to supplement and not to supersede the rights and obligations of the parties to this Agreement under the terms of the Form U-4 signed or to be signed by me to become a registered individual with the Company or the terms of a separate arbitration agreement. The parties further agree that a party's application to a court or an arbitration forum for injunctive relief shall not be construed as a waiver by the other party of the right to arbitrate or demand arbitration of claims, where applicable.

13. I understand and agree that should I violate Paragraph 7(a) or Paragraph 9 of this Agreement, Schwab will suffer irreparable harm and damages that may be difficult to ascertain at the time of the violation, including, but would not be limited to, costs associated with investigating, monitoring, restricting and/or terminating the use of Confidential Information by me in violation of this Agreement, revenue lost from assets diverted or transferred in violation of this Agreement, and costs associated with maintaining, restoring or repairing Schwab's relationship with customers or Prospective Customers that were solicited in violation of this Agreement. I therefore understand and agree that I will be liable to pay Schwab liquidated damages of four percent (4%) of any existing customer or Prospective Customer assets found by a court of competent jurisdiction or an arbitration panel to have been diverted, transferred or otherwise taken away from Schwab in violation of Paragraph 7(a) or Paragraph 9 above. I agree that this formula represents a reasonable estimate of Schwab's actual damages and does not constitute a penalty. I understand and agree that liquidated damages are in addition to any other relief that Schwab may be entitled to, including, but not limited to, injunctive relief and/or punitive damages.

14. This Agreement and the rights and obligations of the parties hereto shall bind and inure to the benefit of any successor or successors of Schwab, but neither this Agreement nor any rights or benefits hereunder may be assigned by me.

15. In the event that a party to this Agreement brings an action to enforce any provision of this Agreement, the prevailing party shall be entitled to attorneys' fees and costs incurred to enforce such claim.

16. If any provision or portion of any provision of this Agreement is found to be invalid or unenforceable, that provision or portion thereof will be enforced to the maximum extent permissible, and the remaining provisions or portions thereof shall remain in full force and effect. I agree that the terms of this Agreement and any disputes arising out of it shall be governed by, and construed in accordance with, the laws of the state in which I was last employed by Schwab, without giving effect to such state's conflict of law principles.

[NO FURTHER TEXT ON THIS PAGE]

17. This Agreement shall be effective as of the date written below. I understand and agree that part of the consideration for this Agreement is the continuation of my employment relationship with Schwab, but that nothing in this Agreement changes my "at will" employment status, and that either Schwab or I may end the employment relationship at any time, with or without notice, for any reason or no reason at all.

Signed: B. K. Carter

Printed Name: BRIAN K. CARTER Date: 2/19/04

Employee ID Number: ______ *or* last 4 digits of Social Security Number: 5940

**EXHIBIT A**

**California Labor Code Section 2870**

(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2) Result from any work performed by the employee for the employer.

(b) To the extent that a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.



RECEIVED TIME OCT. 27. 10:58AM PRINT TIME OCT. 27. 11:00AM

**EXHIBIT B**

List of family members and other relatives (identified by familial status) and individuals or entities that I provided financial services to prior to joining Schwab (attach additional pages if necessary)

_______

Initials

**EXHIBIT C**

**List of Prior Agreements**

______
Initials

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES SCHWAB & CO., INC. | ) | |
| | ) | |
| Plaintiff, | ) | Judge: |
| | ) | |
| v. | ) | Magistrate Judge: |
| | ) | |
| BRIAN D. CARTER, ACORN ADVISORY MANAGEMENT, L.L.C., and ACORN ADVISORY CAPITAL, L.P., | ) | Case No.: |
| | ) | |
| Defendants. | ) | |

**VERIFICATION BY CERTIFICATION**

I, Pete Matthew, being first duly sworn on oath, depose and state as follows:

1. I am a Vice President of plaintiff Charles Schwab & Co., Inc., and am familiar with the facts set forth herein.

2. I certify that the factual statements set forth in the Verified Complaint For Temporary Restraining Order, Preliminary Injunction, And Other Relief are true and correct, except as to matters therein stated to be on information and belief, and as to such matters I certify that I verily believe the same to be true.

FURTHER AFFIANT SAYETH NOT.

[signature]

SUBSCRIBED and SWORN to
before me this 2 day of
November, 2004.

[signature]
Notary Public

LAURA CARNERO
COMM. #1451971
NOTARY PUBLIC-CALIFORNIA
SAN FRANCISCO COUNTY
My Comm. Expires Dec. 8, 2007

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

(1 of 2)

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

---

**Plaintiff(s): Charles Schwab & Co., Inc.**

County of Residence: San Francisco

Plaintiff's Atty: See Attachment.

**Defendant(s): Brian D. Carter, Acorn Advisory Management, L.L.C. and Acorn Advisory Capital, L.P.**

JUDGE AMY ST. EVE

County of Residence:

Defendant's Atty:

04C 7071

MAGISTRATE JUDGE KEYS

---

II. Basis of Jurisdiction: **4. Diversity (complete item III)**

III. Citizenship of Principal Parties **(Diversity Cases Only)**

Plaintiff:- **5 Non IL corp and Principal place of Business outside IL**

Defendant:- **5 Non IL corp and Principal place of Business outside IL**

IV. Origin : **1. Original Proceeding**

V. Nature of Suit: **290 Other Real Property**

VI.Cause of Action: **Misappropriation of trade secrets.**

VII. Requested in Complaint

Class Action: **No**

Dollar Demand:

Jury Demand: **No**

VIII. This case IS NOT a refiling of a previously dismissed case.

**Signature:** [signature]

**Date:** 11/2/04

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.** **Revised: 06/28/00**

FILED ED-7 FOR DOCKETING
04 NOV -2 PM 3:54
U.S. DISTRICT COURT CLERK

NOV - 3 2004

1-2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES SCHWAB & CO., INC. | ) | |
| | ) | |
| Plaintiff, | ) | Judge: |
| | ) | |
| v. | ) | Magistrate Judge: |
| | ) | |
| BRIAN D. CARTER, ACORN ADVISORY MANAGEMENT, L.L.C., and ACORN ADVISORY CAPITAL, L.P., | ) | Case No.: |
| | ) | |
| Defendants. | ) | |

**ATTACHMENT TO CIVIL COVER SHEET**

**Plaintiff's Attorney Information:**

Eric D. Brandfonbrener
Darrell J. Graham
Jonathan R. Buck
PERKINS COIE LLP
131 South Dearborn Street, Suite 1700
Chicago, IL 60603-5559
Phone: (312) 324-8400
Fax: (312) 324-9400

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

In the Matter of
CHARLES SCHWAB & CO., INC.
Plaintiff,
v.
BRIAN D. CARTER, ACORN ADVISORY MANAGEMENT, L.L.C., ACORN ADVISORY CAPITAL, L.P.,
Defendants.

JUDGE AMY ST. EVE

Case Number: 04C 7071

MAGISTRATE JUDGE KEYS

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Plaintiff: Charles Schwab & Co., Inc.

| (A) | | (B) | |
|---|---|---|---|
| SIGNATURE | | SIGNATURE | |
| NAME Eric D. Brandfonbrener | | NAME Darrell J. Graham | |
| FIRM Perkins Coie LLP | | FIRM Same as A. | |
| STREET ADDRESS 131 South Dearborn St., #1700 | | STREET ADDRESS | |
| CITY/STATE/ZIP Chicago, IL 60603 | | CITY/STATE/ZIP | |
| TELEPHONE NUMBER (312) 324-8602 | FAX NUMBER (312) 324-9400 | TELEPHONE NUMBER (312) 312-8637 | FAX NUMBER (312) 324-9400 |
| E-MAIL ADDRESS ebrand@perkinscoie.com | | E-MAIL ADDRESS dgraham@perkinscoie.com | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06195674 | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06190511 | |
| MEMBER OF TRIAL BAR? | YES ☒ NO ☐ | MEMBER OF TRIAL BAR? | YES ☒ NO ☐ |
| TRIAL ATTORNEY? | YES ☒ NO ☐ | TRIAL ATTORNEY? | YES ☐ NO ☐ |
| | | DESIGNATED AS LOCAL COUNSEL? | YES ☐ NO ☒ |

| (C) | | (D) | |
|---|---|---|---|
| SIGNATURE | | SIGNATURE | |
| NAME Jonathan R. Buck | | NAME | |
| FIRM Same as A. | | FIRM | |
| STREET ADDRESS | | STREET ADDRESS | |
| CITY/STATE/ZIP | | CITY/STATE/ZIP | |
| TELEPHONE NUMBER (312) 324-8644 | FAX NUMBER (312) 324-9400 | TELEPHONE NUMBER | FAX NUMBER |
| E-MAIL ADDRESS jbuck@perkinscoie.com | | E-MAIL ADDRESS | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06281672 | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | |
| MEMBER OF TRIAL BAR? | YES ☐ NO ☐ | MEMBER OF TRIAL BAR? | YES ☐ NO ☐ |
| TRIAL ATTORNEY? | YES ☐ NO ☐ | TRIAL ATTORNEY? | YES ☐ NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? | YES ☐ NO ☐ | DESIGNATED AS LOCAL COUNSEL? | YES ☐ NO ☐ |

FILED-7
FILED FOR DOCKETING
04 NOV -2 PM 3:53
U.S. DISTRICT COURT CLERK