FILED

JUN 1 0 2005

MICHAEL W. DOBBINS
CLERK, U. S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES SCHWAB & CO., INC., | ) | |
| | ) | |
| Plaintiff, | ) | Judge Amy J. St. Eve |
| | ) | |
| v. | ) | Magistrate Judge Arlander Keys |
| | ) | |
| BRIAN D. CARTER, *ET AL.* | ) | Case No. 04 C 7071 |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RENEWED MOTION
## TO COMPEL DEFENDANTS' COMPLIANCE WITH DISCOVERY
## AND FOR OTHER RELIEF

Defendants have yet to comply with Schwab's discovery – and this Court's discovery

orders. Despite Schwab's good faith attempts to resolve these issues after consultation in person

and by telephone with Defendants, Schwab respectfully moves, including pursuant to

Fed.R.Civ.P. 37(a), to compel this discovery, or for such other relief as the Court deems just,

including appropriate sanctions (such as presumptions or shifted burdens of proof) against

Defendants for their repeated failures to comply with Schwab's discovery and Court Orders. *See*

Fed.R.Civ.P. 37(a)(4)(A), (b)(2)(A) – (C) (sanctions); *Crown Life Ins. Co. v. Craig*, 995 F.2d

1376, 1381-84 (7th Cir. 1993) (affirming imposition of sanction for party's discovery abuses,

barring party from introducing evidence).[1]

## I.    BACKGROUND TO THIS MOTION:

1.    On April 21, 2005, Schwab filed its first motion to compel Defendants'

compliance with Schwab's discovery. Defendants had largely asserted blanket objections or

---

[1] Schwab's good faith attempts to resolve the discovery disputes raised in this motion
were made by Eric Brandfonbrener to Arthur Howe, including on June 8, 2005. These
discussions are memorialized in a contemporaneous email attached hereto as Ex. 1.

offered a self-serving declaration (denying liability) in lieu of providing meaningful documents and information responsive to Schwab's discovery.  An additional, file-stamped copy of Schwab's April 2005 motion to compel will be provided to chambers and is incorporated in this motion by this reference.

2.     On April 27 and May 4, the Court largely granted Schwab's motion to compel. On April 27, the Court held that the use in discovery responses of a self-serving declaration "is not sufficient. . . . It is not sufficient just to have a blanket denial. So, I am going to grant [Schwab's] motion to compel regarding [its] discovery requests, both document and interrogatory, where [Defendants] have just relied on Sabot's declaration." 4/27/05 Tr. at 12 (Ex. 2). Based on Defendants' representation made after the April 27 hearing that they would be producing additional "liability" related documents, as reported to the Court on May 4, Schwab did not ask the Court to rule further on this aspect of Schwab's motion to compel. *See* 5/4/05 Tr. at 2 (Ex. 3). As for Schwab's "damages" related discovery, the Court directed Defendants to turn over documents relating to Defendants' ownership and structure, but reserved ruling on Schwab's other "damages" related requests: "Certainly the structure documents, to the extent [Schwab] ha[s] not received those, [Defendants] should turn those over. . . . As for the other documents, wait and see what you [Schwab] get and see if you can narrow that further. And if you cannot agree to it, you can come back." 5/4/05 Tr. at 24 (Ex. 3).

3.     On May 4, Defendants provided revised responses to four interrogatories (two of which previously had relied on the self-serving Sabot declaration); Defendants did not provide a revised response to one other interrogatory which relied upon the Sabot declaration and did not provide any revised document request responses (eleven of Defendants' responses had relied on the Sabot declaration). *See* Ex. 4 (revised interrog. answers). On May 4, Defendants also produced an unredacted copy of the November 26, 2004 "faxtree" document (which had

previously been produced in redacted form), and promised other documents. *See id.* (cover letter promising additional documents).

4.     After Defendants failed to comply promptly with the Court's Orders and Defendants' representations that they would be producing additional documents, Schwab raised these issues with Defendants. Schwab also proposed narrower "damages" related discovery. Unable to obtain Defendants' compliance, Schwab filed its motion to set a date certain for compliance with the Court's discovery orders (filed May 19). An additional, file-stamped copy of Schwab's motion for a date certain will be provided to chambers and is incorporated in this motion by this reference.

5.     On May 25, the Court granted Schwab's motion for a date certain and directed Defendants to comply fully on or before June 1, 2005: "By June 1st, you [Defendants] should produce everything that I have ordered. . . . If you cannot work out your protective order issues on these model documents that you think need some extra protection, then file something with the Court by June 3rd." 5/25/05 Tr. at 6 (Ex. 5).

6.     At 7 pm on June 1, Defendants served Schwab with a further revised answer to Set 3, Interrog. 3. *See* Ex. 6. Then, on June 2, Schwab received three boxes of records, most all of them printed with a dark orange background. The orange background makes it impossible to copy the records, for example to make a working set; the dark background also makes it extremely difficult to read the records. The June 2 production divides into three categories:

a.     An approximately 3200-page document labeled at various places throughout "Code for new US Model": On June 3, Defendants represented that this is Gary Sabot's computerized notes from October 2004 through January 2005 regarding efforts to develop a financial model for "Acorn" to replace Schwab's VM Model. The 3200 pages consist of versions of the same file reprinted more than 100 times, each time with more information added. The

individual records that make up this document are undated and do not have internal page numbers. The document is printed with the orange background and designated "Attorneys' Eyes Only – Model Information." The file that is reprinted in its various iterations appears to contain the same information that was included in second half of the "faxtree" document – a record that was produced on May 4 "Attorneys Eyes Only" and on white paper.

      b.     An approximately 4,200-page document containing exclusively columns of letters and numbers: Defendants represented on June 3 that this is a printout of a single "backtest," running a version of Acorn's model against five years of historical stock data. Each line has a date (year and month, starting in or about December 1999 and running through December 2004) and then a column of stock symbols, followed by a two digit number, and then a single digit number carried to 14 decimal places. This backtest was produced on paper with the unreadable orange background and was labeled "Attorneys' Eyes Only – Model Information."

      c.     Approximately 400 pages of other records, mostly Sabot's 1988 PhD thesis (250 pages) and other published articles he authored. Also included is an expense allocation agreement among various Acorn and Delphi entities and Carter's employment file.

      7.     On June 3, 6 and 8, Schwab raised issues with Defendants' June 2 production. *See, e.g.,* Ex. 1. On June 10 (the date by which the Court on June 6 requested this motion be filed), Defendants called shortly before Schwab filed this motion to represent that Defendants would be producing:

      a.     An electronic version of the documents previously produced with the orange background. From the electronic version, Defendants represented Schwab could determine the dates on which Sabot's notes were entered. It is Schwab's information that Defendants are continuing to designate these records "Attorneys' Eyes Only – Model Information."

b.     A January 2005 memo from Sabot to Rosenkranz relating to one of the studies Carter and Sabot testified were run in the course of developing Acorn's model (a study separate from the backtest document, produced on June 2). Defendants' counsel maintained that Defendants do not have records relating to the other studies to which Carter and Sabot testified.

c.     A partnership agreement for Acorn Advisory Capital L.P.

As of the filing of this motion, none of these materials had yet been received.

## II.     FAILURE TO COMPLY WITH THE APRIL 27, MAY 4, AND MAY 25, 2005 ORDERS:

On April 27, and again on May 25, the Court directed Defendants to revise all discovery that relied upon the Sabot declaration. Defendants have failed to do so, despite specific requests by Schwab (*see, e.g.,* Plaintiff's Motion To Set A Date Certain For Compliance (filed May 19, 2005) at 2; *see also* Ex. 1 hereto) and specific Court Orders (*see* above 5/25/05 Order). The following responses relied on the Sabot declaration and have *not* been revised. Discovery Set 2: Doc. Reqs. Nos. 1, 4, 6, 7; Discovery Set 3: Doc. Reqs. Nos. 3, 4, 5, 8, 10, 11, 12, and Interrog. No. 2. (Schwab's 2d and 3d discovery sets were attached to our April 21, 2004 Motion To Compel.) Presumably, additional responsive records should be produced by Defendants pursuant to revised document request responses.

On May 4, and again on May 25, the Court directed Defendants to produce ownership and organization documents. With the exception of one cost-sharing agreement, Defendants have not produced any responsive records. On June 6, Defendants represented to the Court that Defendants do not have ownership or organizational charts. While Schwab made a request for such records (*see* Set 3, Doc. Req. No. 1), Schwab also requested the records from which Schwab can undertake to create its own charts, for use by Schwab in both its liability and

damages cases. *See, e.g.,* Set 3, Doc. Req. No. 9 (asking for records relating to ownership and structure).

The Court should direct complete compliance with its Orders and enter an appropriate sanction against Defendants for the above violations.

### III.   FAILURE TO PROVIDE GOOD FAITH ANSWERS TO INTERROGATORIES:

Even to the extent Defendants have furnished discovery responses, such responses remain incomplete and evasive. The revised answer to Set 2, Interrog. No. 5 does not answer who else has seen the Carter emails at issue (information requested). *See* Ex. 4. The revised answer to Set 2, Interrog. No. 6 does not answer what decisions are made with the model at issue, as requested; the answer instead veers off into whether such model was developed with misappropriated information. *See id.* The revised answer to Set 2, Interrog. No. 7 does not identify what tasks Carter has been performing, except to the extent that Carter or Sabot testified orally; the response instead recounts deposition testimony mostly regarding things Carter purportedly is not doing. *See id.* The revised answer to Set 3, Interrog. No. 3 provides no information as to Acorn's use or costs, the information requested in the interrogatory. *See id.*

Defendants' interrogatories further are improper because they rely exclusively on extracts from transcripts of depositions taken in the case. If interrogatory answers were merely intended to regurgitate deposition testimony, they would be redundant and unnecessary. As a result of Defendants' approach, Schwab merely has Defendants' (useless) representation as to how certain witnesses testified (the transcripts "speak for themselves"); Schwab does not have Defendants' verified answers to the questions posed in the interrogatories, as required by the federal rules.

The most recent revised response to Set 3, Interrogatory No. 3 (Ex. 6), is further objectionable as an egregious "hide-the-ball." This response purports to identify the documents that relate to Defendants' use, development and evaluation of the model at issue. Besides

incorporating the orange Sabot notes and backtest records, Defendants' revised response lists

eight pages of "books, journals, articles and other publications," including vast amounts of

unspecific data that could not possibly have been the basis of the Acorn model's use,

development, or evaluation.  By way of example, it includes entire journal and magazine titles

and websites, without specifying what articles or sections.  It lists popular, best sellers, such as

*Feakonomics* (which was not, on information and belief, published until April 2005) and the

*Tipping Point*.  It includes many statistical software packages and incorporates all conference

proceedings regardless of date of various professional organizations.

The Court should direct Defendants to furnish complete, good faith answers to Schwab's

discovery, as well as enter an appropriate sanction against Defendants for the above conduct.

## IV.  FAILURE TO PROVIDE MODEL DOCUMENTS:

Except for what Schwab was able to retrieve forensically from Carter's computers' hard-

drives, the only unredacted documents Defendants have produced related to the model they

developed to replace the Schwab model are:  (i) the "faxtree" document (produced May 4), and

(ii) the Sabot notes file and backtest documents (produced June 2 and 10).  It is unclear to

Schwab, despite its numerous requests (*see, e.g.,* Ex. 1) whether Defendants have now produced

(a) a copy of their current model; (b) all copies of their model as it was being developed; and (c)

all records (emails, memos, studies, etc.) relating to their model and its development.  *See* Set 2,

Doc. Req. No. 1; Set 3, Doc. Req. No. 3.

Sabot testified that his staff of six – all working remotely –assisted in his effort to

develop a new US Model, and that the process took 4+ months.  It defies credibility that there are

no other records, including emails among the group.  *See, e.g.,* Set 2, Doc. Req. Nos. 1, 7, 8,

Interrog. No. 5, 7; Set 3, Doc. Req. Nos. 3, 12.

Defendants have not produced another version of the model code that is contained in the first half of the "faxtree" document. The most recent model document produced to date is purportedly from January 2005. It defies credibility that there are no other more recent records (including in digital/electronic format) containing Defendants' model code.

Defendants have offered that Schwab should depose Sabot and ask him about the above issues. Schwab will certainly do this, but this should not relieve Defendants of their discovery obligations. Schwab respectfully asks that Defendants be directed to certify to their compliance with Schwab's discovery.

## V.   REFUSAL TO PRODUCE FINANCIAL INFORMATION:

Defendants continue to stand on their blanket objections with respect to all discovery relating to financial information. On May 3, Schwab proposed the following narrowed requests for an initial (and, depending on the production, perhaps final) production of records necessary to enable Schwab to present a damages case. (1) For Schwab's requests regarding costs associated with model development and research, we proposed internal accounting records and ledgers tracking such costs. (2) For revenues and profits earned by the model use, we proposed internal accounting records, reports to Acorn's and Delphi's investment committee and other reports to investors.

In this case, the appropriate measure of compensatory damages is likely to be based on the advantage gained by Defendants as a result of their misappropriation of Schwab's IA Models, including the savings enjoyed by Defendants as a result of the misappropriation, the amount by which Defendants have been unjustly enriched, and/or the amount by which Defendants have profited from the misappropriation. *See* 765 ILCS 1065/4 (Illinois Trade Secrets Act provision specifying that damages "can include . . . the unjust enrichment caused by the misappropriation [or] . . . a reasonable royalty for the misappropriator's unauthorized disclosure or use of a trade

- 8 -

secret"). To determine each of these measures of damages, Schwab requires information and records on Acorn's costs for research, the costs Acorn incurred in developing its model, how Acorn uses its model, and how Acorn benefits from its model. Schwab is also entitled to receive information and records regarding Acorn's revenues, profits and ownership. Schwab also seeks punitive damages against Defendants. For this damages component, information and records on revenues, profits, and ownership are again relevant.

Defendants continue to refuse to provide any information whatsoever. Schwab requests that Defendants be directed to comply with Schwab's narrowed requests.

## VI.   DEFENDANTS' REQUEST FOR GREATER RESTRICTIONS FOR MODEL INFORMATION UNDULY PREJUDICE SCHWAB:

Schwab believes that the present "Confidential" and "Attorneys' Eyes Only" ("AEO") designations in the Agreed Protective Order (entered November 30, 2005) adequately protects Defendants' interests in their model information. Before persons may be shown documents designated Confidential or AEO, they agree that they cannot use the documents for any purpose other than this case.

Defendants request that all records relating to their model have a higher level of protection – "Attorneys' Eyes Only – Model Material" ("AEOMM"). Most importantly, Defendants seek to bar any party employee and any employee or consultant of a financial firm who "works in the field of quantitative securities model-building" from seeing any AEOMM information. Defendants' position is that any person who sees model-related information will inevitably use it in connection with his or her business. However, under the present Agreed Protective Order, any person shown protected information agrees to use such information only in connection with this case and must consciously refrain from all unauthorized use.

Defendants seek to unduly restrict Schwab's choice of experts needed to analyze the Schwab and Acorn models for this case. The proposal would bar any expert who is engaged in some way in the financial model-making business – which will be the most appropriate expert given the highly specialized, complex nature of the financial models at issue. Under Defendants' proposal, Schwab will have to train any expert from scratch and will likely have difficulty finding persons qualified to testify to key issues in the case. Such intrusion on Schwab's choice of expert is unjustified given the existing, adequate protections of the Agreed Protective Order.[2]

The heightened protections Defendants seek for their model information is further unjustified because Defendants have already produced under the AEO designation similar, if not identical, information to that which they now seek to protect now as AEOMM. Defendants claim that the 3200-page collection of Sabot's notes must be AEOMM protected. The identical information in these notes is in the "faxtree" document, which was produced as AEO. Defendants do not explain what has changed since the production of the "faxtree."

Moreover, Defendants are already attempting to abuse the AEOMM designation. Defendants designated the 4200-page backtest document as AEOMM. This backtest is no different than the model outputs that Schwab's Investment Analytics division provided and other institutional research firms currently provide to their customers. By providing model outputs, Schwab and the other institutional research firms have not disclosed their trade secrets. The backtest should be "Confidential," but not AEO or AEOMM.

---

[2] Indeed, in light of the fact that Schwab and Defendants are not competitors (the usual grounds on which protective orders prohibit employees of the parties from seeing opponents trade secrets), one of Schwab's model-makers should be allowed to review Defendants' model materials, subject to restrictions on his retention of such information and subject to his agreement to comply with the Agreed Protective Order. Schwab's model makers are the most experienced persons with the Schwab models at issue and will be able to analyze most efficiently whether the Acorn model contains Schwab code (whether directly or indirectly).

While we think it unnecessary to have a third level of protection in the protective order, Schwab tried to reach an accommodation with Defendants and offered to agree to certain additional restrictions (regarding restricted access by Schwab's in-house counsel, storage of designated documents in locked areas, not hiring as an expert a person employed by one of Defendants' direct competitors). A copy of the proposed amended and restated agreed protective order that Schwab sent to Defendants on June 8 is Ex. 7 (marked as a redline to show changes from the present Agreed Protective Order). Defendants have rejected this proposal.

The Court should deny Defendants' request for a third level of confidentiality for the protective order in this case. Schwab remains willing to agree to certain protections for Defendants' model materials either through the entry of the amended and restated agreed protective order, substantially in the form attached as Ex. 7, or via a side letter agreement.

## VII.   CONCLUSION:

Schwab respectfully requests that Defendants be ordered to comply with Schwab's discovery and the Court's Orders, and that the Court provide Schwab with such other relief as is just, including presumptions in Schwab's favor and/or shifting burdens of proof to Defendants.

June 10, 2005                                     Respectfully submitted,

                                                  CHARLES SCHWAB & CO., INC.

                                                  By:

Eric D. Brandfonbrener
Darrell J. Graham
Jonathan Buck
PERKINS COIE LLP
131 S. Dearborn, Suite 1700
Chicago, IL  60603
Tel: (312) 324-8400

## Brandfonbrener, Eric

**From:**    Brandfonbrener, Eric
**Sent:**    Wednesday, June 08, 2005 5:28 PM
**To:**      Howe@sw.com
**Subject:** June 8, 2005 meet and confer.

Art,

I write to confirm our June 8, 2005 meet and confer. This summary is not intended as a verbatim or chronological record of the discussion, but rather a review of the issues that we discussed, supplemented as appropriate, for example, with background that may not have been discussed on today's call but which we have discussed previously. You made a point at the outset of the call that you had your paralegal present to take notes. Your (or her) comments are welcome.

### I. Schwab's liability discovery:

### A. Issues with the June 2 production:

1.     On June 2, Defendants produced approximately 3200-pages labeled at various places throughout "Code for new US Model." On June 3, you represented that these are Gary Sabot's computerized notes from October 2004 and January 2005 regarding his efforts to develop a financial model for "Acorn" to replace Schwab's VM Model. The 3200 pages consist of versions of the same file reprinted more than 100 times, each time with more information added.

The individual records that make up this stack of documents are undated. There are no page numbers. It was produced on paper with an orange background that cannot be copied (making it impossible to make a working set or to make deposition exhibits) and that is extremely hard to read. (The pages also have a foul smell -- presumably the ink used to create the orange background.) The file that is reprinted in its various iterations that makes up this stack appears to be contain the same information that was included in second half of the faxtree document.

We require copies of documents that we can copy, read, mark-up, analyze, and use at deposition and trial. On today's call, you indicated that if we can work out an agreement regarding amendments to the protective order, you will produce these documents electronically (which presumably would resolve all of these issues). We also require documents that are dated. We find it hard to believe that there is not a date associated with each file iteration. You agreed to look into whether there is a date associated with each iteration.

2.     On June 2, defendants also produced a 4,200 page stack which you told me on June 3 is a printout of a single five-year backtest running a version of Acorn's model against five years of stock data. Each page has a date (year and month, starting in or about December 1999 and running through December 2004) and then a column of stock symbols followed by a two digit number and then a single digit number carried to 14 decimal places. This backtest was produced on paper with the same unreadable orange background as the model information. It plainly is an electronic file. It is baffling why you would go to the expense to print this out instead of providing it electronically.

As with the 3,200 page stack, we require copies of documents that we can copy, read, mark-up, analyze, and use at deposition and trial. On today's call, you again indicated that if we can work out an

Exhibit 1

agreement regarding amendments to the protective order, you will produce these documents electronically (which presumably would resolve these issues).

I also raised the point that these records should not be designated "Attorneys' Eyes Only", let alone "AOE-Model Materials." As with Schwab's model outputs, one cannot generate the model code from the outputs. While we do not dispute that these records may be designated as Confidential under the protective order, they do not require greater protection. As I understand it, you disagreed with this position and are continuing to insist on the as-yet-to-be-agreed-upon "Models Materials" level of protections.

3.    In Court on June 6, you referenced efforts to reach an agreement regarding a higher level of protection for Acorn's model information. You sent me a proposed term sheet for such additional protections on May 24. I objected to the proposal shortly thereafter, including after the hearing on May 25 when you and I discussed certain of our objections. You said you would revise the proposal in light of our discussion and send me a new proposal. On June 3 you sent me a proposed supplement to the agreed protective order.

The June 3 proposal remains objectionable. It is overly intrusive and will unduly interfere with our case preparation (e.g., it still allows the uncopyable/unreadable paper; it will require your approval of any person we wish to show records to).

We believe that the present "Attorneys' Eyes Only" designation adequately protects defendants' interests. However, to accommodate defendants' stated concerns and to see if we can compromise without needing to involve the Court, we are willing to agree to certain additional restrictions (regarding in-house counsel access, storage of copies, etc.). I am attaching a redline of a proposed amended agreed protective order for your review and for discussion (redlined to show changes for the current agreed protective order). You will note that we propose that one Schwab person be able to review model materials, subject to certain restrictions. As we understand the facts, the existing Schwab model and the Acorn model serve different purposes and Schwab and Acorn are not competitors (the usual grounds on which protective orders prohibit employees of the parties from seeing opponents trade secrets).

**B. Other liability discovery issues:**

1.    In granting Schwab's motion to compel, the Court rejected defendants' use of the Sabot declaration as an answer to requests. As we understood the ruling, defendants were to provide new answers without the Sabot declaration.

The Sabot declaration served as defendants' response to the following discovery requests (this includes both those requests that we characterized as "liability" as well as "damages" related): Discovery Set 2: Doc. Reqs. Nos. 1, 4, 6, 7, and Interrog. No. 6; Discovery Set 3: Doc. Reqs. Nos. 3, 4, 5, 8, 10, 11, 12, and Interrog. Nos. 2, 3. (Schwab's 2d and 3d discovery sets were attached to our April 21, 2004 Motion To Compel.) On or about May 6, defendants served revised responses to Discovery Set 2, Interrog. Nos. 5, 6, 7; Discovery Set 3, Interrog. No. 3. Defendants served another response to Set 3, Interrogatory No. 3 on June 2.

Defendants have never provided revised responses to the document requests. Nor have they provided a revised response to Set 3, Interrogatory No. 2. We believe that these responses are overdue. On today's call, you indicated that you would consider this.

The revised interrogatory responses to the extent they have been made are unsatisfactory on at least three grounds. First, instead of providing us with complete answers, the revised responses provide mere

partial answers. Set 2, Interrog. No. 5 never answers who else has seen the Carter emails at issue. Set 2, Interrog. No. 6 never answers what decisions are made with any model developed after October 1, 2004, but instead veers off into whether such model was developed with misappropriated information. Set 2, Interrog. No. 7 does not identify what tasks Carter has been performing, except to the extent that Carter or Sabot testified orally; most time is spent recounting testimony about what Carter is not doing). Set 3, Interrog. No. 3 provides no information as to the model's use or costs.

Second, the revised responses rely exclusively on extracts from transcripts of depositions taken by Schwab. If interrogatory answers were merely intended to duplicate deposition responses, they would be redundant. We require answers from defendants, not merely abstracts of depositions.

Lastly, the most recent revised response to Set 3, Interrogatory No. 3, other than incorporating the orange Sabot records and the orange backtest records, is an egregious "hide-the-ball." The eight pages of "books, journals, articles and other publications" lists vast amounts of unspecific data that could not possibly have been the basis of the Acorn model's use or development.

You told me that you disagree with our objections.

2.      We still do not have any version of the "Acorn" model other than as produced in the November 2004 faxtree. As discussed repeatedly in the past, it is important to have versions of the model before Carter was hired, throughout the time the model was being developed, and up through its current version. *See* Set 2, Doc. Req. No. 1; Set 3, Doc. Req. No. 3; (this request also seeks the costs of the model, as well as communications within Acorn relating to the model).

With respect to our past requests for versions of the faxtree document from other dates, today you indicated the "hard copy" of the faxtree was a one-time creation. The first half of the faxtree that defendants have produced appears to be a print-out of a file that contains the model code. Even if subsequent faxtree documents have not been printed out, we find it hard to believe that the data contained on the faxtree document does not exist in updated form.

You told me that you were going to inquire regarding these issues.

3.      Per my May 6 email, we continue to require all other records showing defendants' development of their model. Sabot testified that all of his staff – all working remotely –assisted in his effort to develop a new US Model that took 4+ months. It defies credibility that there are no other records, including emails among the group. *See, e.g.,* Set 2, Doc. Req. Nos. 1, 8, Interrog. No. 5, 7.

I again repeated our request for records relating to Acorn's overall strategy and effort to create a model to replace the IA model. *See, e.g.,* Set, 2, Doc. Req. No. 7. In my May 6 email, I had asked to find out what you learned, but have heard nothing from you since on these subjects. Today you represented that you had inquired, had received nothing further from defendants, but would inquire again.

4.      As confirmed in my May 6 email, we have requested the other tests performed by Acorn as it developed its model, as testified to by Gary Sabot and Brian Carter, including various regression analyses against Schwab's model. In my May 6 email, I asked you to see about studies such as the one Sabot testified that he had run to get a .99 correlation versus IA model outputs. Sabot said that he got 0.7 on other studies involving IA model outputs. *See also* Set, 3, Doc. Req. No. 12. Today you represented that you had inquired, had received nothing further from defendants, but would inquire again.

## II. Schwab's damages related discovery:

Besides the one cost sharing agreement, Defendants have provided no discovery responsive to the various discovery we grouped for discussion under the heading "damages" discovery.

### A.     Organizational documents:

At the hearing this week, you represented to the Court that there are no organizational or ownership charts. *See, e.g.,* Set 3, Doc. Req. No. 1. We will have to undertake to create our own, therefore, and Schwab's discovery expressly calls for the records we will require to do so. *See, e.g.,* Set 3, Doc. Req. No. 9 (asking for records relating to ownership and structure). Please let me know by tomorrow (June 9) whether defendants will be providing these records.

### B.     Financial records:

On May 3, I had proposed the following for an initial (and, depending on the production, perhaps final) production of records necessary to enable Schwab to present a damages case. For Schwab's requests regarding costs associated with model development and research, we proposed internal accounting records and ledgers tracking such costs. For revenues and profits earned by the model use, we proposed internal accounting records, reports to Acorn's and Delphi's investment committee and other reports to investors.

You told me today that defendants are standing on their objections to producing any financial records.

As we discussed, we are not taking your silence that you have no remaining discovery issues (just that you are choosing not to raise them at this time). Likewise, the above list, while long, is not intended to be exhaustive; it is intended to raise the most significant issues that we believe are ready for resolution by the Court.

I look forward to hearing from you.

Eric


DOCUMENT.01.DOC

Please extract the attached File.


Title: Imported File 06-08-2005 17:23:49
Typist: Brandfonbrener, Eric D.
Author: Brandfonbrener, Eric D.
Department: Litigation
Client/Matter/Child:


Eric D. Brandfonbrener
Perkins Coie LLP
131 S. Dearborn St, Suite 1700
Chicago, Illinois 60603

(312) 324-8602
Fax (312) 324-9602

**FILE** ⬦  1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLES SCHWAB & COMPANY, INC.,   ) Docket No. 04 C 7071
                                  )
                    Plaintiff,    )
                                  )
         vs.                      )
                                  )
BRIAN D. CARTER, et al.,          ) Chicago, Illinois
                                  ) April 27, 2005
                    Defendants.)   8:50 o'clock a.m.


TRANSCRIPT OF PROCEEDINGS - MOTIONS
BEFORE THE HONORABLE AMY J. ST. EVE

**RECEIVED**

**MAY 0 3 2005**

**PERKINS COIE**

APPEARANCES:

For the Plaintiff:          PERKINS COIE, LLC
                            BY:  MR. ERIC D. BRANDFONBRENER
                            131 S. Dearborn Street, Suite 1700
                            Chicago, Illinois  60603


For the Defendants:         SCHOPF & WEISS
                            BY:  MR. ARTHUR J. HOWE
                                 MR. PETER V. BAUGHER
                            312 West Randolph Street, Suite 300
                            Chicago, Illinois  60606


Court Reporter:             MR. JOSEPH RICKHOFF
                            Official Court Reporter
                            219 S. Dearborn St., Suite 1232
                            Chicago, Illinois  60604
                            (312) 435-5562


* * * * * * * * * * * * * * * * *

PROCEEDINGS RECORDED BY
MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

Exhibit 2

1          THE CLERK:  04 C 7071, Schwab vs. Carter.

2          MR. BRANDFONBRENER:  Good morning, your Honor, Eric

3   Brandfonbrener for the plaintiff, Charles Schwab.

4          THE COURT:  Good morning.

5          MR. HOWE:  Arthur Howe on behalf of defendants.

6          MR. BAUGHER:  Peter Baugher for the defendants.

7          THE COURT:  Good morning.

8          MR. BRANDFONBRENER:  Your Honor, we have several

9   motions before you this morning.

10          THE COURT:  Yes, you do this morning.

11          I question whether you have really met your Local

12   Rule 37.2 obligations, but we will talk about that.

13          Let me start with what is the easier one, your motion

14   to file under seal.

15          MR. BRANDFONBRENER:  Your Honor, the defendants have

16   indicated they have no objection to the motion under seal.

17   They also have agreed, I believe, that it wouldn't be a waiver

18   if we filed a motion in the public record and just maintained

19   the final three exhibits under seal.

20          THE COURT:  That is what I think is appropriate.

21          MR. BRANDFONBRENER:  And that's what we've proposed.

22          THE COURT:  Under the Seventh Circuit standards, we

23   cannot put the whole thing --

24          MR. BRANDFONBRENER:  I agree.

25          THE COURT:  -- under seal.

1          So, I will grant your motion, in part, to file under

2    seal.  You may include the last three exhibits, which would be

3    Exhibits E, F and G.  Those may go under seal.

4          MR. BRANDFONBRENER:  Thank you, your Honor.

5          THE COURT:  And the rest will be in the public

6    record.

7          I feel like there is a little bit of tit for tat

8    going on here, that once one motion to compel was on file,

9    that there was a rush to get another one on file.

10         Let us talk about the 30(b)(6) deposition of Mr.

11   Rosenkranz.

12         MR. BRANDFONBRENER:  Your Honor, yesterday afternoon

13   -- we filed our motion Thursday.  Yesterday afternoon, the

14   defendants' counsel offered Mr. Rosenkranz for this Friday

15   afternoon in New York City.

16         THE COURT:  Okay.

17         MR. BRANDFONBRENER:  And I rearranged a bunch of

18   things and will do it this -- by the end of the week, then.

19         THE COURT:  Okay.  April 29th that will go forward.

20         Now, documents and interrogatories.  Have you had any

21   further discussions?

22         MR. BRANDFONBRENER:  No, your Honor.

23         Would you like me to address our issues on the

24   liability?

25         THE COURT:  Yes.

1          MR. BRANDFONBRENER:  The defendants have admitted

2     that Carter took and used the code from IA models and he used

3     these codes on behalf of Acorn.  Although Acorn -- other parts

4     of Acorn -- dispute knowing use of these codes, the fact of

5     the matter is Acorn was engaged in an effort to replicate the

6     IA models when it hired Carter, who brought along the code and

7     has succeeded now in making a substitute for the IA models.

8          So, the question for this case is not whether the

9     defendants have used the IA model code, but to what extent.

10          We've tried repeatedly to get documents relating to

11     the extent of which the defendants have used the IA code.  In

12     order to determine how it was used, we would need to see their

13     model and to see records of its development.

14          We've been unable to get much in that regard.  We've

15     been, indeed, unable to get what Carter -- who admits taking

16     the code and admits e-mailing the code to others at Acorn.  We

17     haven't been able to find out what he's been doing other than

18     those initial e-mails.

19          THE COURT:  Have you deposed him?

20          MR. BRANDFONBRENER:  We deposed him, and we also

21     deposed the head model maker.  And he was involved in Acorn's

22     model-making efforts up through, I think the witness --

23     30(b)(6) witness -- for Acorn testified, through December or

24     January.  So, there's at least a month or two, including after

25     the lawsuit was filed, where he was engaged in an effort to

1  replicate the model.  A successful effort.

2           The only records we've received that relate to

3  Acorn's model making is behind Exhibit E, which is a redacted,

4  what they call, fax tree.  So, it's just a snapshot in time --

5  and this time being three or four weeks after we filed the

6  lawsuit -- and no earlier record of where their model was and

7  no subsequent record.  So, it doesn't help us, because it's

8  redacted and because there's only one model.

9           Behind Exhibit F, for the Court's information, are

10 the e-mails --

11          THE COURT:  Right.

12          MR. BRANDFONBRENER:  -- shipping our code over to

13 Acorn.

14          So, we have been trying to get more records from the

15 defendants.  And they've declined, I think, for two reasons.

16 They've declined because of --

17          THE COURT:  The affidavit --

18          MR. BRANDFONBRENER:  -- the denial that they've used

19 it, which is just incredible from the get-go because Carter is

20 Acorn.  He's an employee of Acorn.  He cannot -- so, they've

21 used it.  The question, again, as I say, is how much they've

22 used it.  And a self-serving denial shouldn't be a basis to

23 close -- foreclose -- discovery.

24          Their second basis, to use the Court's word, tit for

25 tat:  If we can get their model, they should get what we say

1   is an unrelated third model.

2        They already have the IA code.  We produced the IA

3   code -- the IA model code.  That's the one that is at issue.

4   The IA model code is what defendants have admitted they were

5   trying to replicate.  So, we need to see their code, compare

6   it to IA code.

7        The SER model -- the Schwab Equity Research model --

8   we do not say they copied; they say they don't want.  It's not

9   -- the code for SER is not -- an issue.  The only reason SER

10  came up was it is a valuable other model for Schwab.  And when

11  Schwab had to decide when it was closing its institutional

12  sales whether to sell IA models or what to do with it, they

13  decided to retain them because they didn't want another Schwab

14  model.

15       But there's no accusation of copying.  We've even

16  offered, I think, in our motion that we're -- not going to be

17  a basis of damages.  We're not claiming they copied it.  We

18  don't have any evidence so far that they took it.  It's just

19  not -- the code for SER is not -- going to be a relevant

20  inquiry in this case, and it shouldn't be a precondition for

21  obtaining what we need to determine the extent of the copying

22  of the IA code.

23       THE COURT:  So, tell me -- you have a lot of requests

24  here, some of them in legalese -- with respect to the IA model

25  code, exactly what are you looking for?

1      MR. BRANDFONBRENER:  We think we should get the

2  record that shows the development of their code.  And this is

3  for the liability phase.  For damages, we'll need other

4  information.

5          So, we would need -- they said they started in ernest

6  working on this model in September of 2004, and that by

7  January of 2005 they had it.  So, we need to see what they

8  started with and, then, how it developed; which, I think --

9  given the e-mails and, also, just given how computer models

10  are set up -- they should be able to provide us.

11         At minimum, we need the final operating code or what

12  is going to be an expert to testify to, to compare the two to

13  talk about how fast one could reasonably have developed a

14  code.

15         It's not necessary for Schwab to prove that Acorn

16  copied the code verbatim if Acorn learned from our code, which

17  I think they did, from -- even just from the testimony we have

18  so far that they knew what not to do; they learned how to use

19  the things that Schwab has been doing for 15 years.  They took

20  advantage of that through this misappropriated trade secret

21  information and got a model in four months where it should

22  have taken -- we'll have to see what the expert says, but

23  substantially longer.

24         So, we need evidence from IA -- from Acorn -- since

25  it would be nowhere else of their model development efforts.

1    It's hard to be more specific, since I don't know how they

2    maintain their records.  And a lot of our requests, I think,

3    overlap in that same -- sort of the effort to develop a model

4    and how it was developed and who they --

5           THE COURT:  Mr. Howe, respond to that one.  I know

6    there are more issues we will come back to.

7           MR. HOWE:  With respect to the IA code?

8           THE COURT:  Yes.

9           MR. HOWE:  Your Honor, two points.  One, the

10   plaintiff misstates the defendants' position and the record.

11   Defendants not only do not admit that there has been any

12   copying or use by Acorn, but they deny any type of use.

13          What we're talking about here in terms of the sole

14   factual predicate for the motion are a couple of e-mails in

15   which some fragments of code -- one particular portion of one

16   IA model -- was e-mailed from Mr. Carter to Mr. Sabot.

17          Mr. Sabot, Mr. Carter's direct supervisor, has

18   testified under oath.  In fact, before his deposition we had

19   provided a declaration under penalty of perjury in which

20   Mr. Sabot had stated that he never used those portions of the

21   code.  There's no indication in the denials under oath that

22   any other portions of code have been transmitted from what

23   files Mr. Carter retained when he left the plaintiff's

24   employment to anyone at Acorn.

25          Second, what we're talking about here is essentially


1   a single document.  The fax tree document.  That is the

2   document Mr. Sabot testified at his deposition is the

3   high-level description of the Acorn model.  The Acorn model is

4   not something that arose like Athena from Zeus' skull.  It's a

5   model that Mr. Sabot had had since the mid-'90s, before he had

6   even begun employment with Acorn, and he was updating the

7   model.

8        The fax tree document was dated about a week after

9   the lawsuit was filed.  We produced it in redacted form.  The

10  unredacted portions contain everything that relate directly or

11  indirectly to Schwab or IA in any way.  If this Court wishes,

12  we'd be more than pleased to provide the document for in

13  camera inspection together with the pertinent portions of

14  Mr. Sabot's declaration and testimony so the Court can be

15  apprised.  But we think that the request for the entire code

16  is unwarranted and intrusive.

17       THE COURT:  Who developed the code or the fax tree

18  that is --

19       MR. HOWE:  Mr. Sabot wrote it.  Mr. Carter had

20  nothing to do with the writing.

21       THE COURT:  Was anybody else involved in it?

22       MR. HOWE:  In past, before Mr. Carter had come on

23  board from Schwab, other individuals had assisted Mr. Sabot.

24  But Mr. Sabot at his declaration -- at his deposition --

25  testified that he was the author of the so-called fax tree

1  document.

2          THE COURT:  Okay.

3          MR. HOWE:  Your Honor, may I address the other points

4  Mr. Brandfonbrener made?

5          THE COURT:  Yes, please.

6          MR. HOWE:  With respect to the issue of what

7  Mr. Carter's been doing, I have three points.  One, counsel

8  has deposed Mr. Carter and had an opportunity for a complete

9  deposition day -- and more, because we stayed late -- to fully

10  ask Mr. Carter everything that he's been doing and went

11  through it in detail.

12          Second, counsel has deposed Mr. Sabot.  Mr. Sabot is

13  Mr. Carter's sole and direct supervisor.  Mr. Carter works

14  only with Mr. Sabot.  Mr. Sabot was deposed on what Mr. Carter

15  is doing.  And, your Honor, there's simply nothing further to

16  be provided on what Mr. Carter's doing.  Counsel knows it.  In

17  fact, counsel has been advised that because of the pendency of

18  this lawsuit, Mr. Carter's been taken off anything that has

19  any relevance at all to model development.  He's working

20  solely on other IT issues wholly unrelated to the subject

21  matter of this lawsuit.

22          I can also address the SER code issue now or later,

23  your Honor.

24          THE COURT:  Let us do that later.

25          Have you turned over documents -- I know you turned

1    over a redacted portion that is set forth in Exhibit E of the

2    plaintiff's motion of the fax tree, the final code.  Have you

3    turned over documents regarding the development of this code?

4        Are there any?

5        MR. HOWE:  To my knowledge, this is the one document

6    that had been -- one version of the document that exists.  I

7    do not know whether there are earlier versions of the fax tree

8    document.

9        THE COURT:  What about e-mails?  Are there e-mails

10   regarding its development?

11       MR. HOWE:  This particular document was faxed, but

12   there are no further e-mails between Mr. Carter and Mr. Sabot

13   related to this subject.  We've turned over, to my knowledge,

14   after reasonable investigation every e-mail or other

15   communication between Mr. Carter and Mr. Sabot that relates in

16   any way to the model development by Acorn.

17       THE COURT:  What about other types of correspondence?

18   I do not want to limit it to e-mails.  Memos --

19       MR. HOWE:  We've asked, your Honor.

20       THE COURT:  -- notes.

21       MR. HOWE:  And counsel has had an -- opposing

22   counsel's had an -- opportunity to examine both witnesses

23   about the responsiveness of the documents, and the witnesses

24   have testified as to what they've turned over.

25       THE COURT:  Your document responses are not

1   sufficient.  It is not sufficient to just incorporate Sabot's

2   declaration.  It might be true -- his position and your

3   defense might be perfectly accurate, but that is what

4   discovery is about.  Plaintiff is entitled to explore and

5   determine if Mr. Sabot's version and your version is accurate.

6          So, to respond to a discovery motion asking for

7   documents by incorporating Sabot's declaration is not

8   sufficient.  If you do not have documents, then tell them that

9   you do not have documents.

10          So, you must modify your responses to their discovery

11   requests in light of that.

12          In addition, with respect to their interrogatories,

13   you have also incorporated Sabot's declaration, but you have

14   also said, "We have responded fully through documents."  But

15   you have not identified Bates ranges or what documents are.

16   Under the rules, you must do that for interrogatories.  It is

17   not sufficient just to have a blanket denial.

18          So, I am going to grant their motion to compel

19   regarding your discovery requests, both document and

20   interrogatory, where you have just relied on Sabot's

21   declaration, because that really is not sufficient.  It may

22   turn out that Sabot is accurate and your defense is a viable

23   defense, but that is what discovery is about.  So, just to

24   say, "Because our person said so," is not a sufficient

25   response.

1          MR. HOWE:  Your Honor, may we have one week to

2    supplement our responses?

3          THE COURT:  You may.

4          MR. BRANDFONBRENER:  Your Honor, for the record, the

5    fax tree model is November 26 and our case was filed November

6    1, and Sabot testified his model went operational January.

7    So, there has to be more to it.  Plus, Carter indicated he had

8    been spending the time up through either December or January

9    working on reverse engineering.  So, presumably there's some

10   more to what Carter was doing than these e-mails that we've

11   received.

12         MR. HOWE:  Well, if I might, Judge?

13         THE COURT:  What I am going to do is -- we have quite

14   a bit more to cover.  I am going to pass this and go through

15   the rest of my call, which is not going to take too long, and

16   then come back to you.

17         So, what I would suggest you do -- since I questioned

18   your compliance with 37.2 -- is for the next 10, 15 minutes,

19   while I am going through my call, go in my attorney/witness

20   room and talk about some of these issues.  For example, the

21   defendants claim in their response that all you have produced

22   as of March 9th are 200 pages of documents.  My guess is that

23   that is not accurate.

24         MR. BRANDFONBRENER:  That's not accurate.

25         THE COURT:  It should not be accurate.

1          But there are some disputes that maybe, if you just

2    go sit down and talk about it, you can resolve.  Come back in

3    in 10, 15 minutes.  If I am done, somebody will come and get

4    you.

5          (Whereupon, the Courts gave its attention to other

6          matters, after which the following further proceedings

7          were had in open court, at 9:28 o'clock a.m., to wit:)

8          MR. HOWE:  Good morning, again, your Honor.

9          My partner, Mr. Baugher, apologizes.  He had to run

10   to another court.

11         THE COURT:  All right.  Let us pick up where we left

12   off.

13         With respect to the responses regarding the liability

14   case, did you resolve anything else there?

15         I will give you until May 4th to file your

16   supplemental responses.

17         MR. HOWE:  Thank you.

18         MR. BRANDFONBRENER:  We have talked about -- and I

19   need to check with my client before we can -- I can -- agree,

20   and my clients are all -- it's 7:30 in California.

21         The defendants have proposed, essentially,

22   bifurcating discovery.  So, they would turn over records

23   sufficient for a computer sciences expert to make an

24   assessment of the degree of inclusion or copying or unjust

25   enrichment from the IA model codes, and then we would postpone

1   the damages discovery; which is not an expense to us, but they

2   say it will be a very large burden on them to give us how they

3   operate and the money numbers involved in their research

4   efforts.

5        Not sure if that's going to work, simply because one

6   way they may have benefitted -- and this would be sort of a

7   mis- -- part of our misappropriation liability case would be

8   if it was a very fast and inexpensive process to develop the

9   model, it may -- that may be proof of liability if they didn't

10  do exact copying.

11       But in the interest of not tying the Court up and,

12  you know, entertaining what I think is a serious proposal, you

13  know, I need to talk to my client about it.

14       THE COURT:  Okay.

15       MR. HOWE:  Your Honor, may I add one point to that?

16       THE COURT:  You may.

17       MR. HOWE:  This also relates to the Schwab Equity

18  Rating dispute that Mr. Brandfonbrener had alluded to before

19  and your Honor had asked me to address later.

20       Two points as to Schwab Equity Rating.  One, we

21  haven't placed it at issue.  The plaintiff has placed the

22  Schwab Equity Rating system at issue.

23       In its complaint, the plaintiff has alleged that part

24  of the damage that it is suffering is not only where the IA --

25  the Investment Analytic -- model is allegedly taken, but the

1   IA models are substantially similar to the Schwab Equity

2   Rating models, which is the flagship of the Schwab brand for

3   individual retail investors.

4        Mr. Forsythe, who wrote the IA models, is also the

5   author of the Schwab Equity Rating models.  And Mr. Forsythe,

6   who was the sole corporate representative of Schwab on the

7   Rule 30(b)(6), testified at his deposition that in addition to

8   -- the sole damages he was able to identify were out-of-pocket

9   costs for a computer forensic and out-of-pocket costs for

10  attorneys' fees.  He said the other area of damages that he

11  was concerned about was that Acorn supposedly had stolen a

12  "secret ingredient" from the Schwab Equity Rating model.

13       So, my proposal to Mr. Brandfonbrener is that we

14  bifurcate damages.  And, with respect to the Schwab Equity

15  Rating, we view that as a damages element.  Because if the

16  allegation, based on what the plaintiff's expert says, is that

17  Acorn allegedly stole --

18       THE COURT:  Right.

19       MR. HOWE:  -- Item Y of the IA models, we produce

20  financial information in our possession that relates to what

21  benefit, if any, we gain from Item Y.  And Schwab at that

22  point in time would be required to produce any element of the

23  Schwab Equity Rating model that relates to Item Y; because,

24  after all, if Item Y is not incorporated in Schwab Equity

25  Rating models, Schwab's damages as to that aspect are less.

1    THE COURT:  Talk to your client, and then -- but I
2  want to see a proposal in terms of what this is going to do
3  with the case --
4    MR. BRANDFONBRENER:  I agree.
5    THE COURT:  -- because there have been delays in this
6  case for many reasons, and I am not going to continue to delay
7  discovery and re-invent the wheel on everything here.
8    So, if you agree to that, I want to see a proposal in
9  terms of the case and how you plan on proceeding.  Because
10  what I am not going to do is bifurcate it until there is a
11  decision on liability.  So, I am not going to bifurcate it and
12  let the liability go to trial and, then, address the damages.
13    MR. HOWE:  Your Honor, I agree.  I think that the
14  linchpin is to find out what the plaintiff claims Acorn
15  allegedly misappropriated and copied.  And that will
16  substantially narrow the request both as to damages as to us
17  and Schwab Equity Rating system as to them.
18    MR. BRANDFONBRENER:  SER, we may well work out just
19  -- even if we don't bifurcate, there may be a stipulation.  As
20  I say, as I understood Greg Forsythe's testimony, there's no
21  accusation of any copying of IA code.  So, it may not even
22  be --
23    THE COURT:  Okay.
24    MR. BRANDFONBRENER:  -- an element for damages, in
25  which case --

1        MR. HOWE:  And if I could also add on that, your

2   Honor, counsel is correct:  This is far from a tit-for-tat

3   motion.  We had had our motion in the works for over a week

4   before it was filed.  Counsel and I had discussed the need if

5   one moved to have the other move.  And, in an attempt to avoid

6   any dispute as to Schwab Equity Ratings, I had advised counsel

7   that if they simply took Schwab Equity Ratings out of the case

8   by way of offering of stipulation saying that they were not

9   claiming damages to Schwab Equity Ratings, that we'd be

10   pleased to avoid our request as to it.

11        THE COURT:  Okay.

12        MR. BRANDFONBRENER:  On their motion and the Court --

13        THE COURT:  Let me know -- call Theresa tomorrow and

14   let her know -- if you agree to bifurcate; and, if you do, by

15   Friday I want you to file a joint proposal on how this will

16   affect discovery.

17        MR. BRANDFONBRENER:  Okay.

18        The only issue, we have a deposition today, tomorrow

19   and, then, Friday out of town, but I will just -- we'll push

20   it together.

21        THE COURT:  My guess is that there is somebody else

22   at Perkins Coie who could get it on file --

23        MR. BRANDFONBRENER:  All right.

24        THE COURT:  -- with your input --

25        MR. BRANDFONBRENER:  Okay.

1      THE COURT:   -- via cell phone or e-mail or some other

2  way.

3      MR. BRANDFONBRENER:   This is correct.

4      THE COURT:   So, your motion is granted, in part, and

5  we will take up the other issue regarding damages.

6      MR. HOWE:   Your Honor, may I address our motion to

7  bar?

8      THE COURT:   Yes.

9      MR. HOWE:   It has three points to it, essentially:

10  The issue as to the Rule 30(b)(6); the issue as to documents;

11  and, the issue as to witness statements.

12      As to the Rule 30(b)(6), we served a Rule 30(b)(6)

13  notice on Schwab.  They've tendered one and only one corporate

14  representative.  We, frankly, believe that much of the

15  testimony is inadequate.

16      For example, we have essentially no damage testimony.

17  It's simply Mr. Forsythe saying that they've incurred some

18  costs for attorneys' fees and as to a forensic consultant.

19  And even as to that, we've requested from Schwab on many

20  times, "What's the cost of your fees that you claim?" and,

21  "What's the out-of-pocket cost for the forensic consultant?"

22  We've yet to receive that.

23      We also believe that other testimony as to the

24  liability part of the case is inadequate.  We, for example,

25  asked in our notice, "Please state the complete factual basis

1    for various allegations and paragraphs of the complaint."   And

2    Mr. Forsythe said he had no personal knowledge; he hadn't

3    investigated; but, he believed that certain other witnesses --

4    no longer Schwab employees, whom we've now been required to

5    depose -- may have knowledge.

6           Our goal here as to the first aspect of our motion to

7    bar or to compel is simply to close the door on Schwab.   If

8    they choose to provide only Mr. Forsythe as a corporate

9    representative, we simply ask that Schwab be barred from

10   offering testimony from one of its witnesses on the subjects

11   of the Rule 30(b)(6) dep notice.

12          Would your Honor like me to address the two other

13   aspects now?

14          THE COURT:   Let us take up the 30(b)(6).

15          It is hard for me to give a blanket order like that

16   until I see what your other witness would say; and, is it a

17   fact witness that gave facts?   I am not going to agree to such

18   a blanket order.

19          But based on what you have represented here, it seems

20   like there are some blanks in Mr. Forsythe's testimony.

21          MR. BRANDFONBRENER:   A couple things.   This almost is

22   a motion in limine, not a --

23          THE COURT:   Exactly, which is why I cannot decide

24   it -- whether or not to bar -- in a vacuum, until we see what

25   the other witnesses say and how the evidence develops.

1      MR. BRANDFONBRENER:  This is how we proceeded on

2  Forsythe.  They sent us an amended 30(b)(6) notice with 27

3  subject matters.  And I wrote them before the deposition,

4  "Many of the topics are so overbroad as to defeat the purpose

5  of the rule.  Others are not appropriate areas of testimony.

6  When you have time, we should talk."

7      And, then, instead of wanting to confer to narrow,

8  the proposal that the defendants made, that we agreed to and

9  which we memorialized at the beginning of the Forsythe

10  deposition, was -- and this was my statement for the record --

11  "We've made objections to the scope of the 30(b)(6) notice and

12  the amended 30(b)(6) notice that you made, but our agreement

13  was rather than you moving to compel or me moving for a

14  protective order, we've agreed to proceed with the deposition

15  of Mr. Forsythe to see if there are any issues, indeed, after

16  the deposition is done."

17      "I think our basic agreement is to preserve the

18  objection that would have been brought in a motion to compel

19  or for a motion for a protective order -- narrowing the scope

20  or broadening the scope of the 30(b)(6) -- until after we

21  completed the deposition itself."

22      And, then, Mr. Howe:  "I agree."

23      So --

24      THE COURT:  Did you talk after the deposition?

25      MR. BRANDFONBRENER:  No.  So, there's never been a

1   Rule 37 -- and there is no certification -- on this part of

2   their motion.

3           THE COURT:  Meet and confer; and, if there are topics

4   that were not covered that should be covered, then produce

5   somebody else quickly.

6           MR. BRANDFONBRENER:  Agreed.  That has always been

7   how we thought we'd proceed.

8           THE COURT:  And if you cannot agree, then you can

9   come back in.  I am going to have you come back next week,

10  anyway, on these issues.

11          MR. BRANDFONBRENER:  In the two subjects that they

12  identified -- one was the witnesses' colleagues -- in our

13  26 -- they're the, "Who are the colleagues who said these

14  statements?"

15          In our Rule 26 statement that we filed in December,

16  we identify -- in the Rule 26 statement, it says, "This person

17  has knowledge -- " there are two people " -- knowledge of

18  statements made by Carter regarding his proposed use of

19  Schwab's models after leaving."  Both those people were

20  identified.

21          In an e-mail immediately after the Forsythe

22  deposition, I confirmed those were the people.  It's a mystery

23  why that should be an issue, since these were people who

24  supported the allegation in the complaint that we believe

25  there had been copying.  And Carter's admitted to copying, so

1    --

2              THE COURT:   Okay.   Let us turn to the documents.

3              MR. BRANDFONBRENER:   On the document front, just

4    briefly --

5              MR. HOWE:   May I, since I'm the movant?

6              THE COURT:   Yes, but let me -- how many more

7    documents have you produced since March 9th?

8              And, then, I will give you a chance, Mr. Howe.   But I

9    have read what is in your motion.

10             MR. BRANDFONBRENER:   Before March 9th, we went to a

11   Bates stamp of 200, including a CD-ROM and a hard drive, which

12   probably has a million pages on it.   I mean, these are

13   massive -- it was three hard drives of a computer that were

14   downloaded into.

15             THE COURT:   Okay.

16             MR. BRANDFONBRENER:   So, we have not -- then on

17   the -- that was before the 9th.

18             On the 9th, we answered the discovery.   I didn't have

19   any more records to produce, but by the 15th, I had another

20   200 pages, which I produced.   That was a week before any

21   deposition that they took.

22             THE COURT:   Okay.

23             MR. BRANDFONBRENER:   So, there was no prejudice from

24   the way we did the production.   Indeed, that's how the

25   defendants have been doing the production.   As time -- as they

1  get documents, they've been providing them to us.

2         The last -- or two weeks ago, I think it is now, I

3  got seven boxes of documents pursuant to a subpoena that we

4  issued to a third party.

5         THE COURT:  Third party.

6         MR. BRANDFONBRENER:  And we produced those.  They're

7  not responsive to the first set of document requests, I don't

8  think.  I'm not sure.  They're basically -- the seven boxes of

9  records were IA -- Investment Analytics -- records that had

10  been maintained at an office site in New Jersey.

11         Pursuant to the sale of Schwab's Capital Markets

12  Division, that office ceased to be a Schwab office and became

13  a UBS office.  UBS wasn't sure what they should do with these

14  records because these were institutional clients and they had

15  acquired Schwab's institutional business.

16         So, after substantial negotiating with UBS and, then,

17  a subpoena to UBS, they agreed to turn these records over to

18  me and they sent us the originals.  I immediately called

19  defendants to say we had received these seven boxes.  They

20  came over a week later and copied them.

21         But it's not a -- the seven boxes, I don't think, are

22  responsive to the first request.  They may be responsive to

23  the second request.  But there was no delay by Schwab; and,

24  indeed, I've been pursuing UBS to get the records back.

25         THE COURT:  Okay.

1          MR. HOWE:  Two points, your Honor.

2          First, to say that the records are in UBS's

3    possession is disingenuous because upon information and

4    belief, based on the discovery to date, I can represent to the

5    Court that these records were transferred by Schwab to UBS

6    after the filing of this lawsuit.  In fact, we have computers

7    at issue in the IA division that had been -- we've got witness

8    testimony yesterday -- that were transferred from IA --

9    Schwab's IA division -- in February of this year.

10         Second, our goal here is simply to stop the flood.

11   We have more than 10,000 additional documents that have been

12   produced recently.  There are large volumes of those documents

13   that were responsive to the initial requests.

14         For example, among the documents that were turned

15   over was the customer file for the Acorn affiliate Delphi that

16   was a customer of IA.  And that's directly relevant to this

17   case because it goes to the so-called damages issues on the

18   calculation of a reasonable royalty because it shows which

19   rates Delphi did with Schwab.

20         Our goal here is simply to bar Schwab from later

21   producing and using -- later using -- from using documents

22   that it has produced to date.  I'm not complaining about

23   documents being produced on March 15th as opposed to March

24   9th.  I can live with the documents -- the 10,000-plus pages

25   -- that have been produced to date.  I simply want to close

1    the door and make sure that the universe of the documents that

2    we're talking about here is set.

3              MR. BRANDFONBRENER:   I am not aware of any further

4    documents.   The UBS documents were not turned over post-

5    lawsuit.   They've been maintained in New Jersey for -- when

6    you look at the records, they're multiple-year -- they're

7    probably five-year-old invoices.   I was unaware there was any

8    Delphi invoice because I'm pretty sure the records there were

9    only so-called hard-dollar client records.

10             But be that as it may, it was not -- there was no

11   delay by Schwab, and Schwab didn't possess these records at

12   any time since the filing of these lawsuits -- of the lawsuit.

13             It's inherent in dealing with -- especially with -- a

14   closed division that there may be delays.   I'm not -- I have

15   been pursuing discovery on both coasts where records may be,

16   and I am unaware of any others.   That being said, like any

17   other discovery, I think if something comes up and they have

18   an issue with it, we can address it.   But I'm not holding back

19   in order to dump it on them at a later point.

20             THE COURT:   Right.   You have a right to supplement --

21   an obligation to supplement -- discovery.

22             Again, I am not going to enter a general bar order

23   now.   I think that is premature.

24             I am going to deny that part of your motion without

25   prejudice.   If something is turned over between now and the

1    time of trial, if this goes to trial, you can always raise

2    that motion with the Court, again, and I will determine it on

3    a document-by-document basis.

4           MR. HOWE:  Thank you.

5           THE COURT:  But to the extent that you have anything

6    responsive and you have not turned it over --

7           MR. BRANDFONBRENER:  Nothing.

8           THE COURT:  Okay.

9           -- it should have been turned over.

10          Your interrogatory responses, also -- at least one of

11   them I see -- suffers from the same problem that plaintiff's

12   do.  You say that you have produced documents responsive to

13   it, but you do not identify what those documents are.

14          MR. BRANDFONBRENER:  I tried to identify them, but I

15   didn't do them in Bates ranges.  So, I --

16          THE COURT:  Answer to No. 3 --

17          MR. BRANDFONBRENER:  Okay.

18          THE COURT:  -- for example, to the defendants' second

19   interrogatories.  And I do not know that I have the first

20   interrogatories in here, but answer to No. 3 at the end of it:

21   "Copies of this information have been produced in this

22   litigation subject to protective order."

23          You need to identify what that information is.

24          MR. BRANDFONBRENER:  Oh.  Yeah --

25          THE COURT:  That is insufficient.

1          So, you have until May 4th to supplement your

2    responses, as well.

3          Now, with respect to witness statements --

4          MR. HOWE:  Your Honor?

5          THE COURT:  -- you -- go ahead, Mr. Howe.

6          MR. HOWE:  I'm sorry.  I didn't mean to cut you off.

7          THE COURT:  No, that is okay.  Go ahead.

8          MR. HOWE:  We had had documents that counsel had

9    requested which were drafts of the offer letters that IA had

10   made -- excuse me, Acorn had made -- to Schwab for purchase of

11   IA.  We had had drafts of the offers of employment letters to

12   Mr. Carter and certain other witnesses.  Those drafts were all

13   reviewed and drafted by attorneys.  And we agreed to produce

14   the drafts notwithstanding a claim -- a valid claim, we

15   believe -- of attorney-client privilege and attorney work

16   product, subject to a stipulation that the production of those

17   documents would not work for waiver.

18         With respect to the witness statements, we discovered

19   the witness statement for the first time during the deposition

20   of one witness -- Julia Choate -- who said she signed a

21   statement and no longer retained a copy.

22         Yesterday, Ms. Carolyn Banta -- another former

23   employee -- testified, and she said that she had also signed a

24   witness statement.  We've not seen the witness statements.

25         We're more than willing to enter into a stipulation

1   that their production does not waive any claim of work product

2   or attorney-client privilege, but we don't believe that there

3   is any claim.   These are simply witness statements that we

4   think, if there is an assertion of work product, can be

5   produced in redacted form and, if there's a claim of

6   attorney-client privilege, can be produced for in camera

7   inspection.

8           MR. BRANDFONBRENER:   These are -- there are two of

9   them.   They are both created by counsel after the start of the

10  lawsuit.   So, they're distinct from the cases that were cited

11  for witness statements that are created in the ordinary course

12  of business or were created without anticipation of

13  litigation.

14          And there are two cases that we found -- the reason

15  why we didn't produce these; both Northern District cases --

16  that talked about this kind of statement being -- it's

17  either -- that can be either work product for the lawyer's

18  selection of which facts or attorney-client communication.

19          There's no fact in these that's not in the complaint.

20  I mean, we're not hiding any facts.   Both witnesses have been

21  subjected to multiple-hour depositions.   It is -- but, again,

22  these aren't intended to be an issue.   There hasn't been any

23  meet-and-confer from them on these statements.

24          But that being said, we may well -- I just need to

25  talk to my client.   We just raised today whether -- they said

1   they would stipulate that it wouldn't be a waiver.  Either

2   that or we can provide them in camera.  They shouldn't be a

3   big issue.

4            THE COURT:  Okay.  Meet and confer on those.

5            MR. BRANDFONBRENER:  They're one- and two-page-long

6   statements.

7            THE COURT:  Meet and confer, as you are required to

8   do.

9            Then I would like to see you either next week or the

10  following week to see where things are and to make sure you

11  are on track, and to address the issue of the bifurcation.

12           I know you are in -- you have depositions the next

13  few days.  What does your schedule look like next Wednesday,

14  next Thursday, the 9th?

15           MR. BRANDFONBRENER:  Next Thursday I have to -- I

16  have the privilege of appearing in DuPage Circuit Court.  So,

17  that will take all day just to get back.  It's the joy of --

18  but Wednesday I'm available.  The Court doesn't meet Friday,

19  right?

20           THE COURT:  Not next Friday, no.

21           MR. BRANDFONBRENER:  Okay.

22           So, I'm available -- that would be the 4th or --

23           THE COURT:  9th?

24           MR. BRANDFONBRENER:  9th is fine, also.  That's a

25  Monday?

1          THE COURT:  Mr. Howe, do you have a preference?

2          Yes.

3          MR. HOWE:  The 4th is available, your Honor.

4          THE COURT:  Okay.  Let us do it on the 4th.

5          MR. HOWE:  The 9th I have a hearing.

6          THE COURT:  Well, you can take your pick.  You can

7    either come early -- you can come at 8:30 or you can come at

8    9:30.  I do not have trial, so take your pick.

9          MR. HOWE:  My preference would be the earlier if

10   counsel --

11          MR. BRANDFONBRENER:  My preference is the later just

12   because of the commute.

13          MR. HOWE:  I'm happy to accommodate.

14          MR. BRANDFONBRENER:  The later, please.

15          THE COURT:  Okay.

16          Why is that your preference?

17          MR. BRANDFONBRENER:  The commute.

18          THE COURT:  The commute.  Okay.

19          MR. HOWE:  I live River North, though I'm happy to

20   agree to 9:30, your Honor.

21          THE COURT:  All right.  9:30.

22          My preference is always the earlier, as well, but

23   here that is okay because I do not have trial.

24          MR. BRANDFONBRENER:  So, that is --

25          THE COURT:  9:30, May 4th.  We will take up these

1   issues.

2          This should demonstrate to you why there is a Local

3   Rule 37.2 to meet and confer:  Because some of these issues

4   you could have resolved on your own.

5          And that is why I apply it strenuously:  Because so

6   often you do not need to bring things to the Court's attention

7   and waste your clients' money by filing motions and having to

8   come into court in the first place.

9          May 4th at 9:30.  I will see you then.

10         MR. BRANDFONBRENER:  Thank you, your Honor.

11                 *    *    *    *    *

12

13  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.
14

15  _____   _____, 2005

16  Official Court Reporter

17

18

19

20

21

22

23

24

25

# ORIGINAL

1

1    IN THE UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF ILLINOIS
2    EASTERN DIVISION

3

     CHARLES SCHWAB & COMPANY, INC.,    ) Docket No. 04 C 7071
4                                       )
                           Plaintiff,   )
5                                       )
               vs.                      )
6                                       )
     BRIAN D. CARTER, et al.,           ) Chicago, Illinois
7                                       ) May 4, 2005
                          Defendants.)  9:23 o'clock a.m.

8

9            TRANSCRIPT OF PROCEEDINGS - STATUS
          BEFORE THE HONORABLE AMY J. ST. EVE

10

11   APPEARANCES:

12

     For the Plaintiff:        PERKINS COIE, LLC
13                             BY:  MR. ERIC D. BRANDFONBRENER
                               131 S. Dearborn Street, Suite 1700
14                             Chicago, Illinois  60603

15

     For the Defendants:       SCHOPF & WEISS
16                             BY:  MR. ARTHUR J. HOWE
                               312 West Randolph Street, Suite 300
17                             Chicago, Illinois  60606

18

     Court Reporter:           MR. JOSEPH RICKHOFF
19                             Official Court Reporter
                               219 S. Dearborn St., Suite 1232
20                             Chicago, Illinois  60604
                               (312) 435-5562

21

22        * * * * * * * * * * * * * * * * *

23             PROCEEDINGS RECORDED BY
             MECHANICAL STENOGRAPHY
24        TRANSCRIPT PRODUCED BY COMPUTER

25

Exhibit 3

1          THE CLERK:   04 C 7071, Charles Schwab & Company v.

2   Carter.

3          THE COURT:   Good morning.

4          MR. BRANDFONBRENER:   Good morning, your Honor, Eric

5   Brandfonbrener for the plaintiff, Charles Schwab.

6          MR. HOWE:   Good morning, Arthur Howe for the

7   defendants.

8          THE COURT:   Good morning.

9          MR. BRANDFONBRENER:   Your Honor, we have, since last

10  Wednesday's motion -- hearing -- refiled our motion partly

11  under seal, partly in the public record.

12          We have also conferred with respect to the two

13  categories of discovery that Schwab had at issue in its

14  motion, other than the Rosenkranz deposition.   The first was

15  discovery relating to the broad category I called liability.

16          We have gotten nothing from the defendants yet in our

17  discussions.   They're in the process of providing us with new

18  written discovery responses and, we were told, various other

19  documents.   It's a little hard to be very conclusive until we

20  have a chance to look at the documents, but there are a couple

21  of things I'd like to note.

22          The defendants have now agreed to produce an

23  unredacted fax tree.

24          THE COURT:   Okay.

25          MR. BRANDFONBRENER:   You recall the fax trees --

1            THE COURT:  Yes, I remember that.

2            MR. BRANDFONBRENER:  -- is a written representation

3    of the model.

4            We specified in our motion -- and in our discussions

5    before that -- that we need to see the development of the

6    model over time --

7            THE COURT:  Yes.

8            MR. BRANDFONBRENER:  -- and one fax tree, especially

9    this one dated November 26th.  It's a month after they hired

10   Carter; it's three weeks after we filed the lawsuit; and, it's

11   a month before -- month-and-a-half before -- they said they

12   had a final model.

13           THE COURT:  Have you seen the unredacted fax tree

14   yet?

15           MR. BRANDFONBRENER:  Not yet, no.

16           THE COURT:  Okay.

17           When are you going to produce that, Mr. Howe?

18           MR. HOWE:  The fax tree document, your Honor, we

19   anticipate, will be produced along with the supplemental

20   written responses --

21           THE COURT:  Today.

22           MR. HOWE:  -- which will be today.

23           THE COURT:  Okay.

24           MR. BRANDFONBRENER:  They've also checked to see if

25   there are any other e-mails between Mr. Carter and Acorn's

1   main modeling person, Gary Sabot.  We attached some of those

2   e-mails that showed our model actually being transmitted over

3   to Mr. Sabot.

4           They say they found no more but have agreed to check,

5   again.

6           MR. HOWE:  And, if I may, I've inquired and I've been

7   told that what exists has been produced.

8           THE COURT:  Okay.

9           MR. BRANDFONBRENER:  Our concern here is we deposed

10  Mr. Carter in early January, and he said he was still engaged

11  in model making.  We deposed Mr. Sabot in mid-April, and he

12  said that Carter had assisted him in model making through

13  December or January.  That's at least two months of model

14  making without any record to what he did, other than a

15  collection of e-mails sent the first and second days of his

16  employment with Acorn.

17          THE COURT:  And that would have been two months after

18  the unredacted fax tree that you are going to get; is that

19  right?

20          MR. BRANDFONBRENER:  No.  He -- I'm sorry, the

21  e-mails that we have are from October 26, 27.  The fax tree is

22  November --

23          THE COURT:  November.

24          MR. BRANDFONBRENER:  -- 26th.

25          THE COURT:  But in his deposition, he said --

1        MR. BRANDFONBRENER:  Was January.

2        THE COURT:  Right.  And he said he continued --

3        MR. BRANDFONBRENER:  He was still working at that

4   point on assisting Acorn in developing a model.

5        THE COURT:  Right.  And that is --

6        MR. BRANDFONBRENER:  What he --

7        THE COURT:  I guess my point is that that is two

8   months after the fax tree --

9        MR. BRANDFONBRENER:  Yeah.  A month-and-a-half --

10        THE COURT:  -- that you are going to get.

11        MR. BRANDFONBRENER:  -- after the fax tree.

12        THE COURT:  Okay.

13        MR. BRANDFONBRENER:  And in that time we asked what

14   he was doing, and he was, he said, reverse engineering our

15   model using public engi- -- you know, information; and, yet,

16   we have no record to show that.

17        Mr. Sabot testified -- when I asked him, "How do you

18   know the information you're being provided by Mr. Carter in

19   this effort is not just our trade secret information?" --

20   "Well, because he's providing me with copies of the public

21   research papers that my client used to publish with stuff

22   circled, and I could see where it wasn't from."

23        So, all that shows is there is more documentary

24   evidence to show the development of the model.

25        It's been disappointing in our meet-and-confers to be

1   asked what else do we want.  What we're looking for and sort

2   of in short terms is work papers.  We want to see the model

3   over time.  We certainly need to see the model as it is today,

4   not two months before it was finalized.

5            Without that, I don't see how our liability -- and

6   any sort of liability -- expert -- someone who can compare

7   models -- is going to be able to compare models, because we

8   just don't have them and we don't have after they were

9   developed.

10            THE COURT:  You have asked -- we were talking about

11   e-mails, and you have checked and you do not have e-mails.  Do

12   you have any of this other documentary evidence?

13            MR. HOWE:  Your Honor, we'll be produce- -- counsel

14   for the first time yesterday had referred to "work papers" of

15   Mr. Sabot.  Mr. Sabot's work was based on books, journal

16   articles, abstracts of journal articles, links to articles

17   which he had looked at which were on the Web, and other

18   materials.

19            Handwritten -- we've produced the research briefs

20   that were at issue that counsel was referring to.

21            THE COURT:  The ones --

22            MR. HOWE:  That Mr. --

23            THE COURT:  -- submitted from Carter --

24            MR. HOWE:  -- Carter or --

25            THE COURT:  -- that he circled?

1       MR. HOWE:   -- Mr. Sabot looked at.

2       THE COURT:   Okay.

3       MR. HOWE:   And to the extent that there are extant

4  copies of those research briefs that have any type of

5  handwriting or circling or just pages with notes on them,

6  those have been produced, also.

7       Counsel's requested -- and so we'll be producing --

8  additionally the other materials that I've referred to:   The

9  journal articles, the PDFs, the links to the articles, et

10 cetera.

11      In addition, counsel, in his motion and his request,

12 had asked for outputs of the model.   And we've advised Mr.

13 Brandfonbrener that we'll be in the course of producing the

14 outputs of the models.

15      Now, that happens to be a more laborious process

16 because what we're talking about is a model that generates

17 rankings on a regular basis for over -- a universe of over

18 3,000 stocks.   And my understanding, although I've not

19 actually seen the data yet, is that the data may extend back

20 in time for a five-year time period.

21      So, we're talking 60 months for 3,000 stocks, perhaps

22 rankings more frequently than that.   But as soon as I can get

23 my hands on the volume of that data and be able to produce

24 that -- which may not be today, but as soon as possible -- we

25 will be producing that, as well.

1        THE COURT:  And, then, what you are producing, does

2  that include documentation from the time Mr. Carter started at

3  Acorn up through this unredacted fax tree in November that he

4  submitted regarding the development of it?

5        MR. HOWE:  As to Mr. Carter, we've produced

6  everything that Mr. Carter has.

7        THE COURT:  Okay.

8        MR. HOWE:  As to Mr. Sabot, Mr. Sabot in his

9  deposition had testified that he had had a model that he had

10  worked on that this is the latest evolution of before he had

11  begun work as a part-time consultant for Acorn years ago in

12  the mid-'90s.  So, Mr. Sabot's documentation is not going to

13  extend back till 1994/1995, when he began it.  But we're

14  producing everything for the October -- and, actually, before

15  -- time frame in 2004, so that counsel can see what work Mr.

16  Sabot has been doing on that.

17        THE COURT:  Okay.

18        It sounds like you need to wait and see what you are

19  getting.

20        MR. BRANDFONBRENER:  It will be.  I mean, the output

21  -- certainly, five years of output was requested.  And looking

22  at the output of the model to see how it changes is not --

23  it's going to be tough.  It's not -- as opposed to looking at

24  the model itself.  We would rather have -- and think they must

25  be able to provide us with -- the model itself, certainly, in

1   its current form, since they're running it.

2          Also, I should point out Mr. Sabot testified to

3   running various studies and correlations.  These aren't

4   outputs of his model.  These were outputs that he was running

5   using information to replicate our model.  I mean, he

6   testified he got a .99 correlation on some, which means an

7   almost identical output generated against our model.  So, we

8   need to see -- that just shows work papers.  That's how he

9   developed his model.  Those must be in some form --

10          THE COURT:  It sounds like you are --

11          MR. BRANDFONBRENER:  -- and we'll see what we get.

12          THE COURT:  -- getting that.  Yes.

13          See what you get; and, if there's a problem, meet and

14   confer.  And if you cannot resolve it, come back in.  But it

15   sounds like you are getting --

16          MR. BRANDFONBRENER:  Something.

17          THE COURT:  -- what you have asked for.

18          Whether or not it is, I am sure I will hear from you

19   if it is not.

20          MR. BRANDFONBRENER:  On that point -- and maybe we

21   just need another status -- we have an expert disclosure, and

22   I don't know whether --

23          THE COURT:  May 31st.

24          MR. BRANDFONBRENER:  -- we can meet it or not -- yeah

25   -- until we see what we get.

1          THE COURT:  I will move that.

2          Is it May 31st?  Is that right?

3          MR. BRANDFONBRENER:  It is.

4          THE COURT:  Okay.

5          MR. BRANDFONBRENER:  We may have a better sense once

6   we see what's coming, if that's any --

7          THE COURT:  I am sorry?

8          MR. BRANDFONBRENER:  We may have a better sense of

9   how long it's going to take to analyze the data once we get

10  the data.

11         THE COURT:  I will move that to June 27th.  That is

12  four weeks.  That is burden-of-proof expert disclosures.

13         Rebuttal experts are due July 25th.

14         And expert will close September 1st.

15         Dispositive motions, I previously set September 2nd.

16  I will strike that.

17         October 3rd.

18         I will come can back to a question that I always ask

19  you:  What about settlement?

20         It is clear you are spending a lot of money; which,

21  if --

22         MR. HOWE:  Allow me to --

23         THE COURT:  -- that is the way your clients want to

24  go, that is fine.

25         MR. HOWE:  Allow me to begin with this.

1       Your Honor, in December of '04, I invited Mr.

2   Brandfonbrener and his partner to our offices, and we laid out

3   three terms for a proposed settlement.   An agreement to be

4   reflected in a written agreement in order that:   A, we

5   wouldn't use any of their trade secrets; B, they wouldn't use

6   any of ours, to the extent it was produced in discovery; and,

7   C, to the extent that we had independently reverse engineered

8   a model, we would not market it, so that Schwab would have

9   some comfort.

10      After that, in order to provide greater comfort to

11  Schwab that none of the information that Mr. Carter may have

12  kept with him or have taken with him had actually been used,

13  we voluntarily produced a declaration of Mr. Gary Sabot that

14  was done in January.   It was created and provided in an effort

15  to provide assurance to Schwab.

16      Following that, we had initiated a telephone

17  conference, which Mr. Brandfonbrener, myself, the General

18  Counsel of my client -- Chad Coulter -- and the in-house

19  counsel at Schwab -- Mr. Lowell Haky -- had participated in.

20  We had tried to explore the possibility of settlement then.

21      After that telephone conference, Mr. Brandfonbrener

22  and I had had a series of exchanges over the course of the

23  next couple of weeks.   Mr. Brandfonbrener had asked me to be

24  "more proactive" in trying to reach a settlement.   To that

25  end, we provided Mr. Brandfonbrener and his client with the

1   text of a draft settlement agreement that we thought would

2   advance the ball on this.

3        Not last Friday, but the Friday before that following

4   the deposition of Mr. Lowell Haky, we had a meeting -- excuse

5   me, Mr. Jerry Chaifkin -- we had a meeting at which

6   Mr. Brandfonbrener, Mr. Haky -- the in-house lawyer -- and I

7   participated to discuss settlement.  At that meeting, we were

8   told Schwab, basically, isn't interested in resolving this

9   case until discovery is complete.  We've been --

10            THE COURT:  Who told you that?

11            MR. HOWE:  Mr. Haky.

12            THE COURT:  Okay.

13        Is that accurate?

14            MR. BRANDFONBRENER:  What we need to do in order to

15   assess the case is understand how the model has been used.

16   Right now we've been sort of in a black box.  So, I think

17   getting this model in discovery finally, that we've been

18   asking for, will advance the ball tremendously.

19        We've had -- we have enough indications that it may

20   have been used.  If we get comfort it hasn't, settlement will

21   be much easier.

22            THE COURT:  Okay.

23            MR. BRANDFONBRENER:  We are nearing that point.

24            THE COURT:  Okay.

25            MR. BRANDFONBRENER:  Then I agree, the status of --

1   with some minor exceptions, that is an accurate description

2   overall of how we are proceeding.

3         THE COURT:   Come back early next month -- by then you

4   should have the model -- and we will pick up the issue of a

5   settlement conference and whether or not that makes sense.

6         You are about to go down what sounds like it is going

7   to be quite expensive expert discovery; which, if you choose

8   to go down that, that is fine.   But it seems to make some

9   sense to continue your discussions and get everybody in the

10  same room and try to settle it.

11        MR. BRANDFONBRENER:   Once we have this model and some

12  input from an expert, I think it will be much easier.

13        THE COURT:   Okay.

14        June 6th at 8:45.   Does that work?

15        MR. BRANDFONBRENER:   It does.

16        Your Honor, there are --

17        THE COURT:   Mr. Howe, is that okay with you?

18        MR. HOWE:   Yes.

19        THE COURT:   June 6th?

20        MR. BRANDFONBRENER:   A few other issues?

21        THE COURT:   Yes?

22        MR. BRANDFONBRENER:   I don't know if we -- we left

23  off the last hearing on our motion to compel, there was -- we

24  did liability-related discovery.   We didn't reach damages-

25  related discovery.

1          THE COURT:  And you --

2          MR. BRANDFONBRENER:  It was --

3          THE COURT:  -- informed Theresa that you do not want

4    to sever -- your client does not want to sever.

5          MR. BRANDFONBRENER:  Right.

6          The bifurcation proposal we thought would neither

7    save time nor expedite settlement, since we need to have an

8    overall picture of how these -- of how this operates in order

9    to make a sensible settlement.

10          On the damages, we're not seeking unusual things.

11    We're seeking -- basically, I think we're going to end up with

12    an unjust enrichment theory.  It's not going to be based on

13    Schwab's losses, but based on how Acorn has benefitted from

14    the misappropriated information.

15          For that, we need to know information on Acorn's

16    costs.  And we're not seeking, I don't think, burdensome

17    discovery.  We're seeking ledgers, internal accounting

18    information that must -- that should -- track their costs.

19          THE COURT:  Have you subpoenaed this information?

20          MR. BRANDFONBRENER:  It's in -- well, it's -- we've

21    put it in our discovery requests.  The 30(b)(6) witness was

22    absolutely unknowledgeable about how the finances of the

23    company worked.  And we asked the CEO, and he directed us to a

24    CFO.

25          THE COURT:  Have you requested this documentation in

1    any --

2             MR. BRANDFONBRENER:  Yes.  It's in our motion to

3    compel, in fact.  There's several requests that relate to this

4    sort of stuff.

5             THE COURT:  But the way you are phrasing it -- and

6    maybe I missed it when I looked at it, but the way you are

7    phrasing it -- I do not recall seeing that type of request,

8    which is why I am coming back to asking you, did you ask for

9    this type of information?

10            MR. BRANDFONBRENER:  We asked for all records

11   relating to costs and, basically, how the -- expenses incurred

12   in research at Acorn.  The --

13            THE COURT:  And when you met and conferred, since you

14   were here on April 27th, did you and Mr. Howe discuss this

15   expert issue?

16            MR. BRANDFONBRENER:  We discussed this issue.  He is

17   going to undertake to look for this record, although he

18   indicated -- we got a lot of pushback, but I think this is an

19   issue that they are going to be looking into.  I just want to

20   raise it to the Court's attention.

21            MR. HOWE:  We're now talking pronouns, rather than

22   nouns.  So, I want to be precise.

23            Your understanding of the issue that you think I'm

24   looking into is?

25            THE COURT:  Whether or not you have these documents

1    that would show --

2         MR. BRANDFONBRENER:  We're looking for the costs and

3    expenses of -- at Acorn.  They have research costs.  They

4    presumably have some sort of ledger to track costs of their

5    efforts.

6         We also need the revenues and profits that are

7    generated by the entity and by the entities that benefit from

8    the research.

9         If they have taken our model and investing in a

10   billion-dollar fund have made hundreds of millions of dollars,

11   that's a relevant inquiry versus if they're a $10 million

12   fund.

13        We also need information on the organizational

14   structure of the defendants.  Hedge funds are notoriously

15   complex structures, in part, to shield from liability; in

16   part, for their own investment purposes.

17        We asked the 30(b)(6) witness about structure.  He

18   had no clue.  He called it "cloud of affiliates."  We learned

19   from the CEO some more information.  That was last Friday

20   afternoon.  But in order to know which entities to look at for

21   damages issues, we need to understand the structure.

22        On the costs and expenses, on the revenues and

23   profits, and on the structure, we've gotten almost no

24   testimony and, I think, no documents.

25        THE COURT:  Mr. Howe?

1        MR. HOWE:  Judge, it breaks down into two categories:

2   Financial, structure.  Let me address the structure first.

3   I'll come back to the financial.

4        In terms of the structure, Mr. Brandfonbrener deposed

5   Mr. Rosenkranz, who is, after all, the CEO of the Delphi

6   Financial Group, head of Delphi Financial Management, and is

7   the beneficial owner of the defendant Acorn in this case.

8        And Mr. Rosenkranz, in his deposition -- which is

9   currently being transcribed -- had made clear that the

10  relationship between Delphi Financial Group -- which is a

11  publicly-held corporation, anything you want to find out about

12  it is available on the Internet through the SEC Web site,

13  EDGAR -- and Acorn -- which is a privately-held limited

14  partnership -- the relationship is simply that Mr. Rosenkranz

15  is a shareholder of Delphi and is CEO of Delphi and also

16  happens to be the beneficial owner of Acorn.

17       Mr. Brandfonbrener asked further questions.  There

18  was another Acorn entity that's out there, Acorn Partners.

19  Mr. Rosenkranz answered those questions.

20       There happens to be a Delphi entity that's involved

21  in this matter or whose name has come up in this matter,

22  Delphi Capital Management.  Mr. Rosenkranz identified that as

23  being a wholly-owned subsidiary of Delphi Financial Group.

24       So, the structure issues have been answered in terms

25  of the deposition; and, to the extent counsel has more

1    questions, frankly, I don't know what they are.

2         As to the damages issue --

3         THE COURT:  The financial?

4         MR. HOWE:  Excuse me, the financial issue.

5         The requests to -- or, excuse me, the requests for

6    production are remarkably broad.  In the discussions that

7    Mr. Brandfonbrener and I have had -- and to be fair, we have

8    had discussions, and he has provided more specificity -- he's

9    looking for, basically, seven types of information, as I

10   understand it.  He wants to know every source from which we

11   have bought any data and how much money we have paid for that

12   market data.

13        Second, he wants to know every source from which we

14   have acquired any type of research and the monies that we have

15   paid for that research.

16        Third, he wants to know the cost that Acorn has

17   incurred for model development.

18        Fourth, he wants to know all of the revenues

19   generated from an Acorn model or models.

20        Fifth, he wants to know all of the profits or losses

21   generated from that model or models.

22        Sixth, he wants reports to -- all reports to -- the

23   Investment Committee, because there is an Investment Committee

24   on which Mr. Rosenkranz and Mr. Sabot sit that reviews the

25   trading of Mr. Sabot's models.

1          And, seventh, he wants reports to all investors.

2          We have three problems as to each of these requests:

3   Factual predicate for the need of it; the intrusiveness; and,

4   the irrelevance of it.

5          First, as factual predicate --

6          THE COURT:  Let me interrupt you for a minute.

7          Have you met and tried to narrow these?

8          Because I am hearing different things that you are

9   asking for, Mr. Brandfonbrener, and what you are telling me,

10  Mr. Howe.  What you have just said is a lot broader than what

11  Mr. Brandfonbrener said ten minutes ago.

12         MR. HOWE:  I'm simply recounting our conversations.

13  Mr. Brandfonbrener and I spoke -- we have spoken regularly

14  before last week.

15         THE COURT:  Okay.

16         MR. HOWE:  But since last week --

17         THE COURT:  Since last week.

18         MR. HOWE:  -- we met in chambers.  We spoke

19  afterwards.  Just yesterday we had two telephone conferences,

20  which probably lasted over two hours total.  We've had

21  continuing conversations.

22         THE COURT:  Okay.

23         MR. HOWE:  I'm recounting to you my understanding of

24  what they're asking for in our meet-and-confers.

25         MR. BRANDFONBRENER:  His --

1        THE COURT:  And is that accurate?

2        MR. BRANDFONBRENER:  Well, his version is the most

3   expanded way of saying what I think can be more simply

4   produced in readily-available documents for a very short

5   period of time.  We're talking from October through -- I

6   guess, through current or at least a month ago.  I mean, so,

7   we're talking, you know, a six-month window for -- relatively

8   recent window for -- the costs, revenues and expenses that

9   would be reflected in their internal accounting.  It would be

10  reflected in reports to the Investment Committee and reports

11  to investors.  There can't be that big a universe of records.

12        THE COURT:  What is your objection?

13        MR. HOWE:  Three things.

14        Your Honor, Mr. Brandfonbrener and his client will

15  have an opportunity to test the veracity of the statement.

16        But the only evidence that we have that any

17  information that Mr. Carter may have taken or kept that leaked

18  to Acorn is a couple of e-mails that Mr. Carter e-mailed

19  Mr. Sabot having to do with a particular function called the

20  NA function.  In other words -- NA, not available -- how does

21  a model treat the absence of information for a particular time

22  period?  If you don't have earnings for a company in one

23  quarter, what do you do?  Do you drop the company from the

24  rankings or do you provide a substitute.

25        Mr. Sabot and Mr. Carter testified as to that.  They

1   were examined as to it.  Mr. Sabot had said that even before

2   this lawsuit was filed, he had e-mailed and told Mr. Carter

3   back the information wasn't useful and he hasn't used it.

4        And that's been put in a declaration and in his

5   testimony.  And Mr. Brandfonbrener is going to have a chance

6   to test that when he gets to liability.  But that's the nose

7   of the camel.  That doesn't entitle the camel to enter the

8   tent.

9        Secondly, your Honor, the information that Mr.

10  Brandfonbrener is asking isn't going to be advancing the ball

11  on damages or otherwise.  He's already had an opportunity.

12  Mr. Brandfonbrener's asked Mr. Sabot how much money's been

13  under management, asked Mr. Rosenkranz how much money's been

14  under management.  Mr. Rosenkranz on Friday had said that year

15  to date model that they're running has earned about 7 percent.

16       And what we have here -- let's just assume that one

17  particular item or two or three particular items were, in

18  fact, stolen by Acorn from Schwab, that Mr. Carter's --

19  Mr. Sabot's -- statement on the NA fill is incorrect.  It

20  still is not going to show you what money was earned from

21  those particular formulas in a model.  And if you have 7

22  percent return this year compared to 15 percent return last

23  year, the fact that you may be earning less doesn't disprove

24  copying, nor does it create damages.

25       Third, your Honor, the information that we've been

1  told that counsel is seeking is just remarkably broad,

2  expensive to compile, and is intrusive.

3         To the extent that it deals with Delphi, it's a

4  publicly-held company.  The information is out there.  To the

5  extent --

6         THE COURT:  Yes, what about that?

7         MR. BRANDFONBRENER:  We've tried.  The Delphi -- it

8  is a -- it's a footnote that says they have transactions with

9  related entities, and it mentions a $3.8 million expense item.

10 It doesn't give the revenues.  We are --

11        THE COURT:  They do not have SEC filings --

12        MR. BRANDFONBRENER:  They have --

13        THE COURT:  -- that set forth --

14        MR. BRANDFONBRENER:  -- SEC filings, but they're not

15 segregating the funds that this model manages.  It's a huge

16 insurance conglomerate.  They have, apparently, internally

17 some funds that they use this model to manage.  They're not

18 required by the SEC to report -- to segregate every investment

19 vehicle they use.  They just glue it all together as

20 investment returns.  So, we can't from public information

21 determine the use and the revenues generated by the model.

22        MR. HOWE:  Your Honor, if I might add something

23 further?

24        We have not been able to reach agreement on it, but I

25 think the suggestion that we had proffered is a reasonable,

1   good-faith way of approaching this; which is, Mr.

2   Brandfonbrener has had a chance to ask Mr. Sabot and Mr.

3   Rosenkranz generally how much money is involved in the model

4   development -- and, after all, Mr. Sabot's had a team that's

5   been at this for years; this is not the only aspect of work

6   that they've been doing -- and those questions have been

7   answered.

8          Mr. Rosenkranz has been asked questions about how

9   much money has been earned.

10         If, after we have their expert review information,

11  they contend that some further item has, in fact, been copied,

12  then I think that we have a greater way of specifying what

13  discovery would be necessary and we can try to focus it to

14  avoid intrusiveness and burden and to actually make this

15  productive.

16         THE COURT:  I do not know that we need to wait until

17  expert, but I think you should wait and see what you get in

18  the production today and if that can help you narrow.

19         Your requests are -- looking at what you submitted in

20  your motion to compel -- quite broad.

21         MR. BRANDFONBRENER:  The requests are broad.  We've

22  narrowed them in our meet-and-confer.  We can see what they

23  produce.  I then --

24         THE COURT:  See what they produce, and see if you can

25  narrow them further.

1        Certainly, the structure documents, to the extent you

2   have not received those, you should turn those over.   I know

3   you said that some questions were answered during the

4   30(b)(6).   It sounds like those were not sufficient.   So, if

5   you have documents about the structure of the entity, then

6   those should be turned over.

7        As for the other documents, wait and see what you get

8   and see if you can narrow that further.   And if you cannot

9   agree to it, you can come back in.

10       MR. BRANDFONBRENER:   We will.

11       MR. HOWE:   May I take 15 seconds, your Honor --

12       THE COURT:   You may.

13       MR. HOWE:   -- on one other point?

14       We had also had a cross motion to bar and compel

15   examine.   Mr. Brandfonbrener and I have had discussions about

16   whether Schwab will be designating any additional witness as

17   to certain items in the Rule 30(b)(6).   He has to get back to

18   me.   If there is another witness to be proffered, we'll have

19   an opportunity to depose.

20       We've also had discussions -- although we have not

21   yet reached agreement -- about whether we can enter into a

22   stipulation that would take certain items related to the

23   Schwab Equity Ratings out of the case.

24       THE COURT:   Yes.

25       MR. HOWE:   Those discussions have not yet reached an

1  impasse, but we have made progress on them.

2          THE COURT:  Okay.  Good.

3          I know there was an issue with respect to whether or

4  not Schwab had to turn over one of its models, and it sounds

5  like --

6          MR. BRANDFONBRENER:  This is this other, we say,

7  unrelated model.  That's the Schwab Equity Rating model that's

8  a retail model run by the same --

9          THE COURT:  You say unrelated, but it is part of

10 their counterclaim or you argued last time it is part of

11 your --

12         MR. HOWE:  Well, we've argued --

13         THE COURT:  -- either defense --

14         MR. HOWE:  They've put it --

15         THE COURT:  -- or counterclaim.

16         MR. HOWE:  -- at issue, and we're trying to resolve

17 that and see if we can reach agreement on a stipulation.

18         THE COURT:  Okay.  If you cannot, you know where I

19 am.

20         MR. HOWE:  Judge, thank you very much.

21         MR. BRANDFONBRENER:  One more --

22         THE COURT:  June 6th.

23         Did I give you that date?

24         MR. HOWE:  Yes.

25         MR. BRANDFONBRENER:  You did.

1          One more housekeeping matter.

2          THE COURT:  Yes.

3          MR. BRANDFONBRENER:  From last Friday night's

4   deposition -- and we'll make a motion on this -- we are --

5   likely need to -- once we get the transcript -- to need to

6   amend our complaint to add additional entities that we were

7   unclear what their role was in the case.

8          It turns out Mr. Carter is not employed by Acorn.

9   Acorn has no employees.  Acorn appears to have no assets.

10  Acorn appears to be a shell.

11         THE COURT:  Okay.

12         MR. BRANDFONBRENER:  So, we may have to add the

13  Delphi entity.

14         THE COURT:  See if you can agree.  If not, bring your

15  motion.

16         MR. BRANDFONBRENER:  We will.

17         MR. HOWE:  We'll simply ask a brief time to respond,

18  your Honor, because --

19         THE COURT:  Okay.

20         MR. HOWE:  -- the entity they want to add is Delphi

21  Capital Management, an entity that they've known about --

22  because it's mentioned in Mr. Carter's employment letter --

23  since December, when it was produced.

24         THE COURT:  And I thought early on Mr. Baugher

25  brought that to the Court's attention one day.

1              MR. HOWE:  Delphi has --

2              THE COURT:  I could be wrong, but it --

3              MR. HOWE:  Delphi has come up in the transcripts

4     before, your Honor.

5              THE COURT:  Yes.

6              MR. HOWE:  It's been no surprise.  Parties have known

7     about it.  But we will respond when the motion --

8              MR. BRANDFONBRENER:  Right.

9              MR. HOWE:  -- is brought.

10             MR. BRANDFONBRENER:  We had never gotten

11    organizational documents to know if Acorn ran Delphi, vice

12    versa.

13             THE COURT:  Okay.

14             MR. BRANDFONBRENER:  So, we'll --

15             THE COURT:  Bring your motion if you need to.

16             MR. BRANDFONBRENER:  Thank you.

17             THE COURT:  Thank you.

18                         *     *     *     *     *

19

20    I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.

21

22

23    _____        _____ / 9 _____, 2005
      Official Court Reporter

24

25

**Schopf & Weiss** LLP

**Business Litigation**

312 West Randolph Street, Suite 300
Chicago, Illinois 60606-1721
tel 312.701.9300
fax 312.701.9335
www.sw.com

Writer's e-mail
howe@sw.com

Writer's direct dial
312.701.9336

📁 **FILE**

May 4, 2005

**Via Facsimile:** 312.324.9400
**Original by U.S. Mail**

Eric D. Brandfonbrener, Esq.
Perkins Coie LLP
131 South Dearborn Street
Chicago, Illinois 60603

**RECEIVED**

**MAY 0 5 2005**

**PERKINS COIE**

**Re:**   *Schwab, et al.  v. Carter, et al.*, No. 04-C-7071

Dear Eric:

Enclosed please find Defendants' supplemental interrogatory responses, as well as an unredacted fax tree document bearing document control numbers BC 1024 - 1035, which is designated as confidential and attorneys' eyes only pursuant to the protective order in this litigation.

As we had discussed earlier this week and as I stated in Court this morning, we are in the process of producing additional documents responsive to plaintiff's discovery requests. To the extent that any such additional documents may supplement our interrogatory responses, I will so state by reference to specific document control numbers in my cover letters accompanying the documents.

Yours truly,

Arthur J. Howe

AJH:smc
Enclosures

cc:    Peter V. Baugher, Esq.

144516_1.DOC

Exhibit 4

RECEIVED

MAY 0 5 2005

PERKINS COIE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLES SCHWAB & CO., INC.,                    )
                                               )
                  Plaintiff,                   )        Judge Amy J. St. Eve
                                               )
        v.                                     )        Magistrate Judge Arlander Keys
                                               )
BRIAN D. CARTER, ACORN ADVISORY                )        Case No. 04 C 7071
MANAGEMENT, L.L.C., and ACORN                  )
ADVISORY CAPITAL, L.P.,                        )
                                               )
                  Defendants.                  )

📁 FILE

### DEFENDANTS' SUPPLEMENTAL RESPONSES TO CERTAIN OF PLAINTIFF'S INTERROGATORIES

Pursuant to the Court's ruling at the hearings held in this matter on April 27 and

May 4, 2005, Defendants Brian D. Carter ("Carter") and Acorn Advisory Capital, L.P. ("Acorn")

(collectively, "Defendants"), by their attorneys, hereby supplement their prior responses and

objections to certain of Plaintiff Charles Schwab & Co., Inc.'s ("Plaintiff" or "Schwab")

Interrogatories to Defendants as follows:

Defendants restate and incorporate by reference their prior responses, specific

objections, and General Objections to each Interrogatory as if fully set forth herein.

### SUPPLEMENTAL RESPONSES TO SCHWAB'S FIRST INTERROGATORIES
### (attached to Schwab's Second Discovery Requests to Defendants)

5.  Identify all persons who have received or seen the emails sent by Carter to Acorn,
    including those emails containing information taken from Schwab.

**SUPPLEMENTAL ANSWER:**    Subject to and without waiving Defendants' previously-

stated objections, Defendants state that Documents bearing document control numbers BC 479-

487, 717-719, 739-740, 779-830, as well as e-mail files that were produced electronically on a

CD bearing document control number BC 836, and documents marked as exhibits at Mr. Carter's

deposition, identify persons at Acorn who have received e-mails from Carter. Defendants further

144438v1

incorporate the deposition testimony of Gary Sabot, in which Mr. Sabot stated that, to the best of

his recollection and belief, he did not forward any of the e-mails at issue to anyone other than

Robert Rosenkranz, whom Schwab has also deposed. (*See* Sabot Dep. at 188-89.) Mr. Sabot

also stated that he initially believed that the information that Mr. Carter e-mailed reflected Mr.

Carter's independent efforts to draft code. (*Id.* at 182.) Defendants also refer Schwab to the

deposition transcript of Robert Rosenkranz, in which Mr. Rosenkranz testified that he had only

seen "the one e-mail that Sabot forwarded to [him] from Carter." (Rosenkranz Dep. at 111.)

6. Identify each decision that has relied in whole or in part on information or data generated by the models referenced in Document Request No. 1.

**SUPPLEMENTAL ANSWER:**    Subject to and without waiving Defendants' previously-

stated objections, Defendants state that Acorn has not used any of the confidential code or

formulae contained in Schwab's models in the development of Acorn's models. As evidence

supporting the fact that Acorn has not used any such information in the development of its own

models, Defendants refer Schwab to the deposition testimony of Gary Sabot, Brian Carter and

Robert Rosenkranz. Specifically, Mr. Sabot testified, *inter alia*, that Mr. Carter did not copy

files containing IA's code in preparation for joining Acorn (*see* Sabot Dep. at 11); that Acorn

had no use for the code that Mr. Carter emailed and that Mr. Sabot told Mr. Carter that he should

stop sending that code (*see id.* at 21); that Acorn did not use IA's code in developing its own

code (*see id.* at 49); that Mr. Sabot was able to gather information regarding Schwab's models

from research briefs that Schwab made available to all of IA's institutional customers (*see id.* at

184); that Mr. Carter did not give Mr. Sabot the "key to know what elements were being factored

and weighed in each of [the IA model] components" (*id.* at 185); that Mr. Carter has never sent

Mr. Sabot "things that [say] here is the system" (*id.* at 227); and that Acorn did not approve of

Mr. Carter purportedly taking information from Schwab (*id.* at 227-28). Mr. Carter testified,

*inter alia*, that he did not make copies of any information from Schwab in preparation for his

work for Acorn (*see* Carter Dep. at 129, 131); that Mr. Sabot specifically asked Mr. Carter not to

send him any IA code because "he didn't need to see anything like that." (*id.* at 140-41); and that

Acorn's models use a different programming language than IA's models (*see id.* at 159-60).

Among other things, Mr. Rosenkranz testified that, based upon his conversations with Mr. Sabot,

the e-mail that Mr. Sabot forwarded him from Mr. Carter was "gobbledy gook" (Rosenkranz

Dep. at 51); and that Mr. Sabot provided Mr. Rosenkranz with this code to "make the point that

... Carter's programming language was just hopelessly inferior to what [Acorn was] doing, and

that [Acorn] would have to teach Carter how to create code in [Acorn's] style." (*Id.*) Without

conceding that the document reflects any decision that has relied in whole or in part on

information or data generated from confidential information taken from Schwab, Defendants also

refer Schwab to documents bearing document control numbers BC 765-777 and BC 1024-1035

in response to this Interrogatory.

> 7.   Identify all tasks Carter has performed for Acorn and all persons who are
> supervising Carter in these tasks.

**SUPPLEMENTAL ANSWER:**      Subject to and without waiving Defendants' previously-

stated objections, Defendants refer Schwab to Brian Carter's deposition transcript, in which Mr.

Carter testified that he had not been given access to Acorn's models (*see* Carter Dep. at 154-55);

that he was working on "the asset efficiency component based on the 2001 November research

brief and operating income to enterprise value" (*id.* at 155); that he was helping Acorn to load

Compustat Xpressfeed and Xpressfeed Loader and identifying Compustat data items and

mnemonics (*see id.* at 156); and that he was examining the concepts discussed in the research

briefs that Schwab disseminated to Acorn (as well as other IA institutional customers) (*see id.* at

160). Defendants also refer Schwab to Gary Sabot's deposition transcript, in which Mr. Sabot

testified that Mr. Carter's title is "Financial software engineer" (Sabot Dep. at 64); that Mr.

Carter has been "taken off" of model development (*id.*); that Mr. Carter is "learning how to use

[Acorn's] tools and working on things that don't have to do with model development" (*id.*); and

that Mr. Carter is "developing systems that can capture the results of [Acorn's] various back-

tests." (*id.* at 64-65). When asked what efforts Acorn has made to develop an international

equities rankings model, Mr. Sabot testified: "We've started working with data vendors to get

data and work with models and have Brian become familiar with our tools, building a domestic

model to accomplish these steps, and then we took Brian off of all model development, and we

haven't touched the problem. We haven't accomplished any of these things because we've been

derailed by the effort of dealing with this [lawsuit]." (*Id.* at 70.)

### SUPPLEMENTAL RESPONSES TO SCHWAB'S THIRD INTERROGATORIES (attached to Schwab's Third Discovery Requests to Defendants)

3. Identify in detail how Acorn has developed and develops research software and models, including who at Acorn has been and is involved in developing research software and models, how such software and models were developed or are being developed, how such software and models are used, how such software and models are evaluated, all costs related to the development of such software and models, and all documents that relate to the use, development, evaluation and costs of, and payment for, such software and models.

**SUPPLEMENTAL ANSWER:** Subject to and without waiving Defendants' previously-

stated objections, Defendants refer Schwab to Gary Sabot's deposition transcript, in which Mr.

Sabot testified, among other things, that Mr. Sabot began doing consulting work for various

financial companies, including Delphi, in 1993 (*see id.* at 54); that he managed money for Acorn

beginning in 1998 (*id.*); that he became a full-time employee of Acorn in 1999 (*id.*); that his

current job responsibilities include, *inter alia*, "[b]uilding systems to collect financial data,

analyze the data, build models." (*id.*); and that the Acorn employees with whom Mr. Sabot

currently works, besides Mr. Carter, include Paul Huibers, Jeff Mincy, Andy Piskorski and Don

Allen (*id.* at 60-64). Mr. Sabot further testified that Acorn's model incorporates value and

momentum (Sabot Dep. at 78); and that Acorn collects data from without limitation Bloomberg,

Dow Jones Factiva, as well as the data outputs provided to Acorn and IA's other institutional

customers by IA while Acorn was one of IA's institutional customers (*id.* at 83-84, 92).

Defendants also refer Schwab to Brian Carter's deposition transcript, in which Mr. Carter

testified that Acorn uses a separate language to run its models.  (Carter Dep. at 160.)  Defendants

also refer Schwab to Robert Rosenkranz's deposition transcript, in which Mr. Rosenkranz

testified that the outside research services to which Acorn subscribes include without limitation

Bloomberg, Compustat, 13D Research, and Factiva.  (Rosenkranz Dep. at 61-64); that Mr.

Sabot's group at Acorn was responsible for Acorn's quantitative research and that Acorn was

involved in a continuing process of "beefing up staff" in the research area.  (Rosenkranz Dep. at

72.)

Dated: May 4, 2005

 

 

                                                 _____

                                             One of the Attorneys for Defendants Brian D. Carter
and Acorn Advisory Capital, L.P.

Peter V. Baugher
Arthur J. Howe
Anna Eisner Seder
SCHOPF & WEISS LLP
312 W. Randolph, Suite 300
Chicago, Illinois 60606
312.701.9300

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Gary W. Sabot, Director of Risk Management

and Quantitative Analysis for Acorn Advisory Capital, L.P., state under penalty of perjury that the

responses to the foregoing Supplemental Responses to Certain of Plaintiff's Interrogatories are true

and correct to the best of my knowledge and belief.

Dated: May 4, 2005

Gary W. Sabot

6

## CERTIFICATE OF SERVICE

I, Anna Eisner Seder, an attorney, hereby certify that I caused a copy of the

foregoing **Defendants' Supplemental Responses to Certain of Plaintiff's Interrogatories** to

be served via facsimile and U.S. mail, postage prepaid, the 4th day of May, 2005, upon the

following:

> Eric D. Brandfonbrener
> Darrell J. Graham
> Jonathan Buck
> PERKINS COIE LLP
> 131 South Dearborn, Suite 1700
> Chicago, IL 60603
> Fax:  (312) 324-9400

Anna Eisner Seder

1

```
1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
2                        EASTERN DIVISION

3

  CHARLES SCHWAB & COMPANY, INC.,  ) Docket No. 04 C 7071
4                                  )
                         Plaintiff, )
5                                  )
             vs.                   )
6                                  )
  BRIAN D. CARTER, et al.,         ) Chicago, Illinois
7                                  ) May 25, 2005
                        Defendants.) 8:35 o'clock a.m.
8

9         TRANSCRIPT OF PROCEEDINGS - MOTIONS
          BEFORE THE HONORABLE AMY J. ST. EVE
10

11 APPEARANCES:

12

   For the Plaintiff:        PERKINS COIE, LLC
13                           BY:  MR. ERIC D. BRANDFONBRENER
                             131 S. Dearborn Street, Suite 1700
14                           Chicago, Illinois  60603

15

   For the Defendants:       SCHOPF & WEISS
16                           BY:  MR. ARTHUR J. HOWE
                             312 West Randolph Street, Suite 300
17                           Chicago, Illinois  60606

18

   Court Reporter:           MR. JOSEPH RICKHOFF
19                           Official Court Reporter
                             219 S. Dearborn St., Suite 1232
20                           Chicago, Illinois  60604
                             (312) 435-5562
21

22        * * * * * * * * * * * * * * * * * *

23             PROCEEDINGS RECORDED BY
                MECHANICAL STENOGRAPHY
24        TRANSCRIPT PRODUCED BY COMPUTER

25
```

Exhibit 5

2

1        THE CLERK:  04 C 7071, Schwab vs. Carter.

2        THE COURT:  Good morning.

3        MR. HOWE:  Good morning, your Honor, Arthur Howe for

4   the defendant.

5        MR. BRANDFONBRENER:  Good morning.

6        MR. HOWE:  Defendants.

7        MR. BRANDFONBRENER:  Good morning, your Honor, Eric

8   Brandfonbrener for Schwab.

9        We have two motions before --

10        THE COURT:  Yes, you do.

11        MR. BRANDFONBRENER:  -- the Court this morning.

12        THE COURT:  Let us talk first about your motion to

13   file an amended complaint.

14        Is there an objection?

15        MR. HOWE:  Yes, there is, your Honor.

16        Your Honor --

17        THE COURT:  And what is it?

18        MR. HOWE:  -- we would -- because our objection goes

19   to issues that we'd like to present some documents and some

20   deposition testimony on, we'd like to request a short period

21   to respond.

22        We have this case set for hearing on June 6th.  We

23   have Memorial Day coming up.  If we could have towards the end

24   of next week, we'd have something to you by the afternoon of

25   Friday.  Then you'd have an opportunity to review it and this

3

1   motion can be decided on --

2       THE COURT:  Is your response in connection with -- is

3   your argument going to be that it is futile to amend the

4   complaint to include, like, the unjust enrichment claim?  Are

5   you arguing prejudice?  What is the basis --

6       MR. HOWE:  We're arguing timeliness --

7       THE COURT:  -- that you need deposition testimony?

8       MR. HOWE:  Timeliness and prejudice and the effect

9   that it will have on this case on delay.

10      And, very briefly, your Honor, the Delphi entities

11  that counsel proposes -- that Schwab proposes -- to add in the

12  amended complaint are a publicly-traded corporation and an

13  affiliate of a publicly-traded corporation.  We do not

14  represent them.  If they actually are named in this case, they

15  did not participate in the discovery.  They will want to be

16  separately represented, I am quite sure.

17      Their only connection here is that they are

18  affiliates of Acorn in the sense that Mr. Rosenkranz -- an

19  executive of Delphi and a principal shareholder of Delphi --

20  also happens to have a controlling interest in the Acorn

21  entities.  But Delphi is publicly traded, just like IBM and

22  General Motors.  And it has particular interests -- especially

23  in this day and age -- that need to be protected; and, so, it

24  will be separately represented.

25      I have no doubt that Delphi will argue that it would

4

1   be prejudiced if it were bound by discovery --

2               THE COURT:  Right.

3               MR. HOWE:  -- that it did not have an opportunity to

4   present.

5               THE COURT:  Okay.  File your --

6               MR. HOWE:  That will have an effect --

7               THE COURT:  File your response by Wednesday, June

8   1st, and drop off a courtesy copy.

9               That will give you time to reply by Friday, June 3rd,

10  and drop off a courtesy copy.

11              So, June 1st for your response and courtesy copy.

12  Either fax or hand deliver it --

13              MR. HOWE:  Will do.

14              THE COURT:  -- to opposing counsel so they have

15  enough time to see it to reply by June 3rd, with a courtesy

16  copy of both to the Court.

17              Now, with respect to your motion to set a certain

18  date for compliance.

19              Mr. Howe, what is outstanding that you have not

20  turned over?

21              MR. HOWE:  Judge, we have a volume of information

22  related to models.  In particular, I had mentioned before that

23  we have a collection of a very large volume of information

24  related to model output:  Mr. Sabot's work papers and the

25  like.

5

1          THE COURT:  Yes.

2          MR. HOWE:  We've had -- we've reviewed the protective

3    order that was entered in this case.  We had a concern about

4    whether it would be satisfactory to protect this information.

5          Schwab, when we had deposed some Schwab executives

6    related to related materials, referred to this as equivalent

7    to the Coca-Cola formula, and they wanted -- they declined to

8    provide certain information and were concerned about

9    confidentiality of some information.

10         We have proposed to Mr. Brandfonbrener last week some

11   additional modifications to the protective order.  Mr.

12   Brandfonbrener and I exchanged e-mails.  He had advised me he

13   was tied up.  He called me back late last night.  We did not

14   speak.  We spoke briefly this morning.

15         I can say that some of the items that we've

16   requested, I think, are unobjectionable.  For example --

17         THE COURT:  What about, like, organizational records

18   or other things that you do not think are covered?  As of the

19   time of this, they had not been turned over.

20         MR. HOWE:  We've got a volume of that, your Honor.

21   To be honest, it's been a matter of trying to assemble the

22   model information, which we understand is Mr. Brandfonbrener's

23   key issue.  But we do have other information that we'll be

24   producing.

25         THE COURT:  Okay.

6

1      By June 1st, you should produce everything that I

2  have ordered.

3      I am going to grant your motion for a date certain.

4  June 1st is your date certain.

5      If you cannot work out your protective order issues

6  on these model documents that you think need some extra

7  protection, then file something with the Court by June 3rd

8  that I will take up on June 6th, when you are back here.

9      MR. HOWE:  Your Honor, with respect to the model

10  information, then, what is the Court's direction?  Do you want

11  us to produce it subject to any motion that we may file or --

12      THE COURT:  That is preferable to keep this moving.

13      MR. HOWE:  If -- that's --

14      THE COURT:  Mr. Brandfonbrener, will you agree with

15  respect to these model documents not to -- to use them only

16  for attorneys' eyes only at this point, until you get some

17  type of modification to the protective order that is either

18  agreeable to both sides or ordered by the Court?

19      MR. BRANDFONBRENER:  Yes.

20      The protective order already has an "attorneys' eyes

21  only" designation that, we think, should be adequate.  This is

22  the model -- if the model information needs something extra,

23  we can talk about it.  The current proposal prohibits anyone

24  who consults for a financial services firm to see it; which,

25  of course, is, I think, almost any expert we're going to have

1   to hire, is a --

2          THE COURT:  Okay.

3          MR. BRANDFONBRENER:  -- consultant to a financial

4   services firm.

5          THE COURT:  But until that is resolved --

6          MR. BRANDFONBRENER:  Fine.

7          THE COURT:  -- attorneys' eyes only on the model

8   information.

9          MR. BRANDFONBRENER:  Right.

10         THE COURT:  And turn everything over by June 1st.

11         MR. BRANDFONBRENER:  In our motion for a date

12  certain, we raised issues that relate to our motion to amend.

13  Based on the information we received in one deposition the

14  last day of fact discovery was really the grounds for our

15  motion to amend the complaint to add parties, because we

16  learned only at that time who Mr. Carter was employed by and

17  where his work is being used.

18         We still -- without the organizational documents --

19         THE COURT:  Right.

20         MR. BRANDFONBRENER:  -- we may need to further

21  amend --

22         THE COURT:  Well, we will --

23         MR. BRANDFONBRENER:  -- or --

24         THE COURT:  -- talk on June 6th.  That is why I want

25  you to get everything before you come back.

8

1       MR. BRANDFONBRENER:  It's also -- the other thing I

2   was going to say is we're not looking to blow the case into as

3   many defendants as possible, as long as we have solvent

4   defendants.  The defendants that we've named from the

5   discovery we got on the last day of fact discovery, I think,

6   are shells.  They don't have assets, employees.  The assets

7   and employees are held in this sister company at Delphi.

8       If we are able to establish that the Delphi

9   subsidiary has assets, employees, is solvent, we may be able

10  to just amend to add them and not the parent and not

11  Mr. Rosenkranz.  But given our lack of information and our

12  desire not to delay, we filed the amended complaint with all

13  that in there.

14      We can brief it as is.  We think there's grounds to

15  add those parties.  And, then, maybe once we get the discovery

16  we've been seeking for months, we can narrow the complaint and

17  avoid what I've been told are going to be jurisdictional

18  motions once the motion to amend is -- if the motion to amend

19  is granted.

20      THE COURT:  Well, hopefully, by the time you file

21  your reply on June 3rd, you will be able to address those

22  issues if you want some modification of what you are asking

23  leave to amend for.

24      MR. BRANDFONBRENER:  Okay.

25      Your Honor, the other -- at the last hearing -- we

1  can take this up, also, on the 6th, if that's the Court's

2  preference -- we got a one-month extension --

3  THE COURT:  Yes.

4  MR. BRANDFONBRENER:  -- on the experts.  We're in no

5  better position than we were a month ago, because we've gotten

6  no new information.  So, we'll be in the same position.

7  THE COURT:  But your disclosure is not due until June

8  27th, right?

9  MR. BRANDFONBRENER:  Correct.  But this is a

10  complicated expert issue on both damages and liability.

11  THE COURT:  I understand.

12  MR. BRANDFONBRENER:  And it will take that much time.

13  THE COURT:  I will take that up on June 6th, because

14  what I do not want to do is give you a date today and have you

15  come in on June 6th and say, "Wait a minute.  Because of these

16  documents you just gave us, we now need another date."  So,

17  when you have more complete information to present a revised

18  proposal --

19  MR. BRANDFONBRENER:  That's makes perfect sense.

20  THE COURT:  -- to the Court, I will take that up when

21  you come back on the 6th.

22  MR. BRANDFONBRENER:  Thank you.

23  MR. HOWE:  Thank you, your Honor.

24  THE COURT:  Anything else?

25  MR. HOWE:  No, thank you.

10

1          THE COURT:  Okay.

2          I will see you June 6th.

3          MR. BRANDFONBRENER:  Thanks.

4                    *    *    *    *    *

5

6     I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.

7

8                                        May 27     , 2005

9     Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

RECEIVED

JUN 0 6 2005

PERKINS COIE

CHARLES SCHWAB & CO., INC.,     )

     Plaintiff,     )     Judge Amy J. St. Eve

     v.     )     Magistrate Judge Arlander Keys

BRIAN D. CARTER, ACORN ADVISORY     )     Case No. 04 C 7071
MANAGEMENT, L.L.C., and ACORN     )
ADVISORY CAPITAL, L.P.,     )

     Defendants.     )

## ACORN'S SUPPLEMENTAL RESPONSES TO
## PLAINTIFF'S INTERROGATORIES

Acorn Advisory Capital, L.P. ("Acorn"), by its attorneys, hereby supplements its

prior responses and objections to certain of Plaintiff Charles Schwab & Co., Inc.'s ("Plaintiff" or

"Schwab") Interrogatories to Defendants as follows:

Acorn restates and incorporates by reference its prior responses, specific

objections, and General Objections to each Interrogatory as if fully set forth herein.

## SUPPLEMENTAL RESPONSES TO SCHWAB'S THIRD INTERROGATORIES
### (attached to Schwab's Third Discovery Requests to Defendants)

3.     Identify in detail how Acorn has developed and develops research software and
models, including who at Acorn has been and is involved in developing research
software and models, how such software and models were developed or are being
developed, how such software and models are used, how such software and
models are evaluated, all costs related to the development of such software and
models, and all documents that relate to the use, development, evaluation and
costs of, and payment for, such software and models.

**SUPPLEMENTAL ANSWER:** Subject to and without waiving its previously-stated general

and specific objections, Acorn states that model outputs from that portion of the Acorn model

purported to be at issue in this litigation can be found in documents bearing control numbers

A00001-4214, and documents relating to the history of that portion of the Acorn model

purported to be at issue in this litigation can be found in documents bearing document control

Exhibit 7

numbers A4215-7250.  Furthermore, documents that relate to the use, development, and

evaluation of Acorn's software and models include without limitation the following books,

journals, articles and other publications:

> The Paralation Model:  Architecture-Independent Parallel Programming (Artificial Intelligence) by Gary W. Sabot (Hardcover – September 16, 1988);

> Paralation Lisp:  Software for the Macintosh, With Reference Manual/Diskette by Gary W. Sabot (Hardcover – April 1, 1989);

> High Performance Computing:  Problem Solving with Parallel and Vector Architectures by Gary W. Sabot (Editor);

> Paralation Lisp:  Software for the IBM, Pc, Xt, and at With Reference Manual/Disk and Manual by Gary W. Sabot (Paperback – April 1, 1989);

> Computational Modeling of 1994 A.M. Best Life/Health Insurer Ratings, by Gary Sabot;

> The Portable Financial Analyst:  What Practitioners Need to Know, 2nd Edition;

> Puzzles of Finance:  Six Practical Problems and Their Remarkable Solutions;

> Handbook of Equity Style Management, 3rd Edition;

> Investment Options as a Strategic Investment - Fourth Edition;

> Options, Futures, and Other Derivatives, 5th Edition;

> Technical Analysis of the Futures Markets: A Comprehensive Guide to Trading Methods and Applications;

> Trading and Exchanges: Market Microstructure for Practitioners;

> A Non-Random Walk Down Wall Street;

> The Econometrics of Financial Markets;

> Efficient Asset Management: A Practical Guide to Stock Portfolio Optimization and Asset Allocation;

> Hedge Fund Risk Transparency;

> Optimal Trading Strategies: Quantitative Approaches for Managing Market Impact and Trading Risk;

> Equity Markets: Structure, Trading, and Performance;

Portfolio Construction and Risk Budgeting;

Active Portfolio Management: A Quantitative Approach for Producing Superior Returns and Selecting Superior Returns and Controlling Risk;

Advances in Portfolio Construction and Implementation (QUANTITATIVE FINANCE);

Equity Management: Quantitative Analysis for Stock Selection by Bruce I. Jacobs, Kenneth N. Levy, Harry M. Markowitz (Foreword);

Market Neutral Strategies by Bruce I. Jacobs, Kenneth N. Levy, Mark J. P. Anson (Foreword);

Modern Investment Management: An Equilibrium Approach by Bob Litterman, Bob Litterman;

Advanced Fixed Income Analytics;

Advanced Perl Programming (Nutshell Handbook);

Advanced Programming in the Unix Environment (Addison-Wesley Professional Computing Series);

Advances in Fixed Income Valuation Modeling and Risk Management;

Advances in Portfolio Construction and Implementation (QUANTITATIVE FINANCE);

Applied Multivariate Statistical Analysis;

Dynamic Programming and Optimal Control: 2nd Edition (Volumes 1 and 2);

Equity Markets: Structure, Trading, and Performance by Schwartz, Robert Alan;

Event Trading: Profiting from Economic Reports and Short-Term Market Inefficiencies;

Extraordinary Popular Delusions and the Madness of Crowds and Confusión de Confusiones;

Financial Optimization;

Financial Shenanigans: How to Detect Accounting Gimmicks & Fraud in Financial Reports;

Freakonomics: A Rogue Economist Explores the Hidden Side of Everything;

Hedge Fund Risk Transparency;

Hedge Fund of Funds Investing: An Investor's Guide;

Hedge Funds: Quantitative Insights (The Wiley Finance Series);

Hedge Funds: Myths and Limits;

In Search of Stupidity: Over 20 Years of High-Tech Marketing Disasters;

Introduction to Mathematical Finance: Discrete Time Models;

Knoppix Hacks;

Market Models: A Guide to Financial Data Analysis;

Market Neutral Strategies;

Moneyball: The Art of Winning an Unfair Game;

One Jump Ahead: Challenging Human Supremacy in Checkers;

Online Investing Hacks;

Optimal Trading Strategies: Quantitative Approaches for Managing Market Impact and Trading Risk;

Perl Resource Kit;

Perl Resource Kit: Unix Edition;

Portfolio Construction and Risk Budgeting;

Predicting Presidential Elections and Other Things;

Risk Management: The State of the Art;

The Electronic Day Trader;

The Elements of Statistical Learning: Data Mining, Inference, and Prediction (Springer Series in Statistics);

The Encyclopedia of Trading Strategies;

The Inefficient Stock Market: What Pays Off and Why (2nd Edition);

The New New Thing: A Silicon Valley Story;

The Road since Structure: Philosophical Essays, 1970-1993, with an Autobiographical Interview;

The Structure of Scientific Revolutions;

The Triumph of Contrarian Investing;

The Visual Display of Quantitative Information;

Trading Systems and Methods;

Understanding Statistical Process Control;

Unix Network Programming: Networking Apis: Sockets and Xti;

Using SANs and NAS;

Using Visual C++ 6;

Visual Explanations: Images and Quantities, Evidence and Narrative;

Wall Street Secrets for Tax-Efficient Investing: From Tax Pain to Investment Gain;

Wicked Cool Shell Scripts;

Windows XP Pro: The Missing Manual;

Advanced Perl Programming;

An Introduction to R;

Dynamic Hedging;

Equity Management;

Forecasting;

GNU Emacs and XEmacs with CDROM;

Gnu Scientific Library Reference Manual - Second Edition;

Google Hacks;

Latex;

Linux Server Hacks;

Market Efficiency;

Navigate the Noise;

New Market Timing Techniques;

Non-Linear Time Series Models in Empirical Finance;

Oracle PL/SQL Programming with 3.5 Disk;

Oracle8i;

Oracle8i DBA Handbook with CDROM;

Perl Cookbook;

Practical Forecasting for Managers;

Principles of Forecasting;

Programming Perl;

Programming with Data;

R Reference Manual - Base Package - Volume 1 R Reference Manual - Base Package - Volume 2; Red Hat Linux 7.3 Bible with CDROM;

Regression Modeling Strategies;

Statistical Quality Control;

Testing Macroeconometric Models;

The Dream Machine;

The LaTeX Web Companion;

The Qmail Handbook;

The Tipping Point;

Time-Series Forecasting;

Trading and Exchanges;

The Journal of Finance;

The Journal of Investing;

Financial Analysts Journal;

Journal of Portfolio Management;

Journal of Asset Management;

CFA Digest;

CFA Institute Conference Proceedings;

Institutional Investor;

Wall Street & Technology;

Computing Surveys;

Communications of the ACM;

ACM Queue;

IEEE Spectrum;

IEEE Computer;

Linux Journal;

SysAdmin;

Network Computing;

Eweek;

ARN Accounting Research Network
     Behavioral and Experimental Accounting –APS;
     Behavioral and Experimental Accounting –WPS;
     ARN Professional Announcements and Job Postings-JA;

ERN Economics Research Network
     Behavioral & Experimental Economics-APS; Behavioral & Experimental
     Economics-WPS;
     Econometrics-APS; Econometrics-WPS;
     ERN Professional Announcements and Job Postings-JA;

FEN Financial Economics Network
     Capital Markets: Asset Pricing & Valuation-APS;
     Capital Markets: Asset Pricing & Valuation-WPS;
     Capital Markets: Market Efficiency-APS;
     Capital Markets: Market Efficiency-WPS;
     Capital Markets: Market Microstructure-APS;
     Capital Markets: Market Microstructure-WPS;
     Derivatives-APS;
     Derivatives-WPS;
     Corporate Finance: Capital Structure & Payout Policies-APS;
     Corporate Finance: Capital Structure & Payout Policies-WPS;

Corporate Finance: Governance, Corporate Control & Organization-APS;
Corporate Finance: Governance, Corporate Control & Organization-WPS;
Corporate Finance: Valuation, Capital Budgeting & Investment Policy-APS;
Corporate Finance: Valuation, Capital Budgeting & Investment Policy-WPS;
Behavioral & Experimental Finance-APS;
Behavioral & Experimental Finance-WPS;
Banking & Financial Institutions-APS;
Banking & Financial Institutions-WPS;
International Center for Finance at Yale School of Management-CMBO;
U. of Chicago Center for Research in Security Prices (CRSP)-CMBO;
USC Finance & Business Economics Working Papers-CMBO; European
Corporate Governance Institute (ECGI) - Finance-CMBO;
Texas Finance Festival-CMBO;
American Finance Association Meetings (AFA)-CMBO;
FEN Professional & Practitioner Journal (Forthcoming)-CMBO;
Mutual Funds, Hedge Funds, & Investment Industry Abstracts (Forthcoming)-
APS;
Mutual Funds, Hedge Funds, & Investment Industry Abstracts (Forthcoming)-
WPS;
FEN Professional Announcements and Job Postings-JA.

To the extent that these documents are within Acorn's possession, custody and control, they are

available for inspection upon reasonable request.

Additional material that relates to the use, development, and evaluation of its software and

models can be found through the following websites:

http://www.panagora.com/index.asp?mode=rlinks;

http://www.panagora.com/index.asp?mode=mainpapers;

http://fisher.osu.edu/fin/fdf/osudata.htm;

http://www.cob.ohio-state.edu/cgi-bin/DB_Search/db-search.cgi?;

http://www.cob.ohio-state.edu/fin/journal/jofsites.htm.;

http://www.ssrn.com;

http://www.citeseer.ist.psu.edu;

http://www.umi.com.

Furthermore, Acorn states that software that it has used and/or uses includes without limitation

Mozilla, Linux kernel, XFree86, GDB, Xemacs, Aolserver, open acs, Tcl, Perl, C++, CMU

Common Lisp, latex, gnu gcc, valgrind, SPlus, R, bison, yacc, awk, and sed.

Dated: June 1, 2005

_One of the Attorneys for Defendant Acorn Advisory_
_Capital, L.P._

Peter V. Baugher
Arthur J. Howe
Anna Eisner Seder
SCHOPF & WEISS LLP
312 W. Randolph, Suite 300
Chicago, Illinois 60606
312.701.9300

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Gary W. Sabot, Director of Risk Management and Quantitative Analysis for Acorn Advisory Capital, L.P., state under penalty of perjury that the responses to the foregoing Supplemental Responses to Plaintiff's Interrogatories are true and correct to the best of my knowledge and belief.

Dated: June 1, 2005

_____
Gary W. Sabot

verify.doc

## CERTIFICATE OF SERVICE

I, Anna Eisner Seder, an attorney, hereby certify that I caused a copy of the

foregoing **Acorn's Supplemental Responses to Plaintiff's Interrogatories** to be served via e-

mail attachment and U.S. mail, postage prepaid, the 1st day of June, 2005, upon the following:

> Eric D. Brandfonbrener
> Darrell J. Graham
> Jonathan Buck
> PERKINS COIE LLP
> 131 South Dearborn, Suite 1700
> Chicago, IL 60603
> Fax:  (312) 324-9400

Anna Eisner Seder

- 10 -

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

CHARLES SCHWAB & CO., INC.,

        Plaintiff,

    v.

BRIAN D. CARTER, ~~ACORN ADVISORY
MANAGEMENT, L.L.C., and ACORN
ADVISORY CAPITAL, L.P.,~~ _et al._

        Defendants.

Case No. 04 C 7071

Judge Amy J. St. Eve

Magistrate Judge Arlander Keys

## FIRST AMENDED AND RESTATED AGREED PROTECTIVE ORDER

~~Whereas Charles Schwab & Co., Inc. ("Schwab") has filed claims against Brian D. Carter, Acorn Advisory Management, L.L.C., and Acorn Advisory Capital, L.P. (collectively "Defendants");~~

~~Whereas, Defendants deny Schwab's claims;~~

Whereas the parties hereto are engaged in discovery which ~~will~~ involves the disclosure of confidential, proprietary, technical, business and financial information;

Whereas, the parties hereto seek to preserve their privacy and property interests in such information, without unduly encroaching on the public's right to be informed of judicial proceedings, and recognizing that the party seeking to protect information filed under seal with the Court must show good cause for sealing that part of the record and that either party and any interested member of the public can challenge any designation of confidentiality pursuant to this protective order;

Whereas, the parties and counsel will act in good faith in designating records pursuant to the protections provided by this protective order; and

Exhibit 7

Whereas the parties hereto wish to supercede and replace the prior Agreed Protective Order, entered by the Court on November 30, 2004, with this First Amended and Restated Agreed Protective Order (hereafter the "Agreed Protective Order");

~~Whereas, the parties to this Agreed Protective Order agree to be bound by its terms with respect to documents and information shared pursuant to it regardless of whether the Order in fact is entered by the Court (or another court should the case or a portion of it be filed in another court) (to the extent a court does not enter the Agreed Protective Order as drafted, the parties agree to comply with its terms with respect to information provided prior to the Court's action, unless otherwise agreed by all parties to this Agreed Protective Order).~~

Therefore, t~~T~~he parties hereto, by their undersigned counsel, hereby agree as follows:

1. As used herein:

   a. "Document" means any written, printed, typed, graphic, electronic or otherwise recorded matter of any kind, however produced or reproduced, including but not limited to:

      i. all originals, nonidentical copies, intermediate drafts and revisions of any written matter; and

      ii. all deposition transcripts, exhibits, affidavits, interrogatories, answers to interrogatories or other litigation materials;

   b. "Confidential Information" means sensitive or proprietary non-public information, regardless of whether in a Document, electronically stored or orally communicated, and includes all information extracted from Documents containing such sensitive or proprietary non-public information.

   c. "Attorneys Eyes Only" as used herein means Confidential Information that the producing party believes in good faith is so sensitive that it may be disclosed only to those persons listed in paragraph 7 below.

2

d. "Attorneys Eyes Only – Model Information" as used herein means model-related Confidential Information that the producing party believes in good faith is so sensitive that it may be disclosed only to those persons listed in paragraph 8 below.

d̶e̲. "Person" means an individual, corporation, partnership, association, unincorporated organization, governmental entity, quasi-governmental entity or any other entity, including, without limitation, each party to this action, experts and consultants for any party;

e̶f̲. "Party" or "parties" means the parties to this Agreed Protective Order, individually and collectively, namely Charles Schwab & Co., Inc., Brian D. Carter, a̶n̶d̶ Acorn Advisory Management, L.L.C., Acorn Advisory Capital, L.P., Acorn Partners, L.P., Delphi Financial Group, and Delphi Capital Management, Inc., and includes their officers, employees, and attorneys and their parents and affiliates and their officers, employees, and attorneys;

f̶g̲. "Produce" means providing documents or information to a party whether pursuant to settlement discussions or in response to discovery requests;

g̶h̲. "Disclose" means to furnish, divulge, reveal, describe, summarize, paraphrase, quote, transmit or otherwise communicate documents or information received from any other party or third-party witness to any other person or party, whether voluntarily or involuntarily, whether pursuant to request, interrogatory or process, and whether pursuant to the Federal Rules of Civil Procedure or otherwise;

h̶i̲. The "Litigation" refers to the above-captioned litigation;

i̶j̲. "Expert" refers to a person retained or specially employed by a party to assist in preparation for trial or to testify at trial. The term also includes all employees of such person.

2.      Any document that a party hereto produces to another party or information that a party hereto discloses to another party in the course of the Litigation, whether voluntarily or in response to an order of this Court, which the producing or disclosing party believes in good faith contains or reflects Confidential Information may be designated by that party as Confidential and shall be governed by the provisions of this Agreed Protective Order. To be afforded Confidential status, all such Confidential Information shall be designated as follows: if in tangible form, by stamping each page thereof which contains information the party wishes to protect, or labeling the disk containing such information, with the words "CONFIDENTIAL," ~~or~~ "CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER," ~~or~~ "ATTORNEYS' EYES ONLY," ~~or~~ "ATTORNEYS' EYES ONLY: SUBJECT TO PROTECTIVE ORDER;," "ATTORNEYS' EYES ONLY - MODEL INFORMATION," or "ATTORNEYS' EYES ONLY MODEL INFORMATION: SUBJECT TO PROTECTIVE ORDER;" or if in non-tangible form, by stating on the record at the hearing or deposition or at time of disclosure (or by so designating any transcript made within 20 days of the receipt by the parties) that the statements or testimony contains Confidential Information. Subject to the terms and conditions of this Agreed Protective Order, Confidential Information, ~~or~~ Attorneys' Eyes Only ~~Information~~information, or Attorneys' Eyes Only – Model Information or information derived therefrom, shall be used solely for purposes of this Litigation and not for any other purpose.

3. If a designating party inadvertently omits to designate Confidential Information ~~as Confidential or for Attorneys' Eyes Only~~pursuant to this Agreed Protective Order , that party shall notify the other parties that such documents or information should be treated as though it were properly marked in accordance with this Agreed Protective Order, and the parties in

4

possession of such documents and information shall treat them accordingly. No party shall be liable for disclosure of a document or information not marked as Confidential, ~~or for~~ Attorneys' Eyes Only, or Attorneys' Eyes Only – Model Information before receiving notice of its confidentiality.

4. All Confidential Information designated as Confidential, ~~or for~~ Attorneys' Eyes Only, or Attorneys' Eyes Only – Model Information and any transcript, chart, brief, affidavit, exhibit, or other document containing any such Confidential Information which a party hereto wishes or is required to file in connection with this Litigation, but only such portion of any such filing, shall be filed with Clerk of the Court in a sealed envelope or other sealed container with a cover sheet disclosing the following, consistent with LR5.8. (Filing Materials Under Seal):

    (A)    the caption of the case, including the case number;

    (B)    the title "Restricted Document Pursuant to LR26.2";

    (C)    a statement indicating that the document is filed as restricted in accordance with an order of court and the date of that order; and

    (D)    the signature of the attorney of record or unrepresented party filing the document.

The party shall include a notice to the Clerk and the other parties that such document contains information that is subject to the terms of this Agreed Protective Order. All such documents shall be maintained by the Clerk separate from the public records in this action and shall not be released or made public except upon further Order of the Court.

5. All Confidential Information designated as Confidential ~~or for,~~ Attorneys' Eyes Only, or Attorneys' Eyes Only – Model Information and any transcript, chart, brief, affidavit, exhibit, or other document containing any such Confidential Information may be used in this Litigation if a party wishes to or is required to present such material in a hearing, deposition or document production in this Litigation.

6.      Subject to the use restrictions and notification requirements set forth herein, Confidential Information produced or disclosed by a party pursuant to this Agreed Protective Order and which is designated as "Confidential" may be disclosed only to the following persons, and in the manner described below:

a.      Any party, including employees of any party but only to the extent that, and for the time during which, such disclosure is necessary to assist in the conduct of this Litigation.

b.      Counsel of record representing a party hereto in this Litigation and their partners, associates and support staff, including but not limited to stenographic, paralegal and clerical employees to whom disclosure is deemed necessary by said counsel of record, and in-house counsel of any party;

c.      Any non-party expert who is consulted or retained by a party or its counsel in order to assist in the conduct of this Litigation including without limitation accountants and economists, but only to the extent that, and for the time during which, such disclosure is necessary for the performance of such assistance; provided however that any such person to whom disclosure is to be made has been given a copy of this Agreed Protective Order and has signed a copy of the Confidentiality Agreement attached hereto as Exhibit A establishing that the person has read this Agreed Protective Order, understood it, and agreed to be bound by its terms and to be subject to the jurisdiction of this Court;

d.      This Court (using the procedures specified herein);

e.      Outside contractors and their employees performing one or more aspects of organizing, filing, coding, converting, storing, copying or retrieving data or otherwise providing computerized litigation support to any party; and

6

f.     Court reporters transcribing a deposition or hearing at which the document or information is disclosed.

7.     Confidential Information designated as for "Attorneys' Eyes Only" shall be disclosed only to the following persons, and in the manner described below:

a.     Counsel employed by any party to assist in this litigation, including partners, associates, and stenographic, paralegal and clerical employees in the respective law firms;

b.     Any person, including outside technical consultants or experts, but excluding employees, agents, directors, and officers of the parties, who is assisting counsel or a party to this litigation to whom it is necessary to disclose Confidential Information designated Attorneys Eyes Only for the purpose of assisting in the preparation and trial of this lawsuit, provided however that any such person to whom disclosure is to be made has been given a copy of this Agreed Protective Order and has signed a copy of the Confidentiality Agreement attached hereto as Exhibit A establishing that the person has read this Agreed Protective Order, understood it, and agreed to be bound by its terms and to be subject to the jurisdiction of this Court. Such signed documents in the form of Exhibit A shall be retained by counsel for each party, and will be subject to inspection for good cause shown by the other parties;

c.     Any person subject to deposition in this action and to whom it is necessary to disclose Confidential Information designated Attorneys Eyes Only for the purpose of their deposition, provided however that any such person to whom disclosure is to be made has been given a copy of this Agreed Protective Order and has signed a copy of the Confidentiality Agreement attached hereto as Exhibit A establishing that the person has read this

7

Agreed Protective Order, understood it, and agreed to be bound by its terms and to be subject to the jurisdiction of this Court, but only after notice has been provided in accordance with paragraph 8-9 of this Order, or is otherwise ordered by the Court, or agreed to by the parties named in this lawsuit.

d.      Notwithstanding any of the foregoing to the contrary, Caroline Banta (with respect to the files on the computers imaged by Schwab or or about November 23, 2004);

e.      This Court (using the procedures specified herein); and

f.      Court reporters transcribing a deposition or hearing at which the document or information is disclosed.

8.      Confidential Information designated as for "Attorneys' Eyes Only – Model Information" shall be disclosed only to the following persons, and in the manner described below:

a.      Counsel employed by any party to assist in this litigation, including partners, associates, and stenographic, paralegal and clerical employees in the respective law firms; provided, however, that no more than one in-house counsel of the opposing party may receive such information and provided further that such in-house counsel shall not retain copies of such information longer than is needed to supervise the Litigation;

b.      Any person, including outside technical consultants or experts, but excluding employees, agents, directors, and officers of the parties, who is assisting counsel or a party to this litigation to whom it is necessary to disclose Confidential Information designated Attorneys Eyes Only – Model Information for the purpose of assisting in the preparation and trial of this lawsuit, provided however that any such person to whom disclosure is to be made has been given a copy of this Agreed Protective Order and

has signed a copy of the Confidentiality Agreement attached hereto as Exhibit A establishing that the person has read this Agreed Protective Order, understood it, and agreed to be bound by its terms and to be subject to the jurisdiction of this Court (such signed documents in the form of Exhibit A shall be retained by counsel for each party, and will be subject to inspection for good cause shown by the other parties); provided further, however, that, unless otherwise agreed to by the party producing the information, such person shall not be a current employee of [a hedge fund];

c.      Any person subject to deposition in this action and to whom it is necessary to disclose Confidential Information designated Attorneys Eyes Only for the purpose of their deposition, provided however that any such person to whom disclosure is to be made has been given a copy of this Agreed Protective Order and has signed a copy of the Confidentiality Agreement attached hereto as Exhibit A establishing that the person has read this Agreed Protective Order, understood it, and agreed to be bound by its terms and to be subject to the jurisdiction of this Court, but only after notice has been provided in accordance with paragraph 9 of this Order, or is otherwise ordered by the Court, or agreed to by the parties named in this lawsuit.

[d.      Notwithstanding any of the foregoing to the contrary, [Gregory Forsythe], provided, however, that such person must review all records at the offices of Schwab's counsel and may not retain any notes or related documents;]

e.      This Court (using the procedures specified herein); and

f.      Court reporters transcribing a deposition or hearing at which the document or information is disclosed.

9

Notwithstanding the foregoing, all information designated as Attorneys' Eyes Only – Model Information shall be maintained in a locked drawer or room with access restricted on a need-to-know basis, except as provided to in-house counsel or experts or as filed with the Court, as provided here-in.  Such information provided to in-house counsel or out-side expert shall be retrieved from such persons by outside counsel once such in-house counsel's or out-side expert's is completed.  To the extent that Attorneys' Eyes Only – Model Information is provided in electronic form, such files shall not be maintained on networked computers and shall be stored in password-protected form.

9.      In the case of disclosures to persons other than those covered by paragraphs 6 ~~and~~ - 8~~7~~ above, including but not limited to the use of such information during depositions in this Litigation, the disclosure of Confidential Information designated as "Confidential" or for "Attorneys' Eyes Only" may only be made upon ~~two days advance notice in writing to the party which produced the materials to the extent to be used in connection with any preliminary injunction proceedings and upon fourteen~~ five business days advance notice in writing to the party which produced the material for any other purposes, so as to provide the producing or designating party with an opportunity to object to the proposed disclosure and to take appropriate precautions.  The notice of intent to disclose shall contain the name, title, and business address of the person to whom the information will be disclosed and a description of the documents and/or information to be disclosed.  Documents and information shall be disclosed to such person(s) only if the designating party consents in writing to the proposed disclosure.  If an objection to disclosure is received or the designating party does not consent to disclosure, the party seeking the disclosure may then apply to the Court for an order permitting disclosure.  Nothing in this paragraph shall prevent the party objecting to the disclosure from filing a motion opposing the disclosure or shall prevent the parties from agreeing that the matter may be brought before a court in any other matter.  If the parties are unable to resolve the matter informally, the intended disclosure shall not be made until the matter is resolved by a court.

9~~10~~. Confidential Information designated as Confidential, ~~or for~~ Attorneys' Eyes Only, or Attorneys' Eyes Only – Model Information, including any information contained therein or extracted therefrom, shall be treated as Confidential, ~~or for~~ Attorneys' Eyes Only, or Attorneys' Eyes Only – Model Information -and shall be used only for the purposes of the settlement, prosecution or defense of this Litigation. Persons to whom any Confidential, ~~or for~~ Attorneys' Eyes Only, or Attorneys' Eyes Only – Model Information material or information contained therein or derived therefrom is disclosed under the circumstances set forth above shall not disclose any such material to any other person and shall not use any such material for any purpose other than the settlement, prosecution or defense of this Litigation.

~~10~~11. If subsequent to being furnished any information, document or thing designated as Confidential, ~~or for~~ Attorneys' Eyes Only or Attorneys' Eyes Only – Model Information, a party wishes to challenge any other party's claim of such status, based on a good faith belief that the material is not entitled to protection, the objecting party shall give written notice thereof to the designating party who has made the claim of confidentiality, identifying the information or documents that the objecting party contends are not properly designated ~~as Confidential or for Attorneys' Eyes Only~~, and allow at a minimum ~~fourteen~~ five business days for the designating party to file a written response. The objecting party may thereafter, after good faith consultation with the designating party, file a motion with this Court challenging the propriety of the designation ~~within thirty days of the receipt of the designated information or document~~. Information or documents which are the subject of such a challenge shall be treated as Confidential or for Attorneys' Eyes Only at least until this Court rules on the motion challenging the designation.

~~11~~12. Upon a motion of a party to this Agreed Protective Order, a court of competent jurisdiction may at any time examine and review in camera any document governed by the terms of this Agreed Protective Order.

~~12~~13.   The parties affirmatively represent that they will use their best efforts to limit confidentiality designations to those documents and that information which constitute confidential, sensitive commercial and/or proprietary information.

~~13~~14.   In the event that a person subject to this Agreed Protective Order receives any subpoena or other process relating to Confidential, ~~or for~~ Attorneys' Eyes Only, or Attorneys' Eyes Only – Model Information documents or information received pursuant to this Agreed Protective Order, such person shall give counsel for the party who produced such documents or information reasonable notice before furnishing or permitting inspection of such documents or information to persons not subject to this Agreed Protective Order.  Notice fourteen days in advance of the return or response date for any such subpoena or process shall be deemed reasonable notice, where circumstances make such notice possible.

~~14~~15.   The final determination or settlement of the Litigation shall not relieve any person who has received Confidential, ~~or for~~ Attorneys' Eyes Only, or Attorneys' Eyes Only – Model Information material from the obligations imposed by this Agreed Protective Order.  Within fourteen days following the final determination or settlement, all such information in the possession of a party shall be returned to the producing party or, to the extent it contains attorney work product, such information shall be destroyed and counsel shall certify to its destruction.

~~15~~16.   This Agreed Protective Order shall in no way affect or impair the right of any party or person to raise or assert any defense or objection, including, but not limited to, defenses or objections to the discovery or production of documents or information and to the use, relevance or admissibility at trial of any evidence, whether or not comprised of documents or information governed by this Agreed Protective Order.

~~16~~17.   Nothing in this Agreed Protective Order shall limit the right of a party to use any document or information derived therefrom at a hearing or trial of the merits of the Litigation, nor does this Order limit the right of any party or person to seek from a court Confidential treatment or other limited disclosure of any document or information derived therefrom.

~~17~~18.  Nothing in this Agreed Protective Order shall limit the producing party or person from using its own documents and information in any fashion it may desire.

~~18~~19.  If information, including without limitation any computerized media, subject to a claim of attorney-client privilege, attorney work product or any other ground on which production of such information should not be made to any party is nevertheless inadvertently produced to a party or parties, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of attorney-client privilege, attorney work product or any other ground for withholding production to which the Producing Party would otherwise be entitled.  If a claim of inadvertent production is made with respect to information then in the custody of another party, such other party shall promptly return the original and all copies of the information to the Producing Party.  The recipient of such inadvertent production shall not use such information for any purpose other than in connection with a motion to compel, which shall be filed under seal, provided that the fact of inadvertent production may not be argued in support of such a motion.

~~19~~20.  In the event that a party produces computerized media, including without limitation hard drives, diskettes, CD-ROMs, DVDs, and other media, that contains information subject to a claim of attorney-client privilege, attorney work product or any other ground on which production of such information should not be made, the producing party may delete such information from the media to be produced and overwrite such information, provided, however, that counsel for the producing party maintains an electronic copy of such information and provides a written log to the non-producing party containing sufficient information to allow the non-producing party to evaluate the appropriateness of all such redactions.  In no event shall any party, including without limitation any of their attorneys, agents, experts, or consultants, use for this Litigation or any other purpose any information contained on any computerized media that is subject to a claim of attorney-client privilege or attorney work product.  This prohibition encompasses any emails or other electronic communications between or among any party and its or her attorneys.

13

~~20~~21.  This Court shall retain jurisdiction after final determination or settlement of this action to enforce or modify the provisions of this Agreed Protective Order unless jurisdiction over this Litigation is transferred by order or agreement to another court, in which case this Court shall retain jurisdiction until such other court has assumed jurisdiction over this matter and entered an order identical to this Order or in a form agreeable to all parties.  All disputes concerning the designation of documents or other information as protected pursuant to this Order may be brought before this Court or such other court to the extent jurisdiction over this Litigation has been transferred (a) upon proper notice and (b) after a good faith effort to resolve such disputes has been made.  Any party may, on notice, move this Court or such other court to the extent jurisdiction over this Litigation has been transferred for relief from, or modification of, any of the provisions of this Agreed Protective Order.

Dated:  ~~November ___, 2004~~June ___, 2005

_____
Judge

| | |
|---|---|
| *Agreed to by:* <br><br> _____ <br> *Attorneys for Charles Schwab & Co., Inc.* <br><br> Eric D. Brandfonbrener <br> PERKINS COIE LLP <br> 131 S. Dearborn, Suite 1700 <br> Chicago, Illinois 60603 <br><br><br> _____ <br> *Attorneys for Defendants* <br><br> Peter V. Baugher <br> <u>Arthur J. Howe</u> <br> SCHOPF & WEISS LLP <br> 312 W. Randolph, Suite 300 <br> Chicago, IL 60606 | |

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

CHARLES SCHWAB & CO., INC.,

             Plaintiff,

    v.

BRIAN D. CARTER, ~~ACORN ADVISORY
MANAGEMENT, L.L.C., and ACORN
ADVISORY CAPITAL, L.P.,~~*et al.*

             Defendants.

Case No. 04 C 7071

Judge Amy J. St. Eve

Magistrate Judge Arlander Keys

## CONFIDENTIALITY AGREEMENT

    I, _____, have read and understood the Agreed Protective Order entered in the above-captioned action and hereby agree to be bound by its terms and provisions.

                                      _____

Dated: _____

15

## CERTIFICATE OF SERVICE

I, Eric D. Brandfonbrener, certify that on June 10, 2005, I caused true and complete copies of **1) PLAINTIFF'S RENEWED MOTION TO COMPEL COMPLIANCE WITH DISCOVERY AND FOR OTHER RELIEF**, and **2) NOTICE OF MOTION** to be served by messenger on:

Peter V. Baugher
Arthur J. Howe
Schopf & Weiss, LLP
312 West Randolph Street - Suite 300
Chicago, Illinois 60606-1721
Fax: 312.701.9335

