**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHARLES SCHWAB & CO., INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04 C 7071 |
| | ) | |
| BRIAN D. CARTER, ACORN ADVISORY | ) | |
| MANAGEMENT, L.L.C., ACORN ADVISORY | ) | |
| CAPITAL, L.P., DELPHI FINANCIAL GROUP, | ) | |
| INC., DELPHI CAPITAL MANAGEMENT, INC., | ) | |
| and ROBERT ROSENKRANZ, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

In its initial complaint, Plaintiff Charles Schwab & Co., Inc. ("Schwab") brought suit

against Defendants Brian D. Carter ("Carter"), Acorn Advisory Management, L.L.C., and Acorn

Advisory Capital, L.P. (collectively, the "Original Defendants") for incidents surrounding

Carter's resignation from Schwab and subsequent employment with one of the Acorn entities.[1]

Schwab maintained that Carter and Acorn were liable for misappropriation of Schwab's trade

secrets (Count I), conversion (Count II), and violation of the Computer Fraud and Abuse Act

(codified at 18 U.S.C. § 1030) (the "CFAA") (Count VI).  Schwab further alleged that Carter

was liable for breach of contract (Count IV) and breach of fiduciary duty (Count III) and that

Acorn was liable for aiding and abetting Carter's breach of fiduciary duty (Count V).

---

[1]	The Complaint does not allege which one of the Acorn entities hired Carter, but
for ease of reference, the Court will refer to the Acorn entities together as "Acorn."

Schwab subsequently added other parties to this suit. Specifically, Schwab (after receiving leave of court) filed a Third Amended Complaint (the "Complaint") suing the Original Defendants and adding to the suit Acorn Partners, L.P., Delphi Financial Group, Inc., Delphi Capital Management, Inc., and Robert Rosenkranz ("Rosenkranz") (collectively, the "New Defendants"). Schwab added the New Defendants to Counts I, II, V, and VI. In addition, Schwab added a claim of unjust enrichment (Count VII) against all Defendants.

Two motions currently are before the Court. The New Defendants filed a motion to dismiss Counts II, III, V, VI (in part), and VII (the "Motion to Dismiss") and a motion for summary judgment on Count I (the "Summary Judgment Motion"). The Original Defendants have joined in the New Defendants' Summary Judgment Motion[2] and have further requested to join in the New Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(c) (despite having previously filed their own motion under Rule 12(b)(6)).[3] For the reasons below, the Court denies both Motions.

---

[2]     On August 2, 2005, the Court granted the Original Defendants' motion to join in the New Defendants' Summary Judgment Motion. (R. 96-1; Order of Aug. 2, 2005.)

[3]     Because Federal Rule of Civil Procedure 12(c) allows a party to move for judgment on the pleadings "[a]fter the pleadings are closed but within such time as not to delay the trial" the Court will allow the Original Defendants to join the New Defendants' motion to dismiss. *See* Fed. R. Civ. P. 12(c); *see also North Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998) (under Rule 12(c) a court applies the same standard that applies to a Rule 12(b)(6) motion to dismiss). Accordingly, the Court will refer to the Original Defendants and the New Defendants collectively as "Defendants." Yet because many of Defendants' grounds for dismissal do not pertain to Carter the term "Defendants" as used herein will not refer to Carter unless the Court so indicates.

**ANALYSIS**

## I.     The Motion to Dismiss

### A.     Legal Standard

Defendants' motion to dismiss is based on Federal Rule of Civil Procedure 12(b)(6).  A Rule 12(b)(6) motion tests the sufficiency of a complaint.  It is not designed to resolve the case on the merits.  *Johnson v. Rivera*, 272 F.3d 519, 520-21 (7th Cir. 2001).  When determining whether to grant a 12(b)(6) motion to dismiss, a court must accept all factual allegations in the complaint as true.  *Jang v. A.M. Miller & Assocs.,* 122 F.3d 480, 483 (7th Cir. 1997).  A court must also draw all reasonable inferences in the plaintiff's favor.  *Id.*  A court should dismiss a complaint under Rule 12(b)(6) only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."  *Hishon v. King & Spaulding,* 467 U.S. 69, 73, 104 S. Ct. 2229, 2232 (1984).

### B.     Facts

For purposes of deciding Defendants' Motion to Dismiss, the Court accepts the following allegations as true.

#### 1.     The Parties

Schwab is a California corporation with its principal place of business in San Francisco, California.  (R. 69-1; Pl.'s Third Am. Compl. at ¶17.)  Defendant Brian Carter was formerly employed by Schwab and currently resides in Tinley Park, Illinois.  (*Id.* at ¶¶1, 18.)  Defendant Acorn Advisory Management, L.L.C., is a limited liability company formed in Delaware with its principal place of business in New York, New York.  (*Id.* at ¶19.)  Defendant Acorn Advisory Capital, L.P., is a limited partnership formed in Delaware with its principal place of business in

New York, New York.  (*Id.* at ¶20.)  Defendant Acorn Partners, L.P., is a limited partnership

formed in Delaware with its principal place of business in New York, New York.  (*Id.* at ¶21.)

Defendant Delphi Financial Group, Inc. is a Delaware corporation with its principal place of

business in New York, New York.  (*Id.* at ¶23.)  Defendant Delphi Capital Management, Inc. is a

Delaware corporation with its principal place of business in New York, New York.  (*Id*. at ¶22.)

Defendant Robert Rosenkranz is a New York resident and has an ownership interest in each of

the company defendants.  (*Id.* at ¶¶24, 25.)[4]

## 2.        The Events Surrounding Carter's Departure

Prior to November 1, 2004, Schwab, a full service investment and securities firm,

maintained a business division named the Schwab Soundview Capital Markets' Investment

Analytics Division ("IA").  (*Id.* at ¶¶1-2, 17.)[5]  Through IA, Schwab generated and maintained

substantial amounts of confidential information, including proprietary investment research

strategies and analytical tools.  (*Id.* at ¶30.)  IA provided analytical research – derived from

twelve analytical models (the "Models") – to approximately 100 institutional clients (including

Defendants) nationwide.  (*Id.* at ¶2.)  Schwab kept the Models confidential and did not disclose

the Models to IA customers or other individuals outside of Schwab.  (*Id.* ¶¶2, 30.)  To protect the

confidentiality of the Models, Schwab instituted certain policies and precautions.  (*Id*. at ¶32.)

For instance, Schwab maintained security at all of its offices, restricted access to confidential

---

[4]        In their Local Rule 56.1 statements, the parties concede that the Complaint
accurately identifies the parties.  (R. 99-1; Defs.' Stmt. of Mat. Facts in Supp. of Its Mot. for
Summ. J. ("Defs.' SMF") at ¶¶1-8.)

[5]        The facts elicited during discovery indicate that Schwab acquired IA's
predecessor, Chicago Investment Analytics, in 2000 for $20 million.  (R. 115-1; Pl.'s Stmt. of
Additional Material Facts ("Pl.'s SAMF") at ¶17.)

information on a need-to-know basis, and used computer pass codes. (*Id.*) Schwab also required its employees, including Carter, to execute a confidentiality agreement which prohibited the employees from disclosing Schwab's "Confidential Information." (*Id.* at ¶¶33-37.)

Carter worked in the IA division as the Director of Information Technology. (*Id.* at ¶3.) Carter's position allowed him to access the IA division's entire computer information network, including the Models and customer information. (*Id.* at ¶39.) Carter did not develop the IA Models and did not provide any of the ongoing analytical research used to maintain the Models. (*Id.* at ¶3.)

In September 2004, Schwab announced that it intended to close IA, effective November 1, 2004. (*Id.* at ¶4.) Schwab's IA division, however, continued to provide research to its institutional clients through the end of January 2005. (*Id.*) In connection with IA's closing, Schwab offered its IA employees severance packages or employment within other areas of Schwab. (*Id.*)

On October 1, 2004, Acorn made a written offer to Schwab to acquire IA, proposing to acquire all assets necessary to operate the Models (including all of IA's intellectual property associated with the Models) and to hire six IA employees including Carter and several of IA's analysts. (*Id.* at ¶5.) Schwab rejected Acorn's offer. (*Id.* at ¶6.) According to Schwab, Acorn's proposed consideration was inadequate, and Acorn's offer did not protect Schwab's brand and continuing business, in particular Schwab Equity Ratings, the investment research offered to Schwab's retail client base. (*Id.*) Even though the model used by Schwab to generate the Schwab Equity Ratings "was built from scratch" in 2002, it shares a "brand" with Schwab's IA Models. (*Id.*) As Schwab sees it, if Schwab sold IA's intellectual property without appropriate

controls and if a Schwab competitor then acquired the Models, the brand, reputation and value of the Schwab Equity Ratings would be diluted and harmed. (*Id.*) Schwab thus decided to retain IA's confidential property, including the Models. (*Id.*)

On Friday, October 15, 2004, after Schwab had rejected Acorn's offer, Rosenkranz, on behalf of Acorn, made offers to employ Carter and several of IA's analysts. (*Id.* at ¶7.) By October 18, 2004, all IA analysts had rejected Acorn's employment offers. (*Id.*) Carter, however, accepted Rosenkranz's offer. (*Id.* at ¶8-13.)

On Monday, October 18, 2004, in preparation for joining Acorn and at Acorn's direction, Carter e-mailed confidential information to Acorn relating to certain of the "outside data sources" used in IA's Models. (*Id.* at ¶8.) In addition, Carter's e-mail attached documents that would facilitate Acorn's access to an information database licensed by Schwab and used in connection with the Models. (*Id.* at ¶44.) Schwab's records also indicate that Carter accessed and copied huge volumes of Schwab's computer information (approximately 15,000 computer files in a single day) during the previous weekend. (*Id.* at ¶8.) At that time, Carter had access to the entire information network of the IA division, but Carter was only authorized to access the information network insofar as it was necessary for him to perform his job duties. (*Id.* at ¶39.)

Shortly before copying this information, Carter acquired a laptop (it was either Carter's or Acorn's) containing a high-speed DVD burner. (*Id.* at ¶¶9, 45.) In addition, Carter previously had informed his colleagues at IA that he planned to copy and keep IA's Models. (*Id.* at ¶10.) Carter further suggested that he and a group of IA employees could take the Models and open their own business based on them. (*Id.*) When a subordinate IA employee told Carter that such conduct was illegal, Carter opined that it was not because Schwab was closing IA. (*Id.*) On

October 22, 2004, Carter resigned without notice and thereafter joined Acorn (which had paid Carter a substantial amount to bring with him the IA information that he had copied). (*Id.* at ¶¶1, 11, 78.) Had he remained at Schwab for another week, Carter would have received a severance package. (*Id.* at ¶11.)

## C.    Defendants' Purported Grounds for Dismissal

The Court now turns to Defendants' asserted grounds for dismissal. Defendants move to dismiss on four grounds: (1) that the Illinois Trade Secret Act ("ITSA") preempts Schwab's common law causes of action (Counts II, III, V, and VII); (2) that, as a matter of law, the CFAA (Count VI) does not allow Schwab to pursue an aiding and abetting theory against Defendants; (3) that Schwab's claim under CFAA Section 1030(a)(2)(A) (Count VI) fails against all Defendants (including Carter) because Carter did not access a "financial record" from a "financial institution;" and (4) that Schwab's claim under CFAA Section 1030(a)(2)(C) (Count VI) fails because Carter's alleged unauthorized access of Schwab's computers did not involve "an interstate or foreign communication" as required by that statutory subsection. The Court will address each argument in turn.

## 1.    Preemption Under the Illinois Trade Secret Act

Defendants contend that the plain language of the Illinois Trade Secret Act ("ITSA") preempts Schwab's common law causes of action (*i.e.,* Counts II, III, V, and VII). Even though Schwab presses a number of common law theories aside from its claim under the ITSA, Defendants assert that the ITSA's preemption provision operates nonetheless because trade secret misappropriation is "undeniably at the heart of this litigation." The Court finds Defendants' argument unavailing.

The preemption provision of the ITSA[6] controls the Court's determination of this issue.

That provision states:

> (a) Except as provided in subsection (b), [Illinois Trade Secret] Act is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret.

> (b) This Act does not affect:  (1) contractual remedies, whether or not based upon misappropriation of a trade secret . . . [or] (2) other civil remedies that are not based upon misappropriation of a trade secret . . .

765 ILCS 1065/8.  By its plain terms, the ITSA preempts only *conflicting* laws that provide remedies *for misappropriation of a trade secret*.  The ITSA expressly allows all other claims that are not based upon trade secret misappropriation.  *See Lucini Italia Co. v. Grappolini*, No. 01 C 6405, 2003 WL 1989605, *22 (N.D. Ill. Apr. 28, 2003) ("[i]nterpreting [the] language [of the preemption provision], courts have determined that the ITSA is the exclusive remedy for misappropriation of trade secrets, but it does not affect common law claims based on other theories" (citing *Automed Tech., Inc. v. Eller*, 160 F. Supp. 2d 915, 922 (N.D. Ill. 2001)).

Accordingly, when considering whether the ITSA preempts a separate claim, a court must determine whether that separate claim "seek[s] recovery for wrongs beyond the mere

---

[6]    As discussed below, to state a claim for trade secret misappropriation under the ITSA, a plaintiff must establish that it had:  (1) a trade secret, (2) that the defendant misappropriated and (3) used for business purposes.  *See Do It Best Corp. v. Passport Software, Inc.*, No. 01 C 7674, 2004 WL 1660814, *10 (N.D. Ill. July 23, 2004); *PRG-Schultz Int'l, Inc. v. Kirix Corp.*, No. 03 C 1867, 2003 WL 22232771, *5 (N.D. Ill. Sep. 22, 2003).  The ITSA further defines the term "trade secret" as "mean[ing] information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:  (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and  (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality."  760 ILCS 1065/2(d).

misappropriation." *EarthDweller, Ltd. v. Rothnagel*, No. 93 C 3790, 1993 WL 487546, *7 (N.D. Ill. Nov. 22, 1993) (denying motion to dismiss because the ITSA did not preempt plaintiff's common law claims of fraud and breach of fiduciary duty even though those claims were related to plaintiff's trade secret claim). If such is the case, then a court must deny a motion to dismiss because "claims based on something more than the trade secret misappropriation are not preempted." *Lucini Italia*, 2003 WL 1989605 at *22 (citing *Thomas & Betts Corp. v. Panduit Corp.*, 108 F. Supp. 2d 968, 971 (N.D. Ill. 2000)); *Combined Metals of Chicago Ltd. P'ship v. Airtek, Inc.*, 985 F. Supp. 827, 830 (N.D. Ill. 1997) (denying motion to dismiss because if the items at issue "fail to qualify as a trade secret, how could the breach of fiduciary duty count be preempted under the ITSA? Again, the ITSA preempts only counts premised on the misappropriation of a trade secret. Thus, if the [items at issue are] not a trade secret or secrets, the ITSA preemption provision is inapplicable."); *see also Web Comm. Group v. Gateway 2000, Inc.*, 889 F. Supp. 316, 321 (N.D. Ill. 1995) (cited by Defendants but stating only that the ITSA preempted an unjust enrichment claim to the extent the plaintiff based that claim on an alleged misappropriation of a trade secret); *cf. Learning Curve Toys, L.P. v. Playwood Toys, Inc.*, No. 94 C 6884, 1999 WL 529572, *3 (N.D. Ill. July 20, 1999) (granting summary judgment motion on preemption grounds because "the operative facts [of non-ITSA claims] are arguably cognizable under the ITSA").

Drawing all reasonable inferences from the allegations in Plaintiff's favor, Schwab's Complaint survives Defendants' Motion to Dismiss. Schwab alleges that, just prior to resigning, Carter copied 15,000 computer files from Schwab's computer network. (R. 69-1; Pl.'s Third Am. Compl. at ¶8.) The Complaint further alleges that Carter e-mailed confidential information

to Acorn relating to certain of the outside data sources used in IA's models, (*id.*) and that Carter copied and removed confidential information from Schwab's offices. (*Id.* at ¶47.) Taken together, it is reasonable to infer that within the downloaded files, the e-mailed information, and other information removed from Schwab's office, Carter acquired proprietary and confidential information that could give rise to common law liability, even if that information does not constitute a full-blown trade secret. *See, e.g., Bagley v. Lumbermens Mutual Cas., Co.*, 100 F. Supp. 2d 879, 884 (N.D. Ill. 2000) (denying motion to dismiss common law misappropriation and unfair competion claims because the ITSA preemption provision did not preclude alternative assertion that stolen business plan was not actually a trade secret). At the motion to dismiss stage, these allegations thus are sufficient to allow Schwab to go forward with its common law claims.

### 2. The Computer Fraud and Abuse Act

#### a. Vicarious Liability

Defendants next contend that, as a matter of law, they cannot be liable under the CFAA. Specifically, Defendants argue that Schwab's Complaint essentially seeks relief against them based upon an aiding and abetting theory of liability – a theory that allegedly conflicts with the CFAA's civil suit provision. Schwab counters by asserting that it is not pursuing an aiding and abetting theory, but rather the theory that Defendants are vicariously liable as principals for the conduct of Carter, their agent.[7] Given the presumptions in play at the motion to dismiss stage,

---

[7] In reply, Defendants argue that by repeatedly using the phrase "support and encouragement" – a phrase that Defendants contend is, by definition, synonymous with "aiding and abetting" – Schwab can maintain only a theory of aiding and abetting and is foreclosed from pursuing a theory of vicarious liability based on Defendants' alleged principal/agent relationship with Carter. (R. 119-1; Defs.' Reply Br. in Support of Summ. J. at 4-5.) Defendants' argument

the Court concludes that the Complaint states a claim upon which relief may be granted.

In determining whether Schwab can establish liability under the CFAA against Defendants – parties who themselves have not directly violated that statute's provisions – the Court first looks to the language of the statute. *United States v. Miscellaneous Firearms, Explosives, Destructive Devices and Ammunitions*, 376 F.3d 709, 712 (7th Cir. 2004) ("The cardinal rule of statutory interpretation is that courts must first look to the language of the statute and assume that its plain meaning accurately expresses the legislative purpose" (quotation and citation omitted)). "Where the meaning of a statute is unambiguous, our sole task is to apply it straightforwardly to the facts at issue without referring to legislative history or other devices." *United States v. Jones*, 372 F.3d 910, 913 n.2 (7th Cir. 2004). Yet a court may assume that "when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those

---

is misplaced. Seventh Circuit authority makes clear that Federal Rule of Civil Procedure 8 does not require a plaintiff to accurately plead a legal theory, or even plead a legal theory at all. *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992) (a "complaint need not identify a legal theory, and specifying an incorrect theory is not fatal" – "details of both fact and law come later, in other documents"); *La Porte County Republican Cent. Comm. v. Board of Comm'rs of County of La Porte*, 43 F.3d 1126, 1129 (7th Cir. 1994) ("Just as a complaint need not plead facts, however, it also need not plead law, and it is not tied to one legal theory."). Rather, at the motion to dismiss stage "a court should ask whether relief is possible under any set of facts that could be established consistent with the allegations." *Bartholet*, 953 F.2d at 1078. Indeed, the Seventh Circuit "insist[s] that a complaint not be dismissed unless no relief may be granted 'under any set of facts that could be proved *consistent* with the allegations.'" *Hrubec v. National R.R. Passenger Corp.*, 981 F.2d 962, 963 (7th Cir. 1992) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S. Ct. 2229, 2232 (1984)) (emphasis original). Thus, notwithstanding Defendants' contention that the Complaint boxes in Schwab's legal theory, Schwab can pursue its CFAA claim against Defendants as long as the Complaint in fact contains allegations upon which relief is possible under the Act. In addition, because Schwab has conceded that it is not pursuing an aiding and abetting theory, the Court will not determine the merits of Defendants' argument that such a theory is unavailable.

rules." *Meyer v. Holley*, 537 U.S. 280, 285, 123 S. Ct. 824, 828-29 (2003) (applying common law principle of vicarious liability to Fair Housing Act claim notwithstanding the fact that the statute "says nothing about vicarious liability" because "[i]t is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment").[8]  Any presumption of vicarious liability, however, cannot apply when doing so would conflict with clear congressional intent.  *See Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1306 (7th Cir. 1987) ("Vicarious liability, however, has only limited application to civil RICO to avoid holding vicariously liable a corporation that was the victim of a RICO violation.  To the extent that agency rules would require holding a legitimate, infiltrated business vicariously liable, the rules are at odds with the clear congressional intent to protect such legitimate businesses.").

The CFAA allows civil actions against:

(a) Whoever . . . (2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains (A) information contained in a financial record of a financial institution . . . [or] (C) information from any protected computer if the conduct involved an interstate or foreign communication . . .

18 U.S.C. § 1030(a)(2).[9]  A plaintiff may "maintain a civil action against the violator," if the

---

[8]     In support of their argument that Schwab cannot pursue liability under an aiding and abetting theory, Defendants rely heavily on the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181-82, 114 S. Ct. 1439, 1450-51 (1994).  As noted above, the Court is not reaching that argument, but, in any event, *Central Bank* does not foreclose the possibility of establishing vicarious liability under an agency theory.  *See Zurich Capital Markets Inc. v. Coglianese*, 332 F. Supp. 2d 1087, 1106 (N.D. Ill. 2004).

[9]     18 U.S.C. § 1030(g) further provides that "[a] civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B)."  Here, Schwab has standing pursuant to 18 U.S.C. §1030(a)(5)(B)(i), which lists as a factor:  "loss to 1 or more persons during any 1-year period

plaintiff "suffers damage or loss by reason of a violation of this section . . . ."  18 U.S.C. §

1030(g); *see also Charles Schwab & Co. v. Carter*, No. 04 C 7071, 2005 WL 351929, *2-3

(N.D. Ill. Feb. 11, 2005) (interpreting 18 U.S.C. § 1030(g)).

By providing compensation to victims of computer fraud, the CFAA operates, in effect,

like a tort action.  *See, e.g., City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S.

687, 709, 119 S. Ct. 1624, 1638 (1999) (claims brought under a federal statute in effect sound in

tort when, like common-law tort actions, the statute provides redress for interference with

protected personal or property interests) (Seventh Amendment context); *Meyer*, 537 U.S. at 285,

123 S. Ct. at 828-29 (action under the Fair Housing Act, in effect, is a tort action because the

statute provides remedies for violation of a personal or property interest).  As a result, the Court

assumes that Congress drafted the CFAA with an intent to permit vicarious liability.[10]  Thus,

Schwab can pursue relief from Defendants.

*Doe v. Dartmouth-Hitchcock Medical Ctr.* – one of the few cases expressly addressing

whether vicarious liability is available under the CFAA and a case that Defendants cite in

support of their argument – does not counsel a different result.  No. Civ. 00-100-M, 2001 WL

873063, *1 (D.N.H. July 19, 2001).  There, the plaintiff sued both her physician and the medical

_____

(and, for purposes of an investigation, prosecution, or other proceeding brought by the United
States only, loss resulting from a related course of conduct affecting 1 or more other protected
computers) aggregating at least $5,000 in value."


[10]      The Supreme Court and federal Courts of Appeal have imposed vicarious liability
for violations of other federal statutes.  *See, e.g., Farragher v. the City of Boca Raton*, 524 U.S.
775, 787-809 (1998) (Title VII)*; Liquid Air*, 834 F.2d at 1306 (RICO); *Quick v. Peoples Bank of
Cullman County*, 993 F.2d 793, 797 (11th Cir. 1993) (RICO); *United States v. O'Connell*, 890
F.2d 563, 569 (1st Cir. 1989) (False Claims Act); *Jones v. Federated Fin. Reserve Corp.*, 144
F.3d 961, 965 (6th Cir. 1998) (Fair Credit Reporting Act).

center that employed her physician, alleging that the physician had exceeded her authorization to access plaintiff's medical records. In rejecting the plaintiff's theory of vicarious liability against the medical center, the court noted that to hold the employer liable for the employee's "intentional violation of the CFAA, when that violation necessarily involved [ ] an intentional violation of the [employer's] own policies – and actually victimized the [employer], would hardly be consistent with, or further the purpose of, the CFAA, which, after all, is intended to protect computer system's like [the employer's] from unauthorized access and concomitant damage." *Id.* at *5. Applying vicarious liability in that case thus would have resulted in imposing liability on an employer that was harmed by its employee's unlawful conduct. *See also, e.g., Schwarz v. National Van Lines, Inc.*, No. 03 C 7096, 2004 WL 1497804, *3 (N.D. Ill. July 20, 2004) (noting that a corporation may be held vicariously liable under RICO, but refusing to allow plaintiff to proceed on a theory of vicarious liability "[b]ecause the purpose of RICO is to reach those who profit from a pattern of racketeering, [hence] vicarious liability only applies to civil RICO in limited circumstances in order to avoid holding innocent corporations liable for the wrongdoing of their employees.").

Here, in contrast, Schwab alleges that Defendants affirmatively urged Carter to access Schwab's computer system beyond his authorization for their benefit. Looking to the language of the CFAA, "the CFAA's unequivocal purpose is to deter and punish those who intentionally access computer files and systems without authority and cause harm." *See Doe*, 2001 WL 873063 at *5. Thus, if the allegations in the Complaint are true, imposing vicarious liability would further the CFAA's purpose. *See Pacific Aerospace & Electronics, Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1195 (E.D. Wash. 2003), *cited in Schwab*, 2005 WL 351929 at *3 ("Caselaw

14

supports an employer's use of the CFAA's civil remedies to sue former employees and their new companies who seek a competitive edge through wrongful use of information from the former employer's computer system"); *see also Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1123 (W.D. Wash. 2000). To hold otherwise would exempt a principal from liability when its agent improperly accessed a computer at the direction of the principal. The allegations in Schwab's Complaint are sufficient to establish an actionable claim against Defendants.

### b. Section 1030(a)(2)(A)

Defendants next argue that Schwab cannot sustain a claim under CFAA Section 1030(a)(2)(A). The rub of Defendants' argument is that Schwab failed to "expressly allege" that Carter accessed a "financial record" from a "financial institution" as those terms are defined in the statute. The Court rejects this argument.

As noted above, the CFAA permits an injured party to recover civil remedies against:

(a) Whoever . . . (2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains (A) information contained in a financial record of a financial institution . . .

18 U.S.C. § 1030(a). The CFAA further defines the terms "financial record" and "financial institution" as follows:

(4) the term "financial institution" means [among other things] . . . (F) a broker-dealer registered with the Securities and Exchange Commission pursuant to section 15 of the Securities Exchange Act of 1934 . . .

(5) the term "financial record" means information derived from any record held by a financial institution pertaining to a customer's relationship with the financial institution.

18 U.S.C. § 1030. Schwab concedes that it has not alleged specifically that it is a "financial institution" as defined by the statute, but argues that its allegation that it is a "full service

investment and securities firm" should suffice for purposes of a motion to dismiss. The Court agrees.[11]

The Court further agrees that Schwab has adequately alleged that Defendants improperly accessed Schwab's "financial records." The Complaint alleges that Carter (at Defendants' urging) downloaded approximately 15,000 files from Schwab's computer systems. (R. 69-1; Pl.'s Third Am. Compl. at ¶¶8, 83.) Based upon all of the allegations in the Complaint and the nature of Schwab's business (*id.* at ¶¶1, 2, 17), it is reasonable to infer that some of these files "pertain[] to a customer's relationship with [Schwab]" so as to satisfy the statutory definition of "financial records." Such an inference comports with the allegations of the Complaint. *Bartholet*, 953 F.2d at 1078. At the motion to dismiss stage, that is all that is required.

### c. Section 1030(a)(2)(C)

Defendants (including Carter) finally contend that Schwab cannot maintain a claim under CFAA Section 1030(a)(2)(C). As previously noted, that section permits an injured party to recover civil remedies against:

> (a) Whoever . . . (2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . (C) information from any protected computer

---

[11]     Schwab contends alternatively that it does in fact meet the definition of "financial institution" because it is a "broker-dealer registered with the Securities and Exchange Commission pursuant to section 15 of the Securities Exchange Act of 1934." 18 U.S.C. § 1030(e)(4)(F). Although it need not do so to resolve the Motion to Dismiss, the Court could take judicial notice that Schwab indeed is a registered broker-dealer. *See* NASD BrokerCheck (available at http://pdpi6.nasdr.com/pdpi/master_report_frame.asp?Subject=5393&Subject_Name=CHARLES+SCHWAB+%26+CO.%2C+INC.&SubjectType=F) (indicating that Charles Schwab & Co. Inc. has been registered with the SEC as a broker-dealer since 1971); *see also Palay v. United States*, 349 F.3d 418, 425 (7th Cir. 2003) ("in resolving a motion to dismiss, the district court is entitled to take judicial notice of matters in the public record (citing *Anderson v. Simon*, 217 F.3d 472, 474-75 (7th Cir. 2000) and *G.E. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080-81 (7th Cir. 1997)).

if the conduct involved an interstate or foreign communication . . .

18 U.S.C. § 1030(a). Defendants maintain that, under the plain meaning of the statute, the "conduct" under subsection (C) necessarily refers to the act of "accessing a computer" under subsection (2). To fall within the scope of the CFAA, Defendants argue, the "access" of a computer must involve an interstate or foreign communication. According to Defendants, the Court must dismiss the Complaint because it alleges only that, when Carter "accessed" Schwab's computer, he did so by using only a laptop and a DVD burner (allegedly, a purely intrastate event).

Although the Court agrees with Defendants' construction of the statute, dismissal is not warranted. The Complaint alleges that Schwab (a company headquartered in San Francisco, but with corporate offices outside of California) maintains an interstate computer network as part of its nationwide business operations. (R. 69-1; Pl.'s Third Am. Compl. at ¶¶1, 2, 4, 17, 82, 84.) The Complaint further alleges that Carter (from his office in Illinois) exceeded his authorization and downloaded substantial volumes of files from Schwab's computers. (*Id.* at ¶¶8, 39, 83.) Based on these allegations, it is reasonable to infer that when Carter accessed Schwab's computer network his conduct involved an interstate communication. As a result, Defendants' argument does not warrant dismissal at this stage.

## II.     The Summary Judgment Motion

As Defendants themselves put it, the Summary Judgment Motion raises but one issue: did Schwab specifically identify its alleged trade secrets with the particularity required under the law? For the reasons discussed below, the Court concludes that Schwab has done so and, accordingly, denies the Summary Judgment Motion.

## A. Legal Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). In determining whether a genuine issue of material fact exists, the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *Id.* at 255, 106 S. Ct. at 2513. The party seeking summary judgment must establish that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986). To prevail, the responding party must then come forward with facts "sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial." *Id.* at 322, 106 S. Ct. at 2552. The existence of a factual dispute is not sufficient to defeat a summary judgment motion, instead the non-moving party must present definite, competent evidence to rebut the summary judgment motion. *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). With these standards in mind, the Court turns to the merits of Defendants' Summary Judgment Motion.

## B. Facts

The following facts find support in the record and are relevant to Defendants' Summary Judgment Motion. In October 2004, after learning that Schwab was closing its IA division,

Acorn offered to buy IA, including IA's intellectual property. (R. 115-1; Pl.'s SAMF at ¶23.) According to Acorn's proposed agreement, the term "intellectual property" "mean[t] all forms of intellectual property, including . . . confidential and proprietary information, including trade secrets and know-how . . ." (*Id.* at ¶24.) In addition, Acorn's proposal counted among Schwab's "intellectual property" "[a]ll IA stock selection model formulas" and specifically listed IA Models by name. (*Id.*)

In March 2005, as part of discovery in this case,[12] the Original Defendants' submitted an interrogatory asking Schwab to:

> Describe in detail all information that Schwab deems to be confidential, proprietary and/or a trade secret . . . including but not limited to its data sources or derivation, economic value, the extent to which this information was confidential or publicly available, and the extent to which Schwab protected the confidentiality of the information.

(R. 99-1; Defs.' SMF at ¶9 (quoting Interrogatory No. 4 from the Original Defendants' First Set of Interrogatories).) Schwab responded by "stat[ing] that the confidential, proprietary and/or trade secret information that is the subject of this case is the confidential information taken from Schwab by Defendants, including the model formulations maintained by [the] IA [division] . . ." (*Id.* at ¶10.) The Original Defendants' second set of interrogatories included an essentially identical interrogatory, to which Schwab offered an identical response. (*Id.* at ¶¶12-13.)

On March 23, 2005, the Original Defendants deposed Schwab's 30(b)(6) designee (Gregory Forsythe) on 18 subjects including:

---

[12]    Fact discovery in this case will close on October 14, 2005 and expert discovery will close on February 6, 2006. (R. 96-1; Order of Aug. 2, 2005.) Schwab did not file its Third Amended Complaint (naming the New Defendants) until June 8, 2005. (R. 69-1; Pl.'s Third Am. Compl.)

> The Information that Schwab deems to be confidential, proprietary and/or a trade secret, and that is the subject of Schwab's Complaint and/or Preliminary Injunction Motion, including without limitation its data sources or derivation, economic value, the extent to which this information was confidential or publicly available, and the extent to which Schwab protected the confidentiality of the information.

(R. 115-1; Pl.'s SAMF at ¶40.) During his deposition, Mr. Forsythe testified that "[w]hat is proprietary is the underlying factor formulas, the precise data inputs, how they were computed, how data was combined, how those factors were weighted, that is what is proprietary." (*Id.* at ¶42.) Mr. Forsythe further testified that "[t]he proprietary layer [of the IA Models] is the factor layer, the specific data inputs, formulations, data manipulations and weights . . . That is the secret sauce." (*Id.* at ¶41.) The Original Defendants did not ask Mr. Forsythe to further clarify his testimony. (*Id.*)

On April 22, 2005, the Original Defendants filed a motion to compel. (*Id.* at ¶39.) That motion complained that Schwab (among other things not relevant here) had not fully or promptly complied with the Original Defendants' request for production of documents, and that Mr. Forsythe's 30(b)(6) testimony was deficient in certain regards, but not as to his testimony regarding the trade secrets at issue in this case. The Original Defendants' motion mentions Schwab's response to Second Interrogatory No. 3, but only in passing as part of a string cite. (*Id.*, Ex. 20 at 13.) The Original Defendants' motion did not expressly raise any concern regarding the specificity with which Schwab had identified the trade secrets at issue. (*Id.*, Ex. 20.)

On May 4, 2005, Schwab amended its response to add specific references to documents produced in discovery:

> Schwab states that the confidential, proprietary and/or trade secret information that is the subject of this case is the confidential information taken from Schwab by Defendants,

including the model formulations maintained by IA . . . Copies of this information have been produced in this litigation, subject to protective order, including on the copies of hard drives that Schwab made of the computers used by Carter (Bates stamp CS 000199) (including, but not limited to, on files named "CIA Model Diagrams.xls"), on discs retained by Carter (BC0000362, BC0000381, BC0000389, BC0000390, BC0000423), and emails that Carter sent to Sabot immediately after being hired by Acorn/Delphi (BC0000794-815, BC0000784-91, BC0000782-83, BC0000792-93).

(R. 99-1; Defs.' SMF at ¶11.) In response to the essentially identical interrogatory posed in the Original Defendants' second set of interrogatories, Schwab added to the above list of documents copies of files on Carter's hard drive including those named, "TRIAL_1.SPS," "MODEL.SPS," and "VA_IBES_DATA_CALCULATION.TXT." (*Id.* at ¶¶13-14.)

### C.    The Illinois Trade Secret Act

To sustain a claim for trade secret misappropriation under the ITSA, a plaintiff must demonstrate that it had: (1) a trade secret, (2) that the defendant misappropriated, and (3) used for business purposes. *See Do It Best*, 2004 WL 1660814 at *10; *PRG-Schultz*, 2003 WL 22232771 at *5 (N.D. Ill. Sep. 22, 2003). Under the ITSA, a "trade secret" is defined as:

information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d). "Thus to show that particular information is a trade secret, [a plaintiff] must demonstrate that it is valuable, not known to others who might profit by its use, and has been handled by means reasonably designed to maintain secrecy." *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002); *see also Lynchval Sys. Inc. v. Chicago Consulting*

*Actuaries, Inc.*, No. 95 C 1490, 1998 WL 151814, *5 (N.D. Ill. Mar. 27, 1998) ("[t]he essential element of a trade secrets action is establishing the existence of the confidential information or trade secrets in dispute").

"It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets." *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) (*per curiam*). "Hence, [a plaintiff] cannot state a claim for trade secret protection . . . by simply 'producing long lists of general areas of information which contain unidentified trade secrets.'" *Nilssen v. Motorola, Inc.*, 963 F. Supp. 664, 672 (N.D. Ill. 1997) (quoting *AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1203 (7th Cir. 1987)). That is to say, a plaintiff pursuing a trade secret claim "must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition." *IDX*, 285 F.3d at 584 (citing *Composite Marine*, 962 F.2d at 1266); *see also Nilssen*, 963 F. Supp. at 672 (to sustain a trade secrets claim a party must do more that "simply persist in the blunderbuss statement that 'Everything you got from us was a trade secret . . . [That view is] wrong as a matter of law'" (quoting *qad. inc. v. ALN Associates, Inc.*, No. 88 C 2246, 1990 WL 93362, *3 (N.D. Ill. June 20, 1990)).

Defendants argue that, in line with the above authorities, Schwab has failed to identify its trade secrets with requisite specificity despite "pointed" interrogatories requesting that specific information. In support of their argument, Defendants latch on to Schwab's interrogatory responses wherein Schwab stated that its "confidential, proprietary and/or trade secret information that is the subject of this case *is the confidential information taken from Schwab by*

*Defendants*, including the model formulations maintained by IA [and others items that Schwab identified by Bates number] . . ." (R. 115-1; Pl.'s SAMF at ¶11.) Defendants read Schwab's response to say that Schwab is pursuing its trade secret claim as to any or all of the 15,000 computer files Carter downloaded. Schwab aptly notes, however, that Defendants' interrogatories were not as "pointed" as Defendants make them seem. Indeed, Defendants' interrogatories do not ask Schwab to isolate the information that is trade secret, but rather ask Schwab to lump trade secrets in with other proprietary and confidential information. (R. 99-1; Defs.' SMF at ¶9 ("Describe in detail all information that Schwab deems to be confidential, proprietary *and/or* a trade secret . . .).) It is entirely possible that, when Carter downloaded IA's computer files, all of the documents he copied were confidential or proprietary, if not trade secret, thus rendering Schwab's response in some sense accurate.

Furthermore, Defendants could raise any shortcoming in Schwab's interrogatory responses (and any attendant confusion regarding what trade secrets are at issue in this case)[13] in a motion to compel,[14] especially since discovery in this case has yet to close. Indeed, the Original Defendants already have moved to compel regarding a number of Schwab's supposedly deficient discovery responses, but have not asked Schwab to clarify what constituted the trade secret information in this case. Instead, the New Defendants have raised what is essentially a

_____

[13] In addition, Defendants' claim that they cannot determine what exactly constitutes Schwab's trade secrets rings somewhat hollow considering that Acorn at one point offered a written proposal to acquire IA and its "confidential" and "proprietary" information (including trade secrets) and specifically identified certain Models by name. Further, although requesting that Schwab produce a 30(b)(6) witness to testify as to the trade secrets at issue in the case, it appears that the Defendants asked only one question on that subject.

[14] Defendants must comply with Local Rule 37.2 before filing any such motion.

complaint about Schwab's responses to discovery – notably not the New Defendants' discovery,[15] but that of the Original Defendants – in a motion for summary judgment. At this juncture, rendering summary judgment would be premature.

In any event, Defendants' cited authorities do not carry the day. Defendants, in large part, rest their motion on *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581 (7th Cir. 2002). In that case, the plaintiff alleged that an entire software program constituted a trade secret notwithstanding the fact that the defendant had purchased the software to use in its business:

> According to IDX, "a 43-page description of the methods and processes underlying and the inter-relationships among various features making up IDX's software package" is specific enough. No, it isn't. These 43 pages describe the software . . . it does not separate the trade secrets from the other information that goes into any software package. Which aspects are known to the trade, and which are not? That's vital under the statutory definition. Likewise, IDX's tender of the complete documentation for the software leaves mysterious exactly which pieces of information are the trade secrets. . . [A] plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition. What is more, many of the items that appear in the 43-page description, such as the appearance of data-entry screens, are exceedingly hard to call trade secrets: things that any user or passer-by sees at a glance are "readily ascertainable by proper means". . . *Minnesota Mining & Manufacturing Co. v. Pribyl*, 259 F.3d 587 (7th Cir. 2001), on which IDX principally relies, did not involve such self-revealing information. Other details, such as the algorithms that the software uses to do real-time error checking (a vaunted feature of IDX's software), may be genuine trade secrets, but IDX has not tried to separate them from elements such as its input and output formats.

*IDX*, 285 F.3d at 583-84 (internal citation omitted); *see also AMP*, 823 F.2d at 1203 (cited by Defendants and refusing to overturn judgment on the merits because plaintiff "consistently failed throughout [the] litigation to identify any particularized trade secrets actually at risk," but rather contended only that it held trade secrets in "a host of confidential information to which [its

---

[15] The Court ordered written discovery as to New Defendants be issued by August 24, 2005. (R. 96-1; Order of Aug. 2, 2005.)

former employee] had access during the course of his employment at AMP" including "business and strategic planning information," "manufacturing information," "financial information," and "marketing and customer information"); *Lynchval Sys*, 1998 WL 151814 at *6 (granting summary judgment where plaintiff was unable to identify any "'computer printouts, formulae, memoranda, or any other tangible technical data,' identifying its trade secrets. . .").

*IDX*, however, dealt with facts distinguishable from the facts here. The plaintiff in *IDX* sought trade secret protection for "self-revealing information," such as the software's data-entry screens. As a result, IDX was seeking trade secret protection for something (publicly disclosed, non-confidential data entry screens) that the trade secret statute at issue[16] clearly did not allow. Here, in contrast, there is at least a genuine issue of material fact as to whether the information Carter took was ever disclosed to the public. (*See* R. 115-1; Pl.'s SAMF at ¶20.) Moreover, although Schwab's interrogatory responses may have been open-ended (perhaps in part due to the way in which Defendants framed the question), Schwab responded to Defendants' Summary Judgment Motion by identifying its "trade secrets" by Bates number and computer file type. By doing so, Schwab would survive summary judgment. *See Do It Best Corp. v. Passport Software, Inc.*, No. 01 C 7674, 2005 WL 743083, *13 (N.D. Ill. Mar. 31, 2005) (plaintiff came "dangerously close" to being too general to sustain trade secret claim where plaintiff instructed that "to determine [its] trade secret, [defendant] need merely look at the lines of code which [plaintiff] identified and examine the design, structure, and programming techniques and the integration into the code which DIB is using," but denying summary judgment because the

---

[16]     The *IDX* court was construing the Wisconsin Trade Secret Act, which is essentially identical to the ITSA.

plaintiff "did identify specific lines of code and specific software features for which it claims protection").

## CONCLUSION

For the above stated reasons, the Court denies Defendants' motion to dismiss, motion for judgment on the pleadings, and motion for summary judgment.


Dated: September 27, 2005                                ENTERED


                                                        _____
                                                        AMY J. ST. EVE
                                                        United States District Judge